UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CESAR FERNANDEZ-RODRIGUEZ, ROBER GALVEZ-CHIMBO, SHARON HATCHER, JONATHAN MEDINA, and JAMES WOODSON, individually and on behalf of all others similarly situated,

                        Petitioners,

                -v.-

MARTI LICON-VITALE, in her official capacity as Warden of the Metropolitan Correctional Center,

                    Respondent.

No. 20 Civ. 3315

**CLASS ACTION PETITION SEEKING WRITS OF HABEAS CORPUS**

---

Petitioners Cesar Fernandez-Rodriguez, Rober Galvez-Chimbo, Sharon Hatcher, Jonathan Medina, and James Woodson (collectively, "Petitioners"), on behalf of themselves and a class of similarly situated detained people in the custody of the Metropolitan Correctional Center ("MCC"), by and through their attorneys, Covington & Burling LLP, allege, based on personal knowledge as to themselves and their own circumstances and on information and belief as to all other matters, as follows:

## PRELIMINARY STATEMENT

1.      An unprecedented public health crisis is unfolding at the MCC, a result of the jail's delayed and patently inadequate response to the COVID-19 pandemic.  Thirty-three staff members have already tested positive for the virus.  The pandemic is spreading through the inmate population as well, in an overcrowded jail serving an inmate population nearly 50 percent greater than the number of inmates the MCC was designed to serve.

2.      The MCC has responded to the spread of COVID-19 within its walls with a mixture of ineptitude and indifference that threatens the safety of inmates, staff, and the community at large.  The MCC has failed to test all but a tiny fraction of the inmate population, including many symptomatic inmates who are almost certainly suffering from the virus.  Only *seven* tests have been conducted to date, representing one percent of the inmate population.  Five of these seven tests—71 percent—have come back positive—strong evidence that the virus is spreading unmonitored and undetected throughout the jail.  The MCC has failed to trace and quarantine those who have had contact with infected inmates and staff, despite written guidance from the federal Bureau of Prisons' ("BOP") sister federal agency, the Centers for Disease Control and Prevention ("CDC"), that such measures are essential.

3.      The MCC's treatment of those suspected of having COVID-19 is as ill-conceived as it is inhumane.  In multiple instances, the MCC has simply left symptomatic inmates in open dormitories in which more than two dozen men bunk closely together, sharing a single toilet and one or two sinks.  Unsurprisingly, the virus has spread rapidly through at least one of the units that contain these open dormitories.  Other inmates with COVID-19 symptoms have been confined to cells with concrete "beds" that were used to hold 9/11 terrorist defendants.  Inmates suspected of infection have received, at best, only cursory medical attention.

4.      Nor has the MCC taken obvious, common-sense health and hygiene measures crucial to reducing the spread of the virus.  Soap has often been lacking, or has been obtainable only through purchase at the commissary.  Toilets, showers, phones, and computer keyboards have not been sanitized between uses.  Inmates have received only paper or thin cloth masks, when they receive them at all, and have been told to reuse them for a week or more.  Inmates have had no

access to hand sanitizer or gloves.  MCC staff members have circulated from unit to unit, often without masks or gloves.

5.     The MCC also has failed to reduce the extreme overcrowding of its facility—operating at nearly 50 percent more than capacity—despite ample tools to do so.  In fact, despite a directive from U.S. Attorney General William Barr to prioritize the release to home confinement of inmates who are vulnerable to COVID-19, Petitioners are unaware of a single MCC inmate released under this authority.

6.     The MCC's many failings have jeopardized the health and safety of the entire population under its care, including 205 inmates—over a quarter of its total population—whom the MCC has determined are especially vulnerable to COVID-19 based on CDC criteria.  This confined population is at a particularly high risk of contracting a disease which, even in the country's general population, has required the hospitalization of hundreds of thousands of people and resulted in the deaths of over 55,000 people in just a few weeks.

7.     Judicial intervention is required to compel the MCC to improve conditions of incarceration and take other steps to comply with the requirements of the U.S. Constitution and lessen the risk of serious illness or the death of individuals in its care.  Inmates nearing the end of their sentences, and other inmates for whom release is reasonable under the extraordinary circumstances of the COVID-19 pandemic, should be released promptly to home confinement. Others should be transferred to alternate facilities where adequate preventive and treatment measures can be provided.  Immediate improvements to the MCC's testing, tracing, treatment, sanitation, isolation, and other health-related conditions of confinement must be put into effect for all who remain.

## THE PARTIES

8.      Each of the five named petitioners is in the custody of the BOP at the MCC and has been designated by the MCC as particularly vulnerable to COVID-19 based on CDC criteria.

9.      Petitioner Cesar Fernandez-Rodriguez is a 37-year-old man currently in pre-trial custody.  Mr. Fernandez-Rodriguez suffers from chronic asthma, and both he and the individual with whom he shares a cell have been suffering from COVID-19 symptoms.  Mr. Fernandez-Rodriguez has not received medical care, his asthma medication, or hygiene products (including soap and tissues).

10.      Petitioner Rober Galvez-Chimbo is a 45-year-old man who has pleaded guilty and is awaiting sentencing.  Mr. Galvez-Chimbo has experienced COVID-19 symptoms, including fever, no sense of smell or taste, severe coughing, and chills, but has not received a COVID-19 test and has received only minimal medical treatment.

11.      Petitioner Sharon Hatcher is a 53-year-old woman who is HIV positive and clinically obese, and suffers from Chronic Obstructive Pulmonary Disease and hypertension.  Ms. Hatcher has been sentenced and is currently awaiting designation to a different BOP facility.

12.      Petitioner Jonathan Medina is a 32-year-old man who has been sentenced and is scheduled for release on June 29, 2020.  Mr. Medina suffers from asthma and is currently being held in an open dormitory with about 25 other inmates, with whom he shares one toilet, one sink, and a shower.  Mr. Medina has experienced COVID-19 symptoms, including chills and difficulty breathing, but has not been given his inhaler or tested for COVID-19.

13.      Petitioner James Woodson is a 56-year-old man who has been sentenced and is scheduled for release in December 2020.  Mr. Woodson is HIV positive and suffers from asthma, chronic lung disease, hypertension, hepatitis-B, depression, and anxiety.  Mr. Woodson is currently

housed in an open dormitory with about 25 other inmates, several of whom have displayed symptoms of COVID-19.

14.     Respondent Marti Licon-Vitale is the Warden at the MCC and is being sued in her official capacity.  As Warden, Respondent Licon-Vitale oversees all day-to-day activity at the MCC and is responsible for ensuring the health and safety of all in the institution, including providing adequate medical care to them.  Respondent Licon-Vitale has failed to adopt and enforce policies, procedures, and practices that adequately protect the Petitioners and other inmates under her care from actual or potential infection, illness, and death due to COVID-19.

## JURISDICTION AND VENUE

15.     Petitioners bring this action pursuant to 28 U.S.C. § 2241.

16.     The Court has subject matter jurisdiction over this action pursuant to Article I, § 9, cl. 2 of the U.S. Constitution (Suspension Clause), the Fifth and the Eighth Amendments to the U.S. Constitution, 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 2241 (habeas corpus), and 28 U.S.C. § 1651 (All Writs Act).  In addition, the Court has authority to grant injunctive relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201.

17.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to these claims occurred in this district.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

18.     Petitioners are excused from Section 2241's prudential exhaustion requirements. While a petitioner is generally required to exhaust all administrative remedies before bringing a habeas petition, the exhaustion requirement does not apply where the petitioner is likely to suffer an irreparable injury without immediate judicial relief or where the administrative remedy would be futile.  Here, both exceptions are met.  The BOP's Administrative Remedy Program is a lengthy

process that would not provide the immediate relief necessary to avoid irreparable injury and does not provide for all measures of relief sought by Petitioners on behalf of themselves and other proposed Class members.

## STATEMENT OF FACTS

### I.    The COVID-19 Crisis

19.    The novel coronavirus that causes COVID-19 has led to an ongoing global pandemic.  As of April 26, 2020, there have been more than 2.9 million reported COVID-19 cases throughout the world and more than 55,000 deaths in the United States.

20.    New York City is currently at the epicenter of the COVID-19 pandemic.  As of April 26, 2020, there have been more than 158,000 positive cases and more than 12,000 reported deaths from COVID-19 in New York City alone.  There is no known vaccine or cure.

21.    Even when not fatal, the COVID-19 virus can cause severe damage to lung tissue, sometimes leading to a permanent loss of respiratory capacity, and can damage tissues in other vital organs, including the heart, liver, and kidneys.[1]

22.    Certain categories of people are more likely to face illness or death as a result of COVID-19.  This includes people over the age of 60 and people of any age who suffer from certain underlying medical conditions, including asthma, obesity, diabetes, lung disease, heart disease, chronic liver or kidney disease, and compromised immune systems (such as from cancer, HIV, or autoimmune disease).[2]  Treatment in these cases may require advanced medical support, including

---

[1] Matt Stieb, *There's More Bad News on the Long-Term Effects of the Coronavirus*, N.Y. Mag. (Apr. 16, 2020), https://nymag.com/intelligencer/2020/04/more-bad-news-on-the-long-term-effects-of-the-coronavirus.html.

[2] *Groups at Higher Risk for Severe Illness*, CDC (April 17, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html .

highly specialized equipment that is in limited supply, as well as care providers, respiratory therapists, and intensive care physicians.

23.     Even for individuals who are not medically vulnerable, COVID-19 presents a serious risk to their health and lives and can require advanced medical support that the MCC does not provide.  For example, 22 percent of individuals requiring admission to a hospital intensive care unit do not have any underlying health conditions.[3]

24.     COVID-19 spreads from person to person through respiratory droplets, close personal contact, and from contact with contaminated surfaces and objects.  Social distancing, wearing a face mask, and vigilant hygiene, including frequent hand washing and sanitizing surfaces, are the only known effective measures for protection from COVID-19.  Widespread testing, contact tracing, and quarantining can reduce the spread of the virus.

## II.     COVID-19 Spreads Rapidly In Detention Facilities

25.     Individuals who are confined in prisons, jails, and other detention centers are generally unable to engage in the social distancing required to mitigate the risk of transmission. Correctional facilities house large groups of people in close proximity, and move them in groups to eat, engage in recreation, receive medication, and shower.  Inmates share toilets, sinks, showers, telephones, and computer terminals, almost always without the ability to disinfect between each use.

26.     Epidemiological research shows that conditions of mass incarceration increase contagion rates of infectious disease, such as COVID-19, not only among inmates but also among

---

[3] *Preliminary Estimates of the Prevalence of Selected Underlying Health Conditions Among Patients with Coronavirus Disease 2019 — United States, February 12-March 28, 2020*, CDC (Apr. 3, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6913e2.htm.

correctional staff and the community at large.[4]  Transmission in prisons and jails endangers the broader community because correctional facilities are not closed systems—as staff enter and leave the facility each day, they can carry the virus with them and risk spreading the disease to everyone they encounter on the outside.  Like the inmates in the facilities where they work, correctional officers face an increased risk of COVID-19 exposure because they are less able to engage in social distancing and because of the shortage of personal protective equipment.  Indeed, as of April 25, 2020, the BOP has reported 441 staff who have tested positive for COVID-19.

27.     Incarcerated people in New York City are testing positive for COVID-19 in increasingly large numbers.  For example, as of April 25, 2020, of the nearly 4,000 people incarcerated by the New York City Department of Correction ("NYDOC"), 377 have confirmed cases of COVID-19.  In addition, 956 NYDOC staff members also have confirmed cases of COVID-19.[5]

28.     COVID-19 is also spreading rapidly in detention facilities across the United States. For example, almost 80 percent of the prison population at the Marion Correctional Institution in Ohio had tested positive as of April 21, 2020 (approximately 1,950 out of 2,500 inmates), making the facility the largest reported source of infections in the United States.[6]

---

[4] Sandhya Kajeepeta & Seth J. Prins, *Why Coronavirus in Jails Should Concern All of Us*, THE APPEAL (Mar. 24, 2020), https://theappeal.org/coronavirus-jails-public-health/.

[5] *Board of Correction Daily Covid-19 Update*, N.Y. Dep't. of Corr. (Apr. 25, 2020), https://www1.nyc.gov/assets/boc/downloads/pdf/News/covid-19/Public_Reports/Board%20of%20Correction%20Daily%20Public%20Report_4_25_2020.pdf.

[6] Rachel Polansky, et. al., *Marion Prison is One of the Nation's Largest Sources of COVID-19 Infections*, WKYC (Apr. 21, 2020), https://www.wkyc.com/article/news/investigations/new-york-times-ohios-marion-correctional-institution-is-nations-largest-source-of-covid-19-infections/95-33650055-04f2-424d-82ae-9b91b2244236.

III.   **Correctional Institutions Have Ample Tools To Protect Incarcerated Persons From Outbreaks Of COVID-19 Within Their Facilities**

29.     Incarcerated people must rely on detention facilities and the people who run them to minimize risks from this sometimes fatal virus.  Those who operate these facilities thus are entrusted with a special responsibility and legal obligation to provide for the health, safety, and well-being of the detainees in their charge.

30.     There is established guidance on how correctional institutions should address and mitigate the risks of COVID-19.  More than a month ago, the CDC issued "Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities." This Guidance emphasizes the need for (a) cleaning and disinfecting shared areas and equipment several times daily with soap and hot water; (b) provision of free hygiene products such as soap and tissues, as well as alcohol-based hand sanitizer, if possible; (c) social distancing; (d) constant use of personal protective equipment by staff and inmates; (e) creation of a plan to ensure COVID-19 evaluation and testing; (f) medical isolation of confirmed and suspected cases; (g) identifying and quarantining of persons in contact with those confirmed and suspected cases; and (h) special protection for at-risk individuals.[7]

31.     A World Health Organization report on COVID-19 prevention in prisons and other places of detention recommends that "physical distancing should be observed"; "wall-mounted liquid soap dispensers, paper towels and foot-operated pedal bins should be made available"; medical masks should be provided and not be reused; surfaces should be regularly disinfected; and

---

[7] *See Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities,* CDC, 2 (last updated Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-correctional-detention.pdf.

appropriate action should be taken for confirmed cases, "including transfer to specialist facilities for respiratory isolation."[8]

32.     Federal and state detention facilities have been making efforts to comply with this guidance.  For example, the Minnesota Department of Corrections established a pandemic response team and began implementing a number of recommended measures as of March 13, 2020, including identifying alternate housing locations for inmates who need to be isolated, identifying vulnerable inmates for prevention considerations, and providing extra handwashing and sanitizing stations for people entering and exiting facilities.  Similarly, the Michigan Department of Corrections has actively taken steps to quarantine inmates who test positive for COVID-19 in separate facilities, creating a setting where there is little to no contact between healthy and sick inmates.  When the Elkton Federal Prison in Ohio determined it lacked medical personnel to treat a severe outbreak within its facility, it partnered with the Ohio National Guard and the Army Corps of Engineers to send 26 medically trained national guard members, medical equipment, and ambulances to the facility.

33.     Correctional health experts have also recommended the release from custody of inmates most vulnerable to COVID-19.  Release protects the inmates with the greatest vulnerability to COVID-19 from transmission of the virus.  Reducing the inmate population also allows for greater risk mitigation for all people held or working in a prison, jail, or detention center.

34.     Both the U.S. Congress and the U.S. Department of Justice have recognized that release of vulnerable inmates and reduction of inmate populations is essential to protecting against

---

[8] *Preparedness, Prevention, and Control of COVID-19 in Prisons and Other Places of Detention*, WHO Regional Office for Europe 1, 9, 19-23 (Mar. 15, 2020), http://www.euro.who.int/__data/assets/pdf_file/0019/434026/Preparedness-prevention-and-control-of-COVID-19-in-prisons.pdf.

COVID-19. The Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") permits the Director of the BOP to increase the amount of time an inmate can serve a prison sentence through home confinement if the Attorney General finds that emergency conditions will materially affect the functioning of the BOP. In an April 3, 2020 memorandum, Attorney General Barr made that finding and directed the BOP to "immediately review" for home confinement "all inmates who have COVID-19 risk factors, as established by the CDC."[9] In a prior, March 26, 2020 memorandum, Attorney General Barr also directed the BOP to "prioritize the use of your various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing COVID-19 pandemic."[10]

35. The BOP itself has emphasized the need for testing to combat the COVID-19 virus. On April 23, 2020, the BOP announced the importance of expanded testing *beyond* symptomatic inmates to identify asymptomatic inmates in order to control the spread of COVID-19.[11]

36. Other state and federal correctional facilities have taken steps towards reducing inmate populations through release of vulnerable inmates and improving health and safety conditions for those incarcerated. For example, on March 17, 2020, the New York City Board of Correction issued a statement calling on the City to release certain people from criminal custody, prioritizing people over 50, with underlying health conditions, detained for administrative reasons,

---

[9] Memorandum For Director of Bureau of Prisons re Increasing Use of Home Confinement at Institutions Most Affected by COVID-19, Office of the Attorney General, Washington, D.C. (Apr. 3, 2020), https://www.justice.gov/file/1266661/download.

[10] Memorandum For Director of Bureau of Prisons re Prioritization of Home Confinement As Appropriate in Response to COVID-19 Pandemic, Office of the Attorney General, Washington, D.C. (Mar. 26, 2020), https://www.bop.gov/coronavirus/docs/bop_memo_home_confinement.pdf.

[11] Kevin Johnson, *Federal Prison System Expands Virus Testing to Find Hidden Asymptomatic Infections*, USA TODAY (Apr. 23, 2020), https://www.usatoday.com/story/news/politics/2020/04/23/coronavirus-federal-prisons-expand-testing-asymptomatic-inmates/3015287001/.

and/or with sentences of one year or less. In response, as of April 21, 2020, New York City has released over 1,500 inmates. Similarly, Cook County Jail in Chicago has released 1,300 inmates, reducing its inmate population by almost 25 percent. Additionally, according to the BOP, since Attorney General Barr's March 26, 2020 directive, approximately 1,500 inmates in the custody of the BOP have been placed in home confinement. The BOP has reportedly furloughed, released to home confinement, or transferred to other facilities *all* inmates in the minimum security facility at FCI Otisville, New York.

## IV.    The MCC Has Failed to Take Appropriate Measures to Protect Inmates from COVID-19

37.    The MCC is a detention facility in lower Manhattan where a significant portion of the inmate population, most of whom are awaiting trial, is at high risk of contracting COVID-19. Designed for a maximum population of 474, the MCC houses approximately 700 inmates, or nearly 50 percent more than its intended capacity. The MCC itself has designated 205 of these inmates, or 29 percent of the population, as particularly vulnerable to COVID-19 based on CDC criteria.

38.    The MCC has failed to adequately provide for the health and safety of its inmate population, even before the COVID-19 crisis.

39.    For example, on April 12, 2019, feces and urine flooded the women's unit at the MCC from pipes overhead, and toilets began to overflow into cells. Women were locked in with raw sewage up to their ankles and feces in their hair. Correctional officers present in the unit instructed the women to clean up the sewage themselves. No effort was made to remove the women from the unit during the clean-up, to provide sufficient safety equipment, or to identify women for whom the raw sewage might pose an increased health concern. Immediately before a scheduled inspection on May 23, 2019, women were made to clean the unit, with threats of

punishment if they refused.  Women were told to scrub the unit with bleach to remove mold, sweep

up rodent droppings and remove rat traps from sight, clean all the air vents, and remove all buckets

that had been placed under leaks from the ceiling and light fixtures.

40.     The MCC has also struggled to protect even its highest profile inmates.  On August

10, 2019, inmate Jeffrey Epstein, who had been removed from suicide watch just two weeks

before, was found dead in his cell.  In response, Attorney General Barr decried the MCC's "failure"

to adequately secure its facility, stating there were "serious irregularities at this facility that are

deeply concerning" and describing it as a "perfect storm of screw-ups."  The failure of the MCC

was so serious that two correctional officers assigned to the MCC's Special Housing Unit ("SHU")

were indicted for their role in the affair, with Geoffrey Berman, the U.S. Attorney for the Southern

District of New York, stating that the officers had failed in their "duty to ensure the safety and

security of federal inmates in their care."

41.     Additionally, from February 27 to March 6, 2020, the MCC was on total lockdown,

with no social or legal visitors permitted and all inmates locked in their cells, as staff searched for

a loaded weapon that a correctional officer allegedly brought into the MCC.  During this time, as

the spread of COVID-19 was making global headlines, staff were throwing away or withholding

personal items, including prescription medications; inmates with acute medical conditions were

being given little or no care; menstruating women were not being provided a change of underwear

or any sanitary pads; and inmates were going without toilet paper for over a week while locked in

two-person cells with open toilets.  Inmates remained locked in their cells until at least March 10,

2020, when the facility fully re-opened.

42.     These underlying and systemic institutional failings have been on full display

during the spread of COVID-19 within the MCC.  As described in detail below, the MCC has

failed to reduce the inmate population even when directed by the head of the Department of Justice to do so, and has failed to implement adequate health care measures to protect individuals at the facility from COVID-19.

### A. Failure to Reduce Overcrowding Through Release or Transfer of Vulnerable Inmates

43.     The MCC has failed to act on existing statutory authority and the express direction of Attorney General Barr to release inmates who are particularly vulnerable to COVID-19.  The MCC is required, pursuant to Attorney General Barr's directives of March 26 and April 3, 2020, to immediately review all inmates with COVID-19 risk factors and authorize the release of inmates at any stage of their sentence if they are particularly medically vulnerable, pose a low security risk, and have a safe residence to be released to.

44.     Despite these directives, Petitioners are unaware of a single MCC inmate released under this authority.  In fact, the MCC has not even released any of the 16 vulnerable individuals who have been identified by the Federal Defenders to the MCC as eligible for home confinement under pre-existing statutory authority because they are nearing the end of their sentences.

45.     Petitioners Medina and Woodson are prime examples of the MCC's failure to appropriately exercise its authority to release inmates.  Both men have only a few months remaining on their sentences (Mr. Medina is scheduled to be released in June, and Mr. Woodson in December), are incarcerated for non-violent offenses, and suffer from health conditions that make them vulnerable to COVID-19.  The MCC has neither acted to release Mr. Medina, Mr. Woodson, or the numerous other MCC inmates nearing the end of their sentences, to home confinement, nor evaluated them for release pursuant to the authority granted by the CARES Act and Attorney General Barr's directives.

46.     The MCC has likewise not acted promptly to transfer inmates serving longer sentences to less crowded facilities capable of providing adequate medical care.  For example, Petitioner Hatcher is in poor health and is suffering from multiple conditions that put her at high risk for COVID-19 complications, including a compromised immune system and chronic respiratory issues.  Although she was sentenced to 52 months imprisonment on March 4, 2020, the MCC has not acted to transfer her to a long-term correctional facility capable of meeting her medical needs.

**B.     Failure to Allow for Social Distancing**

47.     The MCC's failure to release or transfer inmates has resulted in continued overcrowding, with the facility containing approximately 50 percent more inmates than its maximum intended occupancy.

48.     At a time when social distancing is imperative for public health, approximately 150 inmates have been confined in large, dormitory style settings with about 26 people sharing a sleeping space where beds are spaced only 3 to 5 feet apart.  These inmates have shared toilets, sinks, and showers, without disinfection between each use.

49.     The remainder of inmates at the MCC, aside from a small number in solitary confinement in the SHU or in cells on the third floor, share small two-person cells originally designed for one person, with a shared open toilet and sink.  When they have been allowed out of their cells for brief periods to use the telephones, computers, and showers in groups of 10, they have necessarily been in close proximity to each other and to unit staff (who come and go from the facility each day).

50.     These conditions have made it effectively impossible for inmates to maintain a six-foot distance from others.

51.     Of the five inmates who have tested positive for COVID-19 at the MCC, three were housed in open dormitories and two were housed in shared cells while they were symptomatic.

**C.     Failure to Maintain Hygiene**

52.     The MCC has not provided inmates with the basic necessities required to follow recommended hygiene practices designed to minimize the risk of contracting COVID-19.

53.     Many inmates, including several Petitioners, have lacked regular access to soap and tissues, or have been charged for these medically necessary supplies through their commissary accounts.  This is despite CDC guidance that hygiene products, such as soap and tissues, should be provided to inmates free of charge.  Some inmates have been given paper or thin cloth masks and have been told to reuse them for extended periods. Hand sanitizer and gloves have not been available to inmates.

54.     Toilets, sinks, showers, phones, and computer terminals have been shared by many inmates, without disinfection between each use.

55.     Cadre inmates (inmates who work throughout the building) have continued to perform responsibilities, including cleaning the facility and preparing and serving food, even if they have had COVID-19 symptoms.

56.     For example, Petitioner Medina, who experienced COVID-19 symptoms, has performed cadre duties, including serving breakfast, cleaning his unit (where at least two inmates tested positive for COVID-19), and cleaning the kitchen.  He has not received a clean mask to perform these duties.

57.     Even as COVID-19 spread though the facility, inmates, rather than professional cleaners, have been responsible for cleaning MCC facilities and often have not been given appropriate supplies.  Inmate orderlies have continued to clean the open dormitories and common

areas, including infected quarantined units.  After cleaning these units, inmate orderlies have returned to their own housing units without first being provided a change of clothes or an opportunity to disinfect themselves.

58.     Staff, some of whom work with inmates in quarantine or medical isolation, have not been provided sufficient, adequate masks, such as N-95 masks.  Some staff members have not worn masks and gloves when in housing units.

**D.     Failure to Provide Adequate Screening, Testing, and Tracing**

59.     The MCC, a facility which houses approximately 700 inmates has tested only seven inmates to date for COVID-19, five of whom were positive.  This paltry number of tests has almost certainly resulted in a dangerous undercount, leaving the MCC with no reliable indication of the actual prevalence of COVID-19 within the facility.

60.     Data from other correctional facilities further suggests that the MCC's testing for COVID-19 is shockingly inadequate and that its reported data on inmates with COVID-19 is significantly understated.  For example, the NYDOC and the privately run Queens Detention Facility ("QDF") have tested far more inmates than the MCC, on both an absolute and percentage basis.  Unsurprisingly, this additional testing has revealed that a significant number of QDF and NYDOC inmates have, or have had, COVID-19—38 out of about 222 at QDF, and 377 out of approximately 4,000 at NYDOC.[12]  There is no reason to believe that these facilities, which generally house and are staffed by individuals from the same geographic community as the MCC, would have significantly different rates of COVID-19 infection than the MCC.

---

[12] Letter from QDF Facility Administrator William Zerillo to Chief Judge Roslynn R. Mauskopf (Apr. 23, 2020), https://www.nyed.uscourts.gov/pub/bop/QDF_20200423_043331.pdf; *Board of Correction Daily Covid-19 Update*, N.Y. Dep't. of Corr. (Apr. 25, 2020), https://www1.nyc.gov/assets/boc/downloads/pdf/News/covid-19/Public_Reports/Board%20of%20Correction%20Daily%20Public%20Report_4_25_2020.pdf.

61.     The MCC also has failed to conduct tests for its own staff members, who are instead required to obtain tests in the community.   This increases the risk that symptomatic, or asymptomatic but COVID-19 positive, staff members working in the MCC facility who have not been tested will spread the virus to inmates as they travel from unit to unit.   On the other hand, because staff members (unlike inmates) have been able to obtain tests of their own volition, staff members have been increasingly testing positive for COVID-19.   The MCC reported seven staff with positive test results on April 3, 2020, 17 staff positives on April 14, and 33 staff positives on April 23.   This further suggests that the prevalence of COVID-19 among the MCC's inmate population has been increasing in similar fashion and is far larger than what the MCC has reported.

62.     As of April 23, 2020, one month after the MCC's first inmate tested positive for COVID-19, the MCC did not have *any* COVID-19 test kits available, making widespread testing an impossibility.   Six out of the seven tests conducted to date have required transporting the inmate to a hospital.

63.     The MCC also has failed to adequately screen staff entering the facility on a daily basis.   While staff have been checked for elevated temperatures, they have not been asked if they have come into contact with a person who has tested positive for COVID-19 within the last 14 days.   Staff who are exposed to inmates or other staff who have tested positive for COVID-19 have been asked to return to work at the facility after only 48 hours.

64.     The MCC staff themselves recognized these dangers, joining an OSHA complaint alleging "imminent danger" to the staff based on, among other things, the requirement that staff report to work 48 hours following probable COVID-19 exposure and the failure to provide N-95 masks to the staff.

65.     The MCC has not conducted systematic contact tracing of staff members or inmates who have tested positive for COVID-19 to identify and isolate inmates with whom they have come into contact.

**E.     Failure to Isolate and Treat Those Suffering from COVID-19**

66.     The MCC has identified 205 inmates as particularly vulnerable to COVID-19 based on CDC criteria, but has not adequately provided for their medical needs.  The MCC reported on March 20, 2020 that it was keeping many of these at-risk inmates in open dormitory units, comprised of a number of dormitories where 26 inmates sleep in one room in densely packed bunk beds and share a single toilet and one or two sinks.  In certain cases, the MCC has also failed to provide vulnerable inmates with necessary prescription medications.

67.     The MCC's first COVID-19 positive inmate, whose test result was reported by the MCC on March 23, 2020, was being housed on 11 South, an open dormitory unit for individuals vulnerable to COVID-19.  Further, this inmate was a member of the cadre and therefore moved throughout the building, with exposure to many other inmates, prior to testing positive.

68.     Rather than adopting an isolation or social distancing protocol for the unit, the MCC placed the entire unit in "quarantine," thereby keeping inmates from leaving the unit but offering no protection from the spread of COVID-19 within the group or to the staff working on that unit. The MCC failed to sanitize the unit after the inmate tested positive, and instead gave the inmates cleaning supplies—but not masks—to clean the unit themselves.

69.     During this quarantine, many inmates in 11 South had COVID-19 symptoms, including coughing, fever, chills, achy bones, and loss of sense of taste and smell.  Medical treatment primarily consisted of temperature checks and Tylenol.  For the vast majority of these individuals, COVID-19 tests were not administered.

70.     Petitioner Woodson is an inmate in 11 South.  In March 2020, an inmate in his dormitory developed COVID-19 symptoms, including a high fever, vomiting, and sweating. Despite inmates alerting the staff, this individual was not removed until the next morning, and subsequently tested positive for COVID-19.  Two other individuals have since been removed from Mr. Woodson's dormitory and placed into medical isolation.  The unit has not been sanitized since these inmates became sick.

71.     Petitioner Medina, who is also an inmate in 11 South, has shared a dormitory with a number of people who developed COVID-19 symptoms.  Although multiple people in his dormitory had fevers, they were not removed because a corrections officer said that only inmates with temperatures above 104 degrees would be isolated.  Mr. Medina developed chills, achy bones, and difficulty breathing, but did not receive medicine, his inhaler, or a COVID-19 test.

72.     As inmates in 11 South and throughout the MCC have experienced symptoms associated with COVID-19, the MCC has implemented a flawed testing and isolation protocol. Staff have removed only those individuals who have an elevated temperature from their open dormitories and shared cells.  However, as health experts have noted, temperature checks are insufficient for identifying people who are suffering from COVID-19.  In one unit, rather than adopting appropriate testing, tracing, and isolation practices, correctional staff recently covered certain tiers of cells housing a number of symptomatic inmates with plastic.

73.     Petitioner Fernandez-Rodriguez, who is housed on the seventh floor, has shared his cell with another inmate and has not received a COVID-19 test despite having a fever and a cough.  Mr. Fernandez-Rodriguez has not received any medical care (aside from temperature checks) or his prescribed asthma medication.

74.     In some cases, the MCC's failure to provide proper medical care has also harmed the treatment of inmates' underlying health conditions.  For example, Petitioner Woodson's asthma has not been adequately treated by the rescue inhalers he has been provided by the MCC. Since suffering a serious asthma attack and enduring persistent breathing difficulties, Mr. Woodson has repeatedly reported his condition to the staff.  The staff's only response was that Mr. Woodson should place a sick call; however, despite numerous sick call requests, he has still not been seen by a doctor.  Instead, the staff has continued to give him inhalers that are insufficient to manage his condition.

75.     In addition to failing to adequately identify symptomatic inmates, the MCC has failed to provide adequate medical resources to care for them.  Inmates who do contract COVID-19 thus are at higher risk of serious illness or death than if they were in the community.

76.     Unlike many other federal prisons and Rikers Island, the MCC has no separate medical unit or facility for inmates.  Instead, individuals who develop high fevers, and those who are in such distress that they must be taken to the hospital, where they test positive for COVID-19, have been placed in solitary confinement and receive, at most, limited medical treatment.  Those inmates that are symptomatic but do not develop high fevers have been left in their units, with little or no medical care.

77.     The medically isolated inmates have been placed in solitary confinement in cells on the third floor or in the SHU, including in a tier of the MCC that housed the defendants charged with participating in the 9/11 terrorist attacks.  Each of the cells in this tier has a single concrete "bed," an open toilet, and a sink.

78.     Others, like Petitioner Galvez-Chimbo, have been placed in "isolation" with a cellmate.  Despite repeated requests for medical attention, it took two weeks for Mr. Galvez-

Chimbo to be seen by a doctor after he began experiencing symptoms of fever, loss of sense of smell and taste, severe coughing, loss of appetite, physical body aches, and nighttime chills.  His cellmate was also experiencing similar symptoms.  On or about April 8, 2020, Mr. Galvez-Chimbo and his cellmate were moved to medical isolation on the third floor, where they continued to share a cell.  Mr. Galvez-Chimbo received antibiotics (which are not a cure for this virus-based disease) and Tylenol, and was never tested for COVID-19.  Mr. Galvez-Chimbo and his cellmate have now been released back to the general population on 7 North.

79.     The MCC's grossly inadequate treatment of its inmate population exacerbates the spread of COVID-19 at the MCC both because it impedes recovery and because it makes symptomatic individuals reluctant to speak up.  By placing inmates in need of medical isolation in units normally designed for punishment, the MCC has disincentivized inmates from reporting symptoms, because such reporting could result in placement in solitary confinement with even less access to staff and limited ability to call their families or lawyers.

80.     The MCC has been unable to provide the level of medical care that people who contract COVID-19 often require.  Only two doctors have been available at the MCC to care for its approximately 700 inmates.  The MCC has not had ventilators and has not been able to intubate inmates at the facility.  Treatment provided by the MCC to symptomatic and COVID-19 positive individuals has generally been limited to twice-daily temperature readings and Tylenol.

**V.     The MCC's Continued Failure To Respond To The COVID-19 Pandemic Is Occurring Despite Ample Warning and Opportunity to Mitigate**

81.     As early as March 4, 2020, the Federal Defenders attempted to address, with Respondent and other MCC staff, the serious health risks posed by COVID-19 to individuals confined in the facility.  At that time, the MCC had not yet prepared any COVID-19 response plan.

22

82.     In the following days, the Federal Defenders continued to communicate to the MCC the importance of procedures to curb the spread of COVID-19, including implementing screening and testing protocols, ensuring thorough sanitization of the facility, providing all staff and inmates with 24-hour access to hot water and soap, and developing a plan for isolation and medical care for medically vulnerable inmates as well as any individuals displaying COVID-19 symptoms.

83.     On March 12, 2020, Respondent stated that the MCC did not anticipate having a COVID-19 testing protocol, that the facility was housing medically at-risk inmates together in open dormitory units, that it did not know how many at-risk inmates it had, and that it did not know where within the facility it would be able to isolate symptomatic or COVID-19 positive inmates.

84.     On March 20, 2020, the Second Circuit Court of Appeals acknowledged the "grave and enduring" risk posed by COVID-19 in the correctional context.  *Fed. Defs. of New York Inc. v. Fed. Bureau of Prisons*, No. 19-1778, _F.3d._, 2020 WL 1320886, at *12 (2d Cir. Mar. 20, 2020).  As of that same date, the MCC still had not determined how many at-risk inmates it had, had not procured tests for COVID-19, had only 30 N95 and 100 surgical masks for all staff and over 700 inmates, had no alcohol-based sanitizer, and had conducted doctors' visits to each unit only once a week.

85.     As of last week, the MCC had still not procured tests for COVID-19; had not consistently provided inmates with basic necessities, such as soap, gloves, and masks; had not undertaken contact tracing of staff and inmates who have tested positive, and had not addressed its serious shortage of medical staff and equipment necessary to prevent or address a more serious COVID-19 outbreak.

## HABEAS AND CLASS ACTION ALLEGATIONS

86.     Section 2241 authorizes courts to grant habeas corpus relief where, *inter alia*, a person "is in custody in violation of the Constitution … of the United States," 28 U.S.C. § 2241(c)(3), including due to the conditions of confinement.

87.     Actions under Section 2241 may include a "multi-party proceeding similar to the class action authorized by the Rules of Civil Procedure." *United States ex rel. Sero v. Preiser*, 506 F.2d 1115, 1125 (2d Cir. 1974).  Petitioners accordingly bring this action on behalf of a proposed class of all current and future detainees in custody at the MCC during the course of the COVID-19 pandemic (the "Class").  (Petitioners reserve the right to amend the Class definition or establish sub-classes if further investigation or information reveals the Class should be expanded or otherwise modified.)

88.     <u>Numerosity</u>:   The proposed Class includes approximately 700 people and is therefore so numerous that joinder of all proposed Class members is impracticable.  Further, absent class certification, the proposed Class members would face a series of unreasonable barriers in accessing the relief sought, as they have limited ability to obtain legal representation and pursue litigation, a large portion of the proposed Class has limited educational backgrounds, and a significant percentage of the proposed Class suffers from physical or mental impairments.

89.     <u>Commonality</u>:  Common questions of law and fact exist as to all proposed Class members and predominate over questions that affect only the individual members.  These common questions of fact and law include, but are not limited to: (1) whether Respondent's policies, procedures and practices prior to and during the COVID-19 crisis exposed members of the proposed Class to a substantial risk of serious harm; (2) whether the Respondent knew of and disregarded a substantial risk of serious harm to the safety and health of the proposed Class; (3)

whether the Respondent acted with deliberate indifference to members of the proposed Class with respect to their constitutional right to adequate medical care; (4) whether the conditions of confinement described in this Petition amount to violations of the Fifth and Eighth Amendments to the U.S. Constitution; and (5) what relief should be awarded to redress all such violations.

90.     <u>Typicality</u>:  Petitioners' claims are typical of those of the proposed Class as a whole, because each Petitioner is currently in Respondent's custody and Petitioners' claims arise from the same policies, procedures, conditions, and practices (or lack thereof) that provide the basis for all proposed Class members' claims.

91.     <u>Adequacy</u>:  Petitioners will fairly and adequately protect the interests of the proposed Class.  The interests of the proposed Class representatives are consistent with those of the proposed Class members.  In addition, counsel for Petitioners are experienced in class action and civil rights litigation.  Further, counsel for Petitioners know of no conflicts of interest among the proposed Class members, or between the attorneys and the proposed Class members, that would affect this litigation.

## CAUSES OF ACTION

## <u>FIRST CLAIM FOR RELIEF</u>
(FIFTH AMENDMENT DUE PROCESS)

92.     Petitioners incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

93.     The Fifth Amendment to the U.S. Constitution guarantees pretrial detainees the right to be free from conditions of confinement that pose an excessive risk to their health or safety.

94.     Respondent has subjected Petitioners and Class members to conditions of confinement that pose an excessive risk to their health and safety.

95.     Respondent has acted with deliberate indifference to the Fifth Amendment right of Petitioners and Class members to be free from conditions of confinement that pose an excessive risk to their health and safety, by recklessly failing to act with reasonable care to mitigate the risk of COVID-19 to Petitioners and Class members even though Respondent knew or should have known about the risks of COVID-19 to them.

96.     Respondent has subjected Petitioners and Class members to conditions of confinement that increase their risk of contracting COVID-19, for which there is no known vaccine or cure, even though Respondent knew or should have known that the conditions at the MCC exposed Petitioners and Class members to a substantial and unreasonable risk of illness and death.

97.     As a result of Respondent's unconstitutional actions and inaction, Petitioners and Class members are suffering, and will (unless remedied) continue to suffer, irreparable injury.

## SECOND CLAIM FOR RELIEF
### (EIGHTH AMENDMENT CRUEL AND UNUSUAL PUNISHMENT)

98.     The Eighth Amendment to the U.S. Constitution protects convicted persons from the infliction of cruel and unusual punishment.

99.     Society does not tolerate the risk of exposure to COVID-19 to which Respondent's policies, procedures, and practices (or lack thereof) have subjected Petitioners and the proposed Class members.  It violates contemporary standards of decency to expose them unwillingly to this risk.

100.    Respondent knows that Petitioners and Class members suffer a substantial and unreasonable risk of serious harm to their health and safety due to the presence of, and spread of, COVID-19 within the MCC.

101.   Respondent has acted with deliberate indifference towards Petitioners and Class members by knowingly subjecting them to conditions of confinement that increase their risk of contracting COVID-19, a disease for which there is no known vaccine or cure.

102.   Respondent's detention of Petitioners and Class members in the above-described conditions of confinement has failed to protect them adequately from the risks of contracting COVID-19.

103.   As a result of Respondent's unconstitutional actions and inaction, Petitioners and Class members are suffering, and will (unless remedied) continue to suffer, irreparable injury.

### PRAYER FOR RELIEF

**WHEREFORE,** Petitioners seek orders:

(i)      granting the Petition;

(ii)     certifying the Class;

(iii)    granting temporary, preliminary, and permanent injunction, directing Respondent to take all appropriate actions in order to ensure the health and safety of Petitioners and Class members with respect to COVID-19, including but not limited to:

a.  increased inmate health monitoring, expanded testing of inmates and staff, and implementation of contact tracing;

b.  medically appropriate quarantine, isolation, and treatment measures for those suffering from, who have tested positive for, who are experiencing one or more symptoms consistent with, who are presumptively positive for, or who have come into contact with an individual determined to have, COVID-19;

c.  improved cleaning of the facility, by professional cleaners on a regular basis, and distribution (free of charge) of basic hygiene necessities to all inmates;

d.  release from MCC confinement, with such conditions as may be appropriate, of Petitioners and Class members (i) who are eligible for

release pursuant to the BOP's statutory authority or directives issued by Attorney General Barr; or (ii) for whom release (either temporary or permanent) is otherwise reasonable under the extraordinary circumstances of the COVID-19 pandemic; and

e.  for those inmates who cannot be released under (d) above and who are vulnerable to COVID-19 based on CDC criteria, prompt transfer from the MCC to another BOP facility where appropriate preventive measures may be taken and adequate health care can be provided, until such time as the MCC can improve conditions sufficiently to take such measures and provide such care itself;

(iv)    appointing an independent monitor to oversee Respondent's compliance with this Court's orders; and

(v)     granting such other and further relief as this Court may deem just and proper.

Dated:  April 28, 2020                COVINGTON & BURLING LLP
        New York, New York

                                      By: *s/Arlo Devlin-Brown*
                                          Arlo Devlin-Brown

                                          Arlo Devlin-Brown
                                          Andrew A. Ruffino
                                          Alan Vinegrad
                                          Timothy C. Sprague
                                          Ishita Kala
                                          COVINGTON & BURLING LLP
                                          The New York Times Building
                                          620 Eighth Avenue
                                          New York, New York 10018
                                          T:  (212) 841-1000
                                          E: adevlin-brown@cov.com
                                             aruffino@cov.com
                                             avinegrad@cov.com
                                             tsprague@cov.com
                                             ikala@cov.com

                                          *Attorneys for Petitioners*