UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CESAR FERNANDEZ-RODRIGUEZ, ROBER
GALVEZ-CHIMBO, SHARON HATCHER,
JONATHAN MEDINA, and JAMES
WOODSON, individually and on behalf of all
others similarly situated,

                     Petitioners,

             -v.-

MARTI LICON-VITALE, in her official capacity
as Warden of the Metropolitan Correctional
Center,

                     Respondent.

No. 20 Civ. 3315 (ER)

**FACILITY EVALUATION OF THE METROPOLITAN CORRECTIONAL CENTER**

---

      DR. HOMER S. VENTERS declares pursuant to 28 U.S.C. § 1746:

## I.    Executive Summary

      1.     My inspection of the Metropolitan Correctional Center ("MCC") and review of information from BOP staff as well as detained and recently released people indicates that the MCC's response to the COVID-19 pandemic suffers from widespread and systematic failures to follow CDC guidelines and basic infection control practices.

      2.     The deficiencies in the MCC's response to the COVID-19 pandemic include the following failures: (1) inadequate detection and response to COVID-19 cases among staff and detainees; (2) inadequate infection control measures necessary to slow the spread of COVID-19 through the facility; and (3) inadequate identification and protection of high-risk detainees from serious illness and death.  These deficiencies are caused in substantial part by grossly inadequate or absent sick call systems, deficient COVID-19 screening and contact tracing, inadequate access

to soap and cleaning supplies, and deficient isolation and quarantine procedures.  Across many measures, the MCC has failed to implement CDC guidelines.

3.      These deficiencies have led to many vulnerable people becoming infected with COVID-19 and receiving ineffective care.  These deficiencies have also increased the risk that detained people and staff will suffer serious illness or death from COVID-19.

4.      I believe that these deficiencies can be remedied but they require a commitment to address structural barriers to access, quality, and transparency in the MCC's health services, and meeting the CDC's specific COVID-19 guidelines.  Without fundamental improvements to the underlying health care system at the MCC, it is likely that the next wave of COVID-19 will similarly overwhelm the facility's medical system and leave patients with unmet needs, increasing the risk of serious illness or death.

## II.    Background

5.      I am a physician, internist, and epidemiologist with over a decade of experience in providing, improving, and leading health services for incarcerated people.  My clinical training includes residency training in internal medicine at Albert Einstein/Montefiore Medical Center (2007) and a fellowship in public health research at the New York University School of Medicine (2009).  My experience in correctional health includes two years visiting immigration detention centers as part of my public health fellowship where I conducted analyses of physical and mental health policies and procedures for persons detained by the U.S. Department of Homeland Security and evaluated individual asylum applications for torture survivors.  This work included and resulted in collaboration with U.S. Immigration and Customs Enforcement ("ICE") on numerous individual cases of medical release, the formulation of health-related policies, as well as testimony before the U.S. Congress regarding mortality inside ICE detention facilities.

6.       After my fellowship training, I became the Deputy Medical Director of the Correctional Health Services of New York City.  This position included both direct care to persons held in NYC's 12 jails, as well as oversight of medical policies for their care.  This role included oversight of chronic care, sick call, specialty referral, and emergency care.  I subsequently was promoted to the positions of Medical Director, Assistant Commissioner, and Chief Medical Officer.  In the latter two roles, I was responsible for all aspects of health services including physical and mental health, addiction, quality improvement, re-entry, and morbidity and mortality reviews as well as all training and oversight of physicians, nurses, and pharmacy staff.  In these roles, I was also responsible for evaluating and making recommendations on the health implications of numerous security policies and practices including use of force and restraints.  During this time I provided numerous datasets and other forms of cooperation for the U.S. Department of Justice investigation into brutality in the NYC jail system, and worked with my team to support their critical efforts.  Many of the data systems that I implemented in the NYC jails were identified and reported in the U.S. Attorney's Office for the Southern District of New York's substantiation of the health consequences of a pattern and practices of brutality regarding adolescent detainees.[1]

7.       During this time, I managed multiple communicable disease outbreaks including H1N1 in 2009, which impacted almost 1/3 of housing areas inside the adolescent jail, multiple seasonal influenza outbreaks, a recurrent legionella infection, and several other smaller outbreaks.

8.       In March 2017, I left the Correctional Health Services of New York City to become the Director of Programs for Physicians for Human Rights.  In this role, I oversaw all programs of

---

[1] *See* Report on CRIPA Investigation of the New York City Department of Correction Jails on Rikers Island, U.S. Dep't of Justice (Aug. 4, 2014), https://www.justice.gov/sites/default/files /usao-sdny/legacy/2015/03/25/SDNY%20Rikers%20Report.pdf.

Physicians for Human Rights, including training of physicians, judges, and law enforcement staff on forensic evaluation and documentation, analysis of mass graves and mass atrocities, documentation of torture and sexual violence, and analysis of attacks against healthcare workers. I subsequently worked with the nonprofit Community Oriented Correctional Health Services (COCHS) in promoting evidence-based health services for people with justice involvement.  I have also worked as an independent correctional health expert since 2017.  In my roles as a correctional health physician I have conducted over 50 facility inspections, three of which have been specific for assessing the adequacy of COVID-19 response.  My CV is attached hereto as **Appendix A**.

9.     I expect to be compensated for my work on this matter at my usual consulting rate of $500 dollars per hour, plus reimbursement of reasonable expenses.  My compensation is not contingent upon the substance of the opinions expressed.

## III.    Methodology

10.     The purpose of this report is to focus on the adequacy of the MCC's response to COVID-19 with focus on infection control and other public health measures currently being implemented to prevent serious illness and death among staff and detained people.

11.     In order to prepare this report, I visited the MCC on May 13, 2020 and physically inspected the facility.  I toured and examined the entry and screening area, housing areas, and the health services unit.  Housing areas that I inspected included 11S (Dorm), 9S/10S (Special Housing Unit, SHU), 9N, Unit 2 (Women's unit), Unit 3 (at the time used for medical isolation).  During this time I spoke with 13 detained people.[2]

---

[2] The people spoken with were:  Nicolas Sucich, David Crosby, Robert Russo, Ahmed El Soury, Chris Karimbux, Lenin Guzman-Hidalgo, Eddie Cotto, Brian Capellen, Antonio Smith, Geovanny Fuentes-Ramirez, Tiffany Days, Lavaughn Campbell, and Andres Bello.

12.     My interactions with detained people included in most cases asking the following questions, with follow-up as appropriate:

    a.   Have you been around anyone you thought had COVID-19?

    b.   What has this facility done to prepare for COVID-19?

    c.   Have you been asked any questions about COVID-19 by health staff?

    d.   How have you reported concerns about your health (including COVID-19) in this facility?

    e.   Who wears masks and gloves in this facility and how do they get this equipment?

    f.   Who cleans inside cells in this facility and how and how often do they get cleaning supplies?

    g.   Who cleans outside cells in this facility and how and how often do they get cleaning supplies?

13.     I have conducted this assessment and review of information with the following questions in mind:

    a.   Do current practices in the MCC adequately detect the number and severity of COVID-19 cases among staff and detainees and respond in a manner consistent with CDC guidelines and other established clinical standards of care?

    b.   Do current practices in the MCC adequately slow the spread of COVID-19 through the facility and between people, both staff and detainees, in a manner consistent with CDC guidelines and other clinical standards of care?

    c.   Do current practices in the MCC adequately identify and protect high-risk detainees from serious illness and death from COVID-19?

14.     In addition to my inspection of the facility, I was able to review the following records and information:

a.  Declarations from 33 detained or recently released people;[3]

b.  MCC/BOP policies and procedures relating to COVID-19;

c.  Sick call requests of detained people;

d.  Medical records of detained people;[4]

e.  Photographs taken during the facility inspection;

f.  The deposition transcripts of the following MCC staff: Acting Clinical Director Dr. Robert Beaudouin, dated May 20, 2020;  Associate Warden Charisma Edge, dated May 20, 2020; Warden Marti Licon-Vitale, dated May 21, 2020; and Acting Warden Robert Hazelwood, dated May 22, 2020; and

g.  The deposition transcripts of the following MCC inmates: Cesar Fernandez-Rodriguez, Rober Galvez-Chimbo, Sharon Hatcher, and James Woodson, each dated May 19, 2020, and Nicolas Sucich, dated May 21, 2020;

h.  A sample of records documenting inmate temperature checks.

---

[3] I have reviewed the declarations of the following people who are detained at, or were recently released from, the MCC: Vinicius Andrade, Robert Barnes, Armando Beniquez, Randolph Bourgoin, William Bradley, Terrell Brown, David Crosby, Franklyn Dansowah, Darius Davis, Tiffany Days, Manolo Dones, Michael Falu, Cesar Fernandez-Rodriguez, Anthony Flynn, Rober Galvez-Chimbo, Carlos Garcia, Rodney Griffin, Sharon Hatcher, Chris Karimbux, Anthony Luna, Emil Matute, Ahmad Jamal Naqvi, Michel Richard, Carolyn Richardson, Adrienne Roberts, Joseph Schiliro, Antonio Smith, Jorge Soto, Nicolas Sucich, Tyler Toro, Wilbert Turner, James Woodson and Guillermo Zegarra-Martinez.

[4] I have reviewed the medical records of Woodson, Sucich, Naqvi, Medina, Hatcher, Galvez-Chimbo, Fernandez-Rodriguez, Falu, and Davis.

15.     The information I have gathered from the above referenced documents, in conjunction with the results of my physical site visit, are sufficient for me to come to the conclusions drawn below with a high degree of confidence.

## IV.     Assessment of the COVID-19 Response in the MCC

### A.     Visual Observations from the Inspection

16.     The inspection of the facility lasted approximately 3.5 hours and consisted of observation and photography of various housing units, as well as interviews of inmates both cell-side and in open areas.  All interviews were conducted in the presence of at least one representative of the Respondent, including in many cases MCC staff.

17.     A significant portion of the inspection took place on 11 South, which, based on medical records, declarations, and deposition testimony, is the unit where the initial outbreak of COVID-19 occurred.  11 South consists of an open communal area with a number of different tiers separated by open metal bars.  Each tier contained a dorm-like room with a number of bunk beds spaced only a few feet apart across the tier.  It appeared that 20 or more men were in each tier I was able to observe, and were standing or sitting close together.  At our request, the MCC staff removed inmates from one tier to enable me to inspect the tier.  Photographs were taken of the set-up within the tier.  *See* Kala Decl. Exs. 10 and 11.  The tier I observed had approximately 26 bunk beds spaced a few feet apart and some small tables in the center.  The tier had a single toilet and sink. *See* Kala Decl. Ex. 12.  In this tier, as in other places I visited during the inspection, I observed signs of severe pest infection, such as roaches caught in traps.  *See* Kala Decl. Ex. 13.  I spoke to several inmates on this tier who reported that many in the tier, including Chris Karimbux, Brian Capellan, and David Crosby, had been symptomatic for COVID-19 but were not removed from the tier upon reporting symptoms.  This is discussed in more detail below.

18.     I also observed the Special Housing Unit ("SHU") where, based on medical records, declarations, and deposition testimony, it appears that a number of inmates who had COVID-19 were housed for medical isolation.  Photographs were taken of a SHU cell.  *See* Kala Decl. Exs 14 and 15.  The cells I observed and depicted in the photographs consisted of a concrete "bed," a concrete stool affixed to the ground, and a combined toilet/sink.

19.     Throughout my tour of the facility, I observed computer workstations and phones in common areas for inmate use.  In almost every case, no cleaning fluid or applicator was visible near these common spaces.  *See* Kala Decl. Exs 16 and 17.  In a few other instances, I observed cleaning supply with no applicator, *see* Kala Decl. Ex. 18, or a cloth towel with no cleaning supply, *see* Kala Decl. Ex. 19.  This was consistent with reports from inmates, including as discussed below, that disinfectant supplies were lacking.  I also observed in some instances signs stating that soap was available upon request.  As discussed below, inmates I spoke to and declarations I reviewed reported that such signs had been put up in the days prior to the inspection and that adequate soap was not always in fact available.

20.     During my tour, it was clear that the MCC is widely infested with mice and roaches.  Almost all of the housing areas and other common spaces I toured had evidence of numerous living and dead roaches and mice.  Particularly concerning is the presence of these vermin in cells utilized for medical isolation of COVID-19 patients, including the cell in the women's unit as well as the men's SHU.  This was also an obvious problem in the current isolation unit, as well as 11S, which is designated for high risk patients.  Mr. Robert Barnes, a resident of 11 South who is 73 years old and has coronary artery disease, reported that "[t]here is black mold in our unit that has built up over the years.  I recently showed it to an employee, but no action has been taken to address it.  There are rodents—both rats and mice—and cockroaches in our unit.  I see them every day."

Devlin-Brown Decl. Ex. 7 (Barnes Decl. ¶ 7).  While COVID-19 is not known to be spread via these vectors, the presence of mice, rats, and roaches throughout the facility indicates a basic disregard for sanitation and infection control that casts doubt on the ability or commitment of the MCC to maintain a sanitary facility.  The CDC identifies over 35 diseases carried by mice and rats,[5] and the presence of these vermin inside the locked cells of medically isolated patients is especially troubling.

## V.    Detection of COVID-19 Cases

### 1.    Screening

21.    The MCC has failed to adequately detect COVID-19 cases in the facility, and its existing practices for detecting such illness remain deeply inadequate and in many cases non-compliant with CDC guidelines.  Most notably, the MCC has ignored the high prevalence of COVID-19 symptoms being experienced and reported by detained people.  Therefore, the number of infected detained people has likely been much larger than currently appreciated.  There are several reasons for this failure to detect COVID-19 infection, set out below.

22.    The CDC recommends that all new admissions to a detention facility be screened for both signs and symptoms of COVID-19.  This process should include asking about common symptoms of COVID-19 such as cough, fever, and shortness of breath.  This also includes asking about contact with people who have had COVID-19 and checking temperature.  Screening should also occur where there is a risk that the infection is being carried by inmates or staff in the facility.[6]

23.    The MCC acknowledges that COVID-19 screening for all inmates should take place, and claims that such screening became MCC policy in late March.  *See* Kala Decl. Ex. 1

---

[5] *Rodents*, CDC, https://www.cdc.gov/rodents/index.html (last reviewed July 9, 2010).

[6] *See* Kala Decl. Ex. 20 (CDC Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities, at 10, 26).

(Beaudouin Dep. Tr. at 138:5-9).   The screening is meant to involve health staff taking temperatures as well as asking about COVID-19 symptoms.   Dr. Robert Beaudouin testified that screening should include "the usual questions, do you have cough, chest pains, shortness of breath, fever, nausea, vomiting, diarrhea, loss of taste, loss of smell, muscle aches and pains." *Id.* at 146:9-14.   He also stated the records of these encounters were not kept electronically, with the exception of temperature taken in the isolation settings, because the process of recording symptoms would have been too burdensome. *See id.* at 148:14-23.   He stated that some people would receive this screening on a daily basis when they first arrived into the facility, or if they were in quarantine, and later may have received it less frequently, based generally on whether or not there were any COVID-19 cases at the time. *See id.* at 146-149.   He also stated that, when the facility had cases of COVID-19, these screenings would be conducted every day. *See id.* at 149:15-150:5.   For the most part, results of these screenings were not officially documented and were handwritten on roster sheets. *See id.* at 147-148.

24.     Notwithstanding these statements, it is clear from my conversations with detained people, review of declarations, and review of medical records that very little screening is in fact occurring in the MCC, and that this screening relies almost exclusively on temperature checks. Among other examples, Mr. Michael Falu reported that "[t]here was a period of time when people were coming around to take everyone's temperatures.   But they've stopped doing that.   I don't believe that anyone has come to take our temperatures in the last two weeks." Devlin-Brown Decl. Ex. 17 (Falu Decl. ¶ 13).   Likewise, Mr. James Woodson testified that his temperature also had not been checked in approximately two weeks. *See* Devlin-Brown Decl. Ex. 9 (Woodson Dep. Tr. at 33:2-4).   According to Ms. Sharon Hatcher, unless she requests it from the med line, she no longer receives temperature checks. *See* Devlin-Brown Decl. Ex. 5 (Hatcher Dep. Tr. at 28:1-7).

Similarly, Mr. Wilbert Turner reported his temperature has not been checked since early April. *See* Devlin-Brown Decl. Ex. 33 (Turner Decl. ¶ 13).

25.    Further, most of the people I spoke with reported no symptom screening.  That is, they were never asked whether they had cardinal symptoms of COVID-19, including, for example: fatigue, shortness of breath, cough, loss of taste or smell, and other symptoms identified by the CDC.[7]  The same is true of many declarations I reviewed.  For example, Mr. Wilbert Turner reported that, even when the MCC was performing temperature checks, they "never asked us about any other symptoms."  Devlin-Brown Decl. Ex. 33 (Turner Decl. ¶ 13).  Likewise, Mr. Franklyn Dansowah states that, "[w]hen the medical staff started coming around taking temperatures, they did not care if people had other symptoms – cough, chills, diarrhea.  They just left them in bed unless they had a fever."  Devlin-Brown Decl. Ex. 13 (Dansowah Decl. ¶ 9.)  Mr. David Crosby also requested medical care but was told that, unless he had a fever, all they could do was give him Tylenol.  *See* Devlin-Brown Decl. Ex. 12 (Crosby Decl. ¶ 8).  I have also reviewed a sample of records that the MCC provided to Petitioners which document the results of inmate temperature checks.  *See* Kala Decl. Ex. 41.  Other than brief and sporadic notes, this document provides no evidences that inmates are asked any standard set of questions regarding symptoms of COVID-19.  The accuracy of the thermometers being utilized is also questionable.  The internal body temperatures of people who are not ill is commonly accepted to fall between 97 and 99 degrees Fahrenheit.[8]  That few, if any, temperatures were recorded above 98.8 degrees suggests some form

---

[7]  *See Symptoms of Coronavirus*, CDC, https://www.cdc.gov/coronavirus/2019-ncov /symptoms-testing/symptoms.html (last reviewed May 13, 2020).

[8]  *See Body Temperature Norms*, MedlinePlus, https://medlineplus.gov/ency/article/ 001982.htm (last updated May 7, 2020).

of systematic flaw in this process, potentially the accuracy of the devices being utilized or the training of those administering the checks.

26.     The failure to consistently screen individuals for symptoms is a material failing. The CDC makes clear that COVID-19 can present with many signs or symptoms and that screening and surveillance should be focused on asking about symptoms as well as detecting elevated temperature.[9]  It is essential that such active screening be part of any response to a viral outbreak. Failure to do so can result in catastrophic consequences to populations exposed to a communicable virus, such as COVID-19.

27.     Detained people I spoke with, and inmates whose declarations I reviewed, also indicated that even when a person is detected as having a temperature or is able to report COVID-19 symptoms, they often are left in their housing area and not placed into isolation.  Mr. Chris Karimbux reported that while on 11S, he developed a fever and other COVID-19 symptoms, and a nurse found his temperature to be 105 degrees.  He reported that "[s]he gave me Tylenol and told me to take two tablets every four hours.  I went back to my bed.  My symptoms lasted over two weeks.  My bed is a bunk bed very close to everyone else's bed in my tier.  I started having trouble breathing.  The other guys in my tier made me hot tea and helped me take hot showers to open up my lungs.  I was afraid it was the end. . . . New guys continue to join our unit, as recently as two or three days ago a new person came."  Devlin-Brown Decl. Ex. 21 (Karimbux Decl. ¶¶ 6-10).  Likewise, three members of Anthony Luna's tier developed high fevers in early April but were "just left in the tier."  Devlin-Brown Decl. Ex. 22 (Luna Decl. ¶ 7).  After medical staff took Ms. Adrienne Roberts' temperature and determined she had a fever, they left her in her cell until she suggested that she was going to hurt herself.  Only then was she isolated.  Devlin-Brown Decl.

---

[9] *See* Interim Guidance on COVID-19 in Correctional Facilities, *supra* note 6.

Ex. 27 (Roberts Decl. ¶¶ 13-15). These reports call into question the MCC's claim that it promptly isolates symptomatic inmates.[10]

28.     When asked about whether any inmates who reported COVID-19 symptoms were not placed into isolation, Dr. Beaudouin stated "I am not aware of that." Kala Decl. Ex. 1 (Beaudouin Dep. Tr. at 158:14). When asked if a symptomatic patient would ever be left in a housing area, he stated "[i]f we know of it, we wouldn't do it." *Id.* at 186:11-16. However, a document entitled Quarantine Isolation Flowsheet provided by the MCC, *see* Kala Decl. Ex. 32, shows that only 33 inmates have been isolated, and does not account for the isolation of numerous inmates who experienced COVID-19 symptoms (as reported through sick call requests, my interviews, and declarations).

29.     This lack of screening has translated into inmates contracting COVID-19 and never receiving testing or care. For example, Mr. Darius Davis reported "I had symptoms of the coronavirus in April. My bunkmate complained of a fever first. Then I lost my sense of smell and taste, and I experienced fever and chills. I wrapped myself in a blanket. I asked correctional officers for medical care. They said they would ask medical to see me, but no one came. I also asked to speak with the lieutenant, but he did not come either and the officers did not come back to check on me." Devlin-Brown Decl. Ex. 14 (Davis Decl. ¶ 6). Many others have reported heavily delayed or nonexistent responses. For example, Mr. Armando Beniquez also requested to see a doctor due to his fever, chest pain, cough, lethargy, and loss of taste. Despite his repeated requests,

---

[10] Dr. Beaudouin testified that any person who was found to have a fever during their screening would automatically be placed in isolation and examined. He stated that, "[i]f somebody has a fever, yes. Person has a fever, then we are going to put him in isolation. We are going to examine him too." Kala Decl. Ex. 1 (Beaudouin Dep. Tr. at 150:22-151:3). Warden Licon-Vitale also stated that any inmate who is determined to have symptoms of COVID-19 is isolated immediately. *See* Kala Decl. Ex. 7 (Licon-Vitale Dep. Tr. at 62:9-14).

he never saw a doctor.  *See* Devlin-Brown Decl. Ex. 8 (Beniquez Decl. ¶¶ 7-8).  While developing symptoms himself, Mr. Guillermo Zegarra-Martinez listened to his cellmate "ask for help and medical attention over and over and over again, with no help given."  Devlin-Brown Decl. Ex. 34 (Zegarra-Martinez Decl. ¶¶ 8-10).  Mr. Michael Falu refused to re-enter his cell until a lieutenant ensured him that he would receive medical attention.  It still took days until he received a medical visit, and even when he did, the doctor was unfamiliar with his complaints.  *See* Devlin-Brown Decl. Ex. 17 (Falu Decl. ¶ 5).  Symptomatic inmates should be promptly tested, and testing of close contacts of positive cases should follow. As I indicate in my recommendations below, the following groups should be immediately prioritized for COVID-19 testing at MCC:

> a.   Any new admissions or inmates returning from outside the facility;
>
> b.   Any detained person with signs and/or symptoms of COVID-19;
>
> c.   Any close contacts of COVID-19 cases; and
>
> d.   Any staff or detained person who is in the high-risk cohort, as defined by CDC criteria.

30.     The failure to detect and respond to COVID-19 at the MCC is also linked to the failure to undertake the critical step of contact tracing once a staff member or inmate is identified as possibly having COVID-19.

31.     With respect to inmates, there is no indication that any contact tracing is undertaken for those who test positive.   Associate Warden Edge testified that while such tracing was recommended, she was not aware whether it was actually conducted to identify staff and/or inmates who had interacted with COVID-19 positive inmates.  *See* Kala Decl. Ex. 2 (Edge Dep. Tr. 52:5-12).  What is more, while the MCC's number of positive inmates has been suppressed by a lack of testing, *see* Kala Decl. Ex. 7 (Licon-Vitale Dep. Tr. at 51:12-17), it appears the MCC is

also not even engaging in contact tracing for symptomatic inmates either, *see* Kala Decl. Ex. 6 (Hazelwood Dep. Tr. 41:19-42:9).

32.     The testimony of Dr. Beaudouin raises concerns that the COVID-19 cases among staff are not resulting in adequate contact investigations.  In his deposition, Dr. Beaudouin reports that despite being the Acting Clinical Director of the MCC and responsible for contact investigations in the facility, he was not even notified whenever a staff member tested positive for COVID-19.  When asked about being notified about staff cases, he stated "I wasn't being informed regularly.  At first the AW, I think, was contacting the HSA to do the contact investigation.  And then after the HSA got sick and she was contacting me, but I think she contacted me like three or four times to do some contact investigation but from the chart there are many more staff that needed some contact investigation who tested positive."  Kala Decl. Ex. 1 (Beaudouin Dep. Tr. at 117:14-25).  He also agreed that there is no actual policy or protocol for contact tracing in the MCC, and later admitted there is a need "to tighten up on the contact investigation."  *Id.* at 118-19, 131:14-17.

33.     It is also apparent that staff members exposed to COVID-19 positive staff or inmates are expected to continue working, at least in some cases when symptomatic or positive for COVID-19, thus amplifying the risk of the infection spreading.  *See* Kala Decl. Ex. 1 (Beaudouin Dep. Tr. at 120-126).  Dr. Beaudouin identified multiple instances in which staff continued to work in the MCC despite having COVID-19 symptoms or a positive test.  *See id.*  He also noted that an individual who has been exposed to someone with COVID-19 symptoms should quarantine for 14 days, but acknowledged that this standard has not been met for staff members, who are expected to continue working even if they have been exposed to another staff member who has tested positive, unless they themselves develop symptoms.  *See id* at 102-3; 134-35.

### 2.      The Inadequate Sick Call System

34.      In addition to proactively screening inmates, it is crucial that the MCC provide them with a way of reporting illness potentially relating to COVID-19, and that it ensure that such reports are promptly acted upon.  However, I have found that the sick call system at the MCC is systematically deficient and serves as a barrier to adequate care and an adequate COVID-19 response.

35.      It is critical for correctional facilities to implement an effective "sick-call" system to ensure that people who are ill or have medical concerns can receive timely and clinically competent assessments and treatment.  This system should be operated so that when a person reports a health problem, the request for medical care is recorded and the individual is assessed by a nurse or physician within 24 hours.  This best practice is identified by the National Commission of Correctional Health Care as a basic element of ensuring that sick patients do not deteriorate alone in cells or housing areas and die without receiving care.  This standard of care relies on a daily review of paper and electronic sick call submissions by the correctional health authority. That review must be documented and then the records of the original sick call requests must be retained, whether in a central location or the personal medical records of the patients.

36.      This basic approach to sick calls becomes even more critical during an outbreak of communicable disease, when the facility must work to quickly identify new symptomatic staff and inmates, both to ensure prompt treatment as well as to track and mitigate the spread of the outbreak throughout the facility.  On an operational level, this means that every day, nursing staff should review all sick call requests (as they should always) with a list of symptoms relating to the outbreak.  Then any sick call requests with these symptoms should result in a referral for appropriate clinical assessments, and the entry of those symptoms and the inmate's location into a database or spreadsheet used to track the overall spread of disease symptoms in the facility.

16

37.     MCC Acting Clinical Director Dr. Robert Beaudouin has acknowledged in his testimony that anyone who submitted a sick call request with any symptom of COVID-19 should be seen immediately.  *See* Kala Decl. Ex. 1 (Beaudouin Dep. Tr. at 228:12-18).  However, his testimony regarding the sick call process provides a clear and concerning account of the multiple deficiencies in the MCC sick call system, and how these deficiencies drive a lack of awareness or care for detained people with COVID-19.

38.     Dr. Beaudouin reports three ways in which sick call requests can be requested: via verbal request, written paper request, and electronic request.  *See* Kala Decl. Ex. 1 (Beaudouin Dep. Tr. at 211:11-15).  He reported that there are no guidelines or tracking for the number of, or responses to, verbal requests, or even a record as to whether such requests are made.  *See id.* at 213:21-214:2; 217:21-218:10.  For electronic requests, he indicates that either a nurse or the health services administrator (HSA) is designated to review them.  *See id.* at 233:2-234:7.  He also reported that paper sick call requests were not retained, but shredded, and that the response was to view them, schedule an encounter and then shred the paper request.  *See id.* at 218-220.  As a result, there would be no record of the original request, and if no appointment was scheduled, there would be no record of the patient's request for care or reporting of symptoms.  Both Warden Marti Licon-Vitale and Acting Warden Robert Hazelwood stated in their depositions that they were unaware that paper sick call requests were being destroyed.  *See* Kala Decl. Ex. 7 (Licon-Vitale Dep. Tr. at 59:7-18); Kala Decl. Ex. 6 (Hazelwood Dep. Tr. at 28:18-22).

39.     Information I have gathered from my tour of the MCC and review of available information indicates that virtually all of these steps of sick call are broken or grossly deficient in the MCC.  This has resulted in the current situation wherein many people cannot report their COVID-19 symptoms via sick call, or when they do, there is no appropriate response.

40.     When I toured the MCC, staff stated that the computer kiosks located in each housing area were both operational and also were utilized to report COVID-19 related health problems and all other medical concerns.  However, Dr. Beaudouin testified that this electronic sick call inbox was not being monitored by anyone while staff members were absent.  *See* Kala Decl. Ex. 1 (Beaudouin Dep. Tr. at 259-262).  As a result, the monitoring "hasn't been done timely."  *Id.* at 259:21-22.  He further stated that, to date, sick call monitoring had not been treated as a priority: "The sick call box was to be monitored by a nurse daily.  If the nurse wasn't there, it's supposed to be the HSA.  But what happened is there are a lot of work to be done.  Sometimes if you don't address it, then it stays and you get busy with other things but it's a problem that right now we have to put it as a priority, the sick call to be addressed first thing in the morning."  *Id.* at 260:22-261:12.

41.     I have reviewed a compilation of sick call requests, *see* Kala Decl. Ex. 36, alongside a BOP Health Services Activity Report, *see* Kala Decl. Ex. 37, reflecting that in many cases *weeks* or even a month or more went by between inmates making a sick call request relating to COVID-19 symptoms and any treatment or care.  For example, in one such electronic request, from April 16, 2020, a patient reported coughs, fever, chest pain, and shortness of breath and was ignored.  This patient was never placed in isolation and an email reply to this patient was sent on May 5 scheduling him or her for sick call.  As of May 15, the patient had not had a single encounter with medical staff since March 1.  Other patients similarly reported shortness of breath, fever, and chest pain and also received no response, or a very delayed response, to their electronic sick call requests.  In fact, of approximately 25 inmates who submitted electronic sick call requests, the medical activities report indicates that only four received any sort of medical care within one day and only five received medical care within one week.  Six of these inmates had to wait over 15 days to even

be seen by a medical staff member, and, as of May 15, seven of these inmates had not been seen by a medical staff member at all since making the sick call request.

42.     Numerous inmates have reported that their sick call requests – whether verbal, on paper, or in electronic form – have gone unanswered.  Mr. Michael Falu, who experienced several days of fever, chills and progressive weakness, reported that he and his cellmate told security staff for several days of his symptoms and that he needed to be seen.  Devlin-Brown Decl. Ex. 17 (Falu Decl. ¶ 5).  He stated "I did not receive any medical attention until several days later, when a doctor, who was taking temperatures in the unit, came to my cell.  I told him about the symptoms I was having.  Nothing in his visit suggested that he had come to see me because he had heard about my request for medical attention; instead, it appeared that he was just there because he was taking everyone's temperatures." *Id.*  Mr. Falu reported never being tested for COVID-19.  Others have reported the same issues.  After many inmates in his tier became ill, Mr. Anthony Luna and others reported their symptoms to the staff.  The staff "did not do anything in response."  *See* Devlin-Brown Decl. Ex. 22 (Luna Decl. ¶ 10).  Mr. Darius Davis told correctional officers of his fever, chills, and loss of smell and taste, and while the officers stated that they would inform medical staff, no one came for weeks.  *See* Devlin-Brown Decl. Ex 14 (Davis Decl. ¶ 6).  Likewise, Mr. Carlos Garcia reported his sweating, headache, and tight chest directly to an MCC doctor, who simply told him to place a sick call request.  Mr. Garcia followed the doctor's instructions but nevertheless did not receive any medical treatment for approximately one week.  *See* Devlin-Brown Decl. Ex. 19 (Garcia Decl. ¶¶ 10-12).

43.     Dr. Beaudouin also confirms that details from the sick call request or the appointment scheduling do not become incorporated into the sick call encounter itself.  This means that no record of the original concern is retained by the health system, essentially making it

impossible to see whether sick call encounters that do occur adequately address the original complaint. When asked about whether he sees the detail of the appointment or the original sick call request when seeing patients for sick call, Dr. Beaudouin replied "No. I don't see the sick call. So when I'm seeing the inmates, I'm talking to him about the present complaint, the complaint he has not [the] complaint he had before." Kala Decl. Ex. 1 (Beaudouin Dep. Tr. at 274:18-22).

44.     In the outbreaks I have managed, we would create a template for nurses conducting an outbreak sick-call review so that they could pull out any requests that included rash, spider bites, or fever in the case of MRSA outbreak; or, fever, cough, or sore throat during H1N1, for example. This subset of sick-call requests is then used for two purposes. First, on the clinical side, these patients are seen immediately (same day or next morning) for assessment. Second, on the outbreak management side, these symptoms are put into a simple spreadsheet that can track the overall incidence of various symptoms by date and location within a certain facility.

45.     This approach is absolutely essential to tracking the spread of any outbreak and I have utilized it in managing outbreaks of H1N1, Legionella, MRSA, Clostridium Difficile diarrheal illness, seasonal influenza and numerous other instances. I would have expected to have seen such a system implemented at MCC given the severity of the current COVID-19 outbreak.

46.     By failing to conduct adequate screenings as well as failing to monitor and respond to sick call requests, the MCC not only increases the likelihood that individual patients with COVID-19 will develop serious illness, but also increases the likelihood that they will transmit infection to others. Ms. Roberts reported that a woman known to have a fever was placed into her cell, and that she became so anxious to get out of the cell that MCC staff responded with a security team armed with riot gear. She stated, "when medical staff was in my Unit they saw Ms. Piquant still in my cell and said, 'you are not supposed to be in here, you have a fever.' The medical staff

person then took my temperature, saw that I had a fever, closed the door to my cell and ran away. I was terrified. I now realized that Ms. Piquant had Coronavirus symptoms and I was locked in a cell with her. Panicked, I knew the only way to get taken out of the cell was to act as if I was going to hurt myself. So I began hanging a sheet up. The guards saw this and opened the cell door screaming and yelling. One of the guards had some kind of paint gun and put it to my head. I was put in isolation after that. . . . I had a fever. I asked for medicine. I was told to take the Tylenol I already had prescribed to me. Other than taking and keeping records of my temperature and blood pressure no other medical care was provided." Devlin-Brown Decl. Ex. 27 (Roberts Decl. ¶¶ 13-15).

47.     Mr. Garcia reported that on "March 27, my head still hurt and I was covered in sweat. I had never had a headache that bad before. I told a female C.O. named Lupo that I was too sick to work that day. When the morning doctor, Joaquin, came to the unit that day, I told him I was sick. I told him I was sweating, I had a headache and my chest felt really tight. I also told him I wanted a COVID test. He wouldn't give me a test and he didn't check me for any symptoms and didn't take my temperature. The only thing he said was that I should put in a sick call on the computer. That same day, March 27, after I spoke with him, I used the computer to put in the sick call, but I didn't see a doctor. I was sick all weekend and into the next week. I was constantly coughing and I also felt a pain in my chest like someone was sticking me with needles. I wasn't sweating the whole time, but some nights I would wake up sweating and sometimes I would sweat in the day. I never saw a doctor or a nurse during that time and didn't get any treatment or medicine. At that time, we were still locked in our cells just about all day. My bunky started to complain about all the coughing. He kept saying I was going to get him sick." Devlin-Brown Decl. Ex. 19 (Garcia Decl. ¶¶ 9-13).

**B.       Treatment of Inmates in Isolation**

48.       My review indicates that the clinical response to patients who are transferred into medical isolation is also grossly deficient.  Dr. Beaudouin's testimony reveals that even when identified as needing isolation for suspected or confirmed COVID-19, patients at the MCC are unlikely to receive appropriate care.  In his deposition, Dr. Beaudouin testified that the MCC does not have the capacity to create a COVID-19 infirmary and that consequently, the BOP's own guidance document for isolation practices is not being followed.  *See* Kala Decl. Ex. 1 (Beaudouin Dep. Tr. 61:9-19).  When asked about the ability to implement this guideline, Dr. Beaudouin responded "Yes-we do not have the resources to do it."  *Id.* at 63:13-17.

49.       MCC records and reports from inmates also make clear that the SHU was used to house COVID-19 cases.   These housing units, which contain concrete beds**,** are grossly inappropriate for the treatment of any ill inmates, and particularly those suffering from COVID-19.  *See* Kala Decl. Exs. 14 and 15 (photographs of empty SHU cell).  The SHU is a unit that is typically meant as a place to house inmates for disciplinary purposes.  Warden Licon-Vitale stated in her deposition that "the conditions for the inmates in the SHU are not as favorable as conditions in an ordinary cell."  Kala Decl. Ex. 7 (Licon-Vitale Dep. Tr. at 64:14-18).  Yet, the Warden was aware of no steps taken to ameliorate the harsh conditions of the SHU for inmates placed there for medical isolation.  *See id.* at 65:15-18.

50.       Reports from inmates confirm that treatment in isolation is medically inappropriate.  Mr. Vinicius Andrade was part of the group of men who became ill with COVID-19 symptoms in late March, but unlike most of them, he was not kept in his housing area but transferred to the hospital, where he was tested and found positive for COVID-19, and then returned to the SHU.  There, he was locked in a cell with a concrete bed and no sheets, pillow or blanket.  As he described

it, "I lay on the concrete shaking.  They had given me a big SHU jumpsuit to wear, so I took that

off and used it as a pillow, but then I was just in my t-shirt and underwear so I was cold.  I was not

given any food until the next morning."  Devlin-Brown Decl. Ex. 6 (Andrade Decl. ¶ 6).  He

reported being in that cell for 15 days without clinical evaluations beyond temperature and blood

pressure checks: "No one ever checked my chest or lungs.  I could not smell anything.  My muscles

hurt.  I got very depressed.  The only water I had to drink was from the sink."  *Id.* ¶ 8.  Mr. Terrell

Brown reports that while he was isolated in the SHU, he and his cellmate were forced to rip up

towels and clothes in order to clean their cell.  Mr. Brown also had to cover the SHU's solitary

phone with a sock since the inmates were not provided with anything to clean it between uses.

Devlin-Brown Decl. Ex. 11 (Brown Decl. ¶¶ 21, 23).

     51.    This lack of basic care flies in the face of elemental correctional health practices

and even the BOP's own pandemic influenza plan, which identifies a series of daily assessments

for patients identified as being ill.

     52.    The conditions of the SHU not only increased the likelihood that patients with

serious illness could worsen or die, it also created a strong disincentive for patients with COVID-

19 symptoms to report being ill.  Mr. Andrade reported "[w]hen I got back, a lot of guys were sick.

No one wanted to report anything to medical because they did not want to go to the box and go

through what I did.  They said they would rather die in their beds because at least other people

would be around them."  Devlin-Brown Decl. Ex. 6 (Andrade Decl. ¶ 12).  Others have also

expressed the same fear of being locked in the SHU for reporting signs of COVID-19.  For

example, after coughing in front of a guard, Mr. Randolph Bourgoin was afraid that he would be

put in the SHU.  *See* Devlin-Brown Decl. Ex. 9 (Bourgoin Decl. ¶ 4).  Messrs. David Crosby and

James Woodson have each reported that inmates would hide their symptoms for the same reason.

*See* Devlin-Brown Decl. Ex. 12 (Crosby Decl. ¶ 12); Devlin-Brown Decl. Ex. 5 (Woodson Decl. ¶ 15).

53.     It also appears that by utilizing the solitary confinement area as medical isolation, the MCC may have allowed for transmission of COVID-19 from medical isolation patients to those in the SHU for segregation or punishment reasons.  Mr. Antonio Smith was housed in the SHU from the end February 2020, and was aware that people with COVID-19 symptoms were being transferred into the unit.  He reported that, "[a] few days after the sick inmates were transferred to the SHU, I began feeling sick.  I felt very tired and found it difficult to move or even get out of bed.  My eyes were swollen and tearing.  My nose would not stop running.  I had a cough that felt different from any cough I have had before.  When I coughed instead of producing mucus, a clear sticky substance would come out.  I lost my sense of taste and my appetite.  I was sweating a lot.  During my illness, I lost approximately 36 pounds."  Devlin-Brown Decl. Ex. 29 (Smith Decl. ¶ 8).  Despite being ill, and even having pneumonia identified on an x-ray, he was never tested for COVID-19, ever had anyone listen to his lungs, and was even given a cellmate in the SHU.  *Id.* at ¶¶ 9-11. At one point Mr. Smith was allowed to work on a cleaning detail and leave the unit when a passing health staffer recognized that he was ill and then initiated a 5 day quarantine.  *Id.* ¶ 14.

54.     Other inmates isolated on the 3rd floor of the MCC also reported inadequate medical care.  Mr. Garcia, who was also placed into isolation, reported that "[t]he isolation area was on the 3rd floor of MCC.  I was locked in a cell alone 24 hours a day.  They would come around twice a day, 8am and 3:30pm, to take my temperature.  There was no other testing or treatment.  I never received a COVID test.  The only medicine I received was a Ziploc bag with 12 Tylenols."  Devlin-Brown Decl. Ex. 19 (Garcia Decl. ¶ 19).  Mr. Richard Michel reported that, even in isolation, "[w]henever anyone was sick and tried to get the attention of staff to report their symptoms or ask

to see a doctor, it was often hard to get the attention of a CO.  Many inmates who wanted to see a doctor were not taken to see a doctor."  Devlin-Brown Decl. Ex. 25 (Michel Decl. ¶ 7).

55.     Finally, post-isolation care for recovering inmates appears practically non-existent. When inmates are removed from isolation they are often returned to open dormitories where they are unable to engage in social distancing.  Kala Decl. Ex. 1 (Beaudouin Dep. Tr. at 203-04).  What is more, they not provided with any follow-up medical care, nor are their symptoms closely tracked.  *Id.* at 168:3-21.  Mr. Beniquez's cellmate, for example, still showed symptoms after he was returned from isolation to his regular unit.  *See* Devlin-Brown Decl. Ex. 8 (Beniquez Decl. ¶ 10).

**VI.     Assessment of the MCC's Mitigation Practices to Slow the Spread of COVID-19**

56.     As discussed in the preceding paragraphs, the spread of COVID-19 throughout the MCC has been driven by the MCC's failure to properly screen its inmates for symptoms of COVID-19, as well as its failures to appropriately quarantine, isolate, and test inmates.  In addition to these issues, the MCC's lack of adequate sanitation and hygiene practices impacted the spread of COVID-19 within the facility.

57.     Based on my physical inspection of the MCC, it is my assessment that several current practices in MCC actually promote a more rapid spread of COVID-19 inside the facility and serve to work against some of the infection control measures already in place.

58.     The CDC has identified basic guidelines for infection control and overall COVID-19 response in detention settings, many of which the MCC appears to have ignored.  For example, I would have expected—at minimum—that the MCC had sufficient levels of personal protective equipment ("PPE"), cleaning solution and equipment, an adequate quantity of tests available, that

common, high-touch surfaces such as phones and computers would be cleaned between uses, and that no-touch waste receptacles would be present in the facility common areas and housing areas.

59.     Detainees I spoke with reported a lack of access to basic soap and hand washing supplies.  Mr. Barnes, who is 73 with heart disease, reported, "[w]e do not have enough soap or cleaning products.  We receive a hygiene kit once a month.  It contains a small portion of soap that we each must use for our hands and bodies.  I personally have little or no money coming in for commissary, and I have been forced to borrow a bar of soap when my kit has run out and I have no money.  I have asked for more soap several times but have been told that it is unavailable because it is locked upstairs in the unit counselor's office.  I received the same response when I requested additional toilet paper."  Devlin-Brown Decl. Ex. 7 (Barnes Decl. ¶ 5).

60.     Detainees that I spoke with or whose declarations I reviewed indicated significant gaps in access to cleaning solutions, with some reporting that they receive insufficient cleaning solution for their cell area.  Mr. Dones reported that the "MCC does not give us cleaning materials for our cells.  The only cleaning implements available in my unit are a broom, dustpan, and dirty mop.  The mop is so dirty that it is worse than nothing."  Devlin-Brown Decl. Ex. 16 (Dones Decl. ¶ 7).  Mr. Michael Falu reported that "[n]o one, however, cleans or disinfects our cells, or provides us with the supplies to do so.  We ask for cleaning supplies all the time.  There are three phones and five e-mail terminals shared by everyone in the unit.  No cleaning supplies are provided to clean the phones or the e-mail terminals between use.  When I use the phone, I try to cover it with a sock or toilet paper."  Devlin-Brown Decl. Ex. 17 (Falu Decl. ¶¶ 10-11).  Mr. Tyler Toro reports that he also has not been given cleaning supplies to sanitize phones or computers, and that he cannot use his "two travel sized pieces of soap" for that purpose.  Devlin-Brown Decl. Ex. 32 (Toro Decl. ¶ 27).  Even when the MCC does supply cleaning materials, they often do so in such

small volumes that they run out quickly.  *See* Devlin-Brown Decl. Ex. 7 (Barnes Decl. ¶ 5).  The facility also does not provide sufficient rags and clothes.  Instead, inmates are forced to "rip their old towels up to make cloths," which are then used for every surface.  Devlin-Brown Decl. Ex. 12 (Crosby Decl. ¶ 18).

61.     The lack of basic infection control extended to failing to initiate any additional cleaning when a person was identified with COVID-19 and transferred to medical isolation or the hospital.  The CDC has clear guidance on the extra measures to be taken in these situation, none of which appear to occur at the MCC.  For example, when Mr. Andrade returned to his original housing area, he reports that "[t]he inmates in my tier gave me a plastic bag that they had put my blanket and sheet in so they did not spread the infection.  But everything else was just the same, and the guys in my tier said no one had come to clean or given them any extra cleaning supplies."  Devlin-Brown Decl. Ex. 6 (Andrade Decl. ¶ 11).  Likewise, when I talked to Robert Russo, an inmate from 11 South, he reported that when he was returned from medical isolation, no one had sanitized his tier or even replaced his bedding.

62.     The MCC also appears to have given little effort to implementing any social distancing.  Nowhere is this more true than 11 South.  Multiple inmates housed there report that the dorms provide "no possibility of social distancing."  *See, e.g.,* Devlin-Brown Decl. Ex. 33 (Turner Decl. ¶ 21).  Inmates sleep on bunk beds within an arm's reach of each other.  Mr. Turner reports that this means he has five inmates sleeping within six feet of him.  *Id.* ¶ 4.  Inmates in the dorms share a single urinal, toilet, sink, and shower.  *See* Devlin-Brown Decl. Ex. 7 (Barnes Decl. ¶ 4).  The two tables each have four chairs attached to them, meaning that inmates cannot distance from each other while eating.  *Id.*  Meals and medication are also doled out from the gate, which

forces the inmates to gather together to collect their items.  *See* Devlin-Brown Decl. Ex. 10 (Bradley Decl. ¶ 11).

63.     The use of masks by staff also appears to be poorly implemented.  Mr. Andrade reported that "[o]fficers all have masks, but they often leave them around their neck, even when we are out in the unit."  Devlin-Brown Decl. Ex. 6 (Andrade Decl. ¶ 13).  Mr. Anthony Luna also confirms that "[n]ot all of the staff wear their masks at all times."  *See* Devlin-Brown Decl. Ex. 22 (Luna Decl. ¶ 18).  Mr. Rodney Griffin has observed a staff member "coughing without covering her mouth or wearing a face mask."  Devlin-Brown Decl. Ex. 20 (Griffin Decl. ¶ 16).  Tellingly, Warden Licon-Vitale also has acknowledged that she has observed staff around the facility not properly wearing their masks.  *See* Kala Decl. Ex. 7 (Licon-Vitale Dep. Tr. at 78:13-21).

64.     The MCC appears to have dedicated considerable resources to preparation for the facility inspection instead of consistent infection control practices as outlined by the CDC.  Many of the declarations I reviewed reported a hasty spate of cleaning and other efforts in the days before the inspection of May 13, with little sustained effort before or after.  As Mr. Karimbux stated, "[b]efore the inspection by the doctor last week, the officers ordered the orderlies to scrub the unit, and they put up signs about COVID, and they made us all wear our masks.  I also saw that a staff person came around and sanitized the unit with a backpack and a hose full of some kind of spray while the inspection was happening.  That has never been done on our unit before or since."  Devlin-Brown Decl. Ex. 21 (Karimbux Decl. ¶ 12).  Mr. Sucich reported that "[t]oday when the inspector came, the CO came through and was spraying the bars of the dormitory with disinfectant.  That had never happened before."  Devlin-Brown Decl. Ex. 31 (Sucich Decl. ¶ 13).

65.     It also appears that the MCC posted additional signs in anticipation of the inspection.  During my tour, Tiffany Days, an inmate in the Women's Unit, told me that posters

28

had been put up informing the inmates that soap was available upon request.  Ms. Days informed

me that this was not true.  Mr. Woodson also reported that, shortly before the inspection, signs

were posted on his unit's "bubble" falsely claiming that "soap, toilet paper, cleaning suppliers

[sic], and masks" were available there, which they weren't.  Kala Decl. Ex. 9 (Woodson Dep. Tr.

at 39:20-25).  Similarly, Mr. Jorge Soto reported that "[l]ast week, inspectors visited the jail.  The

day before they came, the jail put up signs saying if we need anything to clean our cell, ask the

officer.  This was strange because we couldn't get any materials to clean our cells before."  Devlin-

Brown Decl. Ex. 30 (Soto Decl. ¶ 8).

## VII.  Assessment of the MCC's Efforts to Identify and Protect Detainees Particularly Vulnerable to the Effects of COVID-19 Due to High-Risk Factors

66.      Based on my physical inspection of the MCC, it is my assessment that current

practices do not adequately identify and protect detainees who are particularly vulnerable to the

effects of COVID-19 due to their high-risk underlying medical conditions.  This is despite the fact

that the facility is aware that many such high-risk detainees exist.

67.      According to the CDC, people who are "high-risk" include those who are older;

people with  diabetes, asthma, coronary artery disease, and hypertension; and people who are

immunocompromised, severely obese (body mass index [BMI] of 40 or higher), have chronic

kidney disease, and smokers.[11]

68.      Warden Licon-Vitale and Acting Warden Hazelwood each testified that patients

with more serious health problems had been intentionally placed into 11 South.  *See* Kala Decl.

Ex. 7 (Licon-Vitale Dep. Tr. at 69:4-19); Kala Decl. Ex. 6 (Hazelwood Dep. Tr. at 57:7-11).

---

[11] *See People Who Are at Higher Risk for Severe Illness*, CDC, https://www.cdc.gov /coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last reviewed May 14, 2020).

Associate Warden Edge likewise testified that, "we did try to group all of those quote/unquote high risk inmates together in one location [on 11 South] as opposed to throughout the institution," Kala Decl. Ex. 2 (Edge Dep. Tr. at 165:11-20), and Dr. Beaudouin stated that "most" of the people who were high-risk for serious illness or death from COVID-19 were on 11 South, Kala Decl. Ex. 1 (Beaudouin Dep. Tr. at 84:21-24).  While cohorting medically vulnerable inmates may be an appropriate measure, the benefits of cohorting are poorly served by quarantining vulnerable persons in close quarters and ignoring basic infection control practices, particularly when inmates and staff that are not regularly tested for COVID-19 are introduced to the unit.  The tiers on 11 South were medically inappropriate for such purposes.

69.     During my visit to the MCC, I encountered several patients with risk factors for serious illness or death from COVID-19, including Mr. Miller, Mr. Ruffin, Mr. Cooper, and Mr. Cotroneau, and it was apparent that they had not been identified to receive any additional protection or surveillance for COVID-19 symptoms.

70.     I also spoke with Mr. Nicolas Sucich, housed on 11 South, and reviewed his declaration and a transcript of his deposition.  He has several chronic health problems that clearly identify him as high risk based on CDC criteria.  He reported that he experienced COVID-19 symptoms within in his housing area: "I lost my taste and smell for several days and I was shivering and convulsing with fever."  Devlin-Brown Decl. Ex. 31 (Sucich Decl. ¶ 10).  He also reported that "[d]uring those three days that I was extremely sick no doctors came to check on me.  I have had a lot of trouble breathing since then."  *Id.*

71.     As discussed in Paragraph 17, 11 South is comprised of extremely cramped bunk areas, housing 26 men in a low ceiling, small space that includes one toilet per 26 man pod.  This housing area had no PPE cart outside or near the unit entry and was infested with roaches during

our visit.  No social distancing was possible inside the small bunk areas, where men reported being locked for extended periods of time.  I observed phones being used in this unit without any cleaning occurring in between uses.  These conditions likely increase the spread of COVID-19 among the high risk patients placed onto this unit.

72.     There did not appear to be any regular screening of the high-risk patients held on this unit.  Several detained people I spoke with on this unit, including Nicolas Sucich, David Crosby, and Lenin Guzman-Hidalgo, reported intermittent temperature checks, but no screenings that occurred every day and no screenings that included questions about the symptoms of COVID-19.

73.     Despite being on a high-risk unit, detainees I spoke with on 11 South reported that their sick call requests submitted to medical were often ignored or took days to weeks for a response, even when reporting symptoms of COVID-19.

74.     Detainees on 11 South reported that when they returned from Otisville (after being sent there when the MCC reduced its population over a security incident), several of them became ill with COVID-19 symptoms.  Several reported that nurses checked their temperature, found them to have fevers, and left them on the unit.  These men report that they had to stay in their small pod areas on 11 South for the duration of their acute COVID-19 illness, watching the other people around them become ill within days.

## VIII.  Minimum Expectations of Correctional Best Practices

75.     Given the severity of the COVID-19 outbreak, and the clear guidelines outlined by the CDC, I would have expected that MCC implemented the following simple procedures in order to slow the spread of COVID-19:

a.  Screening of all inmates for COVID-19 signs and symptoms on a twice-daily basis if they are in isolation or quarantine and on a twice-weekly basis otherwise. Inmates should also be provided with a daily opportunity to report any symptoms of COVID-19, and records of those reports should be maintained;

b.  Evaluating all inmates who report symptoms of COVID-19 within 24 hours of the inmate's report;

c.  Administering COVID-19 testing of all inmates:

    i.  with signs and/or symptoms of COVID-19, unless a clear alternative rationale is documented, even when individual temperatures are within normal limits;

    ii.  who have been in close contact with an inmate who is positive for, or has symptoms of, COVID-19;

    iii.  who are being newly admitted to the facility or are returning from outside the facility;

    iv.  who possess risk factors for serious illness or death from COVID-19, as defined by the CDC; and

    v.  who are to be released from quarantine;

d.  COVID-19 testing of staff who possess (i) risk factors for serious illness or death from COVID-19; (ii) any signs and/or symptoms of COVID-19; or (iii) who have been exposed to an individual with COVID-19 signs or symptoms;

e.  Tracing close contacts of staff and inmates who test positive for COVID-19 or have symptoms of COVID-19.  Records of each contact tracing investigation should be recorded and preserved;

f.   Adopting a standardized COVID-19 surveillance tool which includes COVID-19 symptoms and signs, including temperature checks, to be administered twice daily by medical staff to all incarcerated persons in quarantine and isolation, and to be administered twice weekly by medical staff to all other inmates;

g.   Isolating any inmate displaying COVID-19 symptoms in housing not typically used for disciplinary purposes, even when temperature is within normal limits, not later than 12 hours after a positive test or staff becoming aware of such symptoms;

h.   For all patients who are suspected or confirmed to have COVID-19, performing a standardized clinical evaluation at least daily by nursing staff in a clinical setting and not cell-side;

i.   Reviewing on a same-day basis every sick-call paper request and electronic submission that will (i) trigger immediate (same day or next morning) assessment for COVID-19 and (ii) provide data that creates a facility wide symptom tracking dashboard that health care staff will use;

j.   Decreasing the number of people in 11 South by 50% of capacity and in any other area where high-risk patients are housed to allow for social distancing of 6 feet or more, including sleeping, meals, medication administration, and other activities;

k.   Immediately addressing the infestation of mice, rats and roaches in the MCC;

l.   Quarantining all close contacts of inmates and staff with COVID-19 in accordance with CDC guidelines;

m.   Ensuring all isolation units follow CDC guidelines for management of COVID-19 including the use of appropriate PPE, cleaning of common surfaces, and exclusion of individuals not suspected to or confirmed to have COVID-19;

33

n.  Requiring that all staff wear personal protective equipment, including masks, when interacting with any person or when touching surfaces in cells or common areas; this PPE must include N95 masks if it involves interaction with inmates in medical isolation and any quarantine or other settings when interacting with patients suspected of having COVID-19;

o.  Providing sufficient disinfecting supplies, free of charge, so incarcerated people can clean high-touch areas or items (including, but not limited to, phones and computers) between each use;

p.  Ensuring that each incarcerated person receives, free of charge, masks effective at preventing the transmission of COVID-19, adequate personal hygiene supplies for hand washing, disinfectant products effective against COVID-19 for daily cleanings, and access to daily showers and daily access to clean laundry;

q.  Providing weekly COVID-19 information sessions for detainees and correctional staff by a member of the MCC health team that cover the status of the outbreak and efforts to mitigate the spread of COVID-19, with the opportunity for detainees and staff to ask questions.

76.  I recommend that MCC implements these practices as soon as possible.

77.  I may develop additional recommendations as I review any supplemental materials or testimony in this case.

78.  Based on the above considerations, it is evident that the MCC has failed to implement numerous best-practices derived from the CDC guidelines as well as outbreak best practices.  Such practices would increase the health and safety of correctional staff, detainees and the general population.

34

79.     I am therefore concerned about the ongoing health and safety of the population at the MCC, and the likelihood of the continued spread of COVID-19 therein.

80.     I declare under penalty of perjury that the foregoing is true and correct.


Executed:  May 26, 2020
           Port Washington, New York


_____

Dr. Homer S. Venters

# APPENDIX A

# Dr. Homer D. Venters

10 ½ Jefferson St., Port Washington, NY, 11050
hventers@gmail.com, Phone: 646-734-5994

HEALTH ADMINISTRATOR          PHYSICIAN          EPIDEMIOLOGIST

## *Professional Profile*

- International leader in provision and improvement of health services to patients with criminal justice involvement.
- Innovator in linking care of the incarcerated to Medicaid, health homes, DSRIPs.
- Successful implementer of nations' first electronic health record, performance dashboards and health information exchange among pre-trial patients.
- Award winning epidemiologist focused on the intersection of health, criminal justice and human rights in the United States and developing nations.
- Human rights leader with experience using forensic science, epidemiology and public health methods to prevent and document human rights abuses.

## *Professional Experience*

**Medical/Forensic Expert**, 3/2016-present
- Review COVID-19 policies and procedures in detention settings.
- Conduct analysis of health services and outcomes in detention settings.
- Conduct site inspections and evaluations in detention settings.
- Produce expert reports, testimony regarding detention settings.

**President**, Community Oriented Correctional Health Services (COCHS), 1/1/2020-4/30/20.
- Lead COCHS efforts to provide technical assistance, policy guidance and research regarding correctional health and justice reform.
- Oversee operations and programmatic development of COCHS
- Serve as primary liaison between COCHS board, funders, staff and partners.

**Senior Health and Justice Fellow**, Community Oriented Correctional Health Services (COCHS), 12/1/18-12/31/2018
- Lead COCHS efforts to expand Medicaid waivers for funding of care for detained persons relating to Substance Use and Hepatitis C.
- Develop and implement COCHS strategy for promoting non-profit models of diversion and correctional health care.

**Director of Programs,** Physicians for Human Rights, 3/16-11/18.
- Lead medical forensic documentation efforts of mass crimes against Rohingya and Yazidi people.
- Initiate vicarious trauma program.
- Expand forensic documentation of mass killings and war crimes.
- Develop and support sexual violence capacity development with physicians, nurses

and judges.
o Expand documentation of attacks against health staff and facilities in Syria and Yemen.

**Chief Medical Officer/Assistant Vice President**, Correctional Health Services, NYC Health and Hospitals Corporation 8/15-3/17.
o Transitioned entire clinical service (1,400 staff) from a for-profit staffing company model to a new division within NYC H + H.
o Developed new models of mental health and substance abuse care that significantly lowered morbidity and other adverse events.
o Connected patients to local health systems, DSRIP and health homes using approximately $5 million in external funding (grants available on request).
o Reduced overall mortality in the nation's second largest jail system.
o Increased operating budget from $140 million to $160 million.
o Implemented nation's first patient experience, provider engagement and racial disparities programs for correctional health.

**Assistant Commissioner,** Correctional Health Services, New York Department of Health and Mental Hygiene, 6/11-8/15.
o Implemented nation's first electronic medical record and health information exchange for 1,400 staff and 75,000 patients in a jail.
o Developed bilateral agreements and programs with local health homes to identify incarcerated patients and coordinate care.
o Increased operating budget of health service from $115 million to $140 million.
o Established surveillance systems for injuries, sexual assault and mental health that drove new program development and received American Public Health Association Paper of the Year 2014.
o Personally care for and reported on over 100 patients injured during violent encounters with jail security staff.

**Medical Director,** Correctional Health Services, New York Department of Health and Mental Hygiene, 1/10-6/11.
o Directed all aspects of medical care for 75,000 patients annually in 12 jails, including specialty, dental, primary care and emergency response.
o Direct all aspects of response to infectious outbreaks of H1N1, Legionella, Clostridium Difficile.
o Developed new protocols to identify and report on injuries and sexual assault among patients.

**Deputy Medical Director,** Correctional Health Services, New York Department of Health and Mental Hygiene, 11/08-12/09.
o Developed training program with Montefiore Social internal medicine residency program.
o Directed and delivered health services in 2 jails.

2

**Clinical Attending Physician,** Bellevue/NYU Clinic for Survivors of Torture, 10/07-
12/11.

**Clinical Attending Physician,** Montefiore Medical Center Bronx NY, Adult Medicine,
1/08-11/09.

## *Education and Training*

**Fellow, Public Health Research,** New York University 2007-2009. MS 6/2009
Projects: Health care for detained immigrants, Health Status of African immigrants in
NYC.
**Resident, Social Internal Medicine**, Montefiore Medical Center/Albert   Einstein
University7/2004- 5/2007.
**M.D.,** University of Illinois, Urbana, 12/2003.
**M.S.** Biology, University of Illinois, Urbana, 6/03.
**B.A.** International Relations, Tufts University, Medford, MA, 1989**.**

## *Academic Appointments, Licensure*

Clinical Associate Professor, New York University College of Global Public Health,
5/18-present.

Clinical Instructor, New York University Langone School of Medicine, 2007-2018.

M.D.   New York (2007-present).

## *Media*

TV

i24 Crossroads re Suicide in U.S. Jails 8/13/19.

i24 Crossroads re re *Life and Death in Rikers Island* 6/13/19.

Amanpour & Company, NPR/PBS re *Life and Death in Rikers Island* 4/15/19.

CNN, Christiane Amanpour re Forensic documentation of mass crimes against Rohingya.
7/11/18.

i24 Crossroads with David Shuster re health crisis among refugees in Syria. 7/6/18.

Canadian Broadcasting Corporation TV with Sylvie Fournier (in French) re crowd
control weapons. 5/10/18

i24 Crossroads with David Shuster re Cholera outbreak in Yemen.  2/15/18.

China TV re WHO guidelines on HIV medication access 9/22/17.

Radio/Podcast

Morning Edition, NPR re Health Risks of Criminal Justice System. 8/9/19.

Fresh Air with Terry Gross, NPR re *Life and Death in Rikers Island*, 3/6/19.

Morning Edition, NPR re *Life and Death in Rikers Island*, 2/22/19.

LeShow with Harry Sherer re forensic documentation of mass crimes in Myanmar, Syria, Iraq. 4/17/18.

Print articles and public testimony

Oped: Four ways to protect our jails and prisons from coronavirus. The Hill 2/29/20.

Oped: It's Time to Eliminate the Drunk Tank. The Hill 1/28/20.

Oped: With Kathy Morse. A Visit with my Incarcerated Mother. The Hill 9/24/19.

Oped: With Five Omar Muallim-Ak. The Truth about Suicide Behind Bars is Knowable. The Hill 8/13/19.

Oped: With Katherine McKenzie. Policymakers, provide adequate health care in prisons and detention centers. CNN Opinion, 7/18/19.

Oped: Getting serious about preventable deaths and injuries behind bars. *The Hill*, 7/5/19.

Testimony: Access to Medication Assisted Treatment in Prisons and Jails,  New York State Assembly Committee on Alcoholism and Drug Abuse, Assembly Committee on Health, and Assembly Committee on Correction**.** NY, NY, 11/14/18.

Oped: Attacks in Syria and Yemen are turning disease into a weapon of war, *STAT News*, 7/7/17.

Testimony: Connecticut Advisory Committee to the U.S. Commission on Civil Rights: Regarding the use of solitary confinement for prisoners. Hartford CT, 2/3/17.

Testimony: Venters HD, New York Advisory Committee to the U.S. Commission on Civil Rights: Regarding the use of solitary confinement for juveniles in New York. July 10, 2014. NY NY.

Testimony: New York State Assembly Committee on Correction with the Committee on

Mental Health: Regarding Mental Illness in Correctional Settings. November 13, 2014. Albany NY.

Testimony: New York State Assembly Committee on Correction with the Committee on Mental Health: Regarding Mental Illness in Correctional Settings. November 13, 2014. Albany NY.

Oped: Venters HD and Keller AS, The Health of Immigrant Detainees. Boston Globe, April 11, 2009.

Testimony: U.S. House of Representatives, House Judiciary Committee's Subcommittee on Immigration, Citizenship, Refugees, Border Security, and International Law: Hearing on Problems with Immigration Detainee Medical Care, June 4, 2008.

## Peer Reviewed Publications

Parmar PK, Leigh J, **Venters H**, Nelson T. Violence and mortality in the Northern Rakhine State of Myanmar, 2017: results of a quantitative survey of surviving community leaders in Bangladesh. Lancet Planet Health. 2019 Mar;3(3):e144-e153.

**Venters H.** Notions from Kavanaugh hearings contradict medical facts. *Lancet.* 10/5/18.

Taylor GP, Castro I, Rebergen C, Rycroft M, Nuwayhid I, Rubenstein L, Tarakji A, Modirzadeh N, **Venters H**, Jabbour S. Protecting health care in armed conflict: action towards accountability. *Lancet.* 4/14/18.

Katyal M, Leibowitz R, **Venters H**. IGRA-Based Screening for Latent Tuberculosis Infection in Persons Newly Incarcerated in New York City Jails. *J Correct Health Care.* 2018 4/18.

Harocopos A, Allen B, Glowa-Kollisch S, **Venters H**, Paone D, Macdonald R. The Rikers Island Hot Spotters: Exploring the Needs of the Most Frequently Incarcerated.
*J Health Care Poor Underserved.* 4/28/17.

MacDonald R, Akiyama MJ, Kopolow A, Rosner Z, McGahee W, Joseph R, Jaffer M, **Venters H**.  Feasibility of Treating Hepatitis C in a Transient Jail Population.
*Open Forum Infect Dis*. 7/7/18.

Siegler A, Kaba F, MacDonald R, **Venters H**. Head Trauma in Jail and Implications for Chronic Traumatic Encephalopathy. *J Health Care Poor and Underserved.* In Press (May 2017).

Ford E, Kim S, **Venters H**. Sexual abuse and injury during incarceration reveal the need for re-entry trauma screening. *Lancet.* 4/8/18.

Alex B, Weiss DB, Kaba F, Rosner Z, Lee D, Lim S, **Venters H,** MacDonald R. Death After Jail Release. *J Correct Health Care.* 1/17.

Akiyama MJ, Kaba F, Rosner Z, Alper H, Kopolow A, Litwin AH, **Venters H**, MacDonald R. Correlates of Hepatitis C Virus Infection in the Targeted Testing Program of the New York City Jail System. *Public Health Rep.* 1/17.

Kalra R, Kollisch SG, MacDonald R, Dickey N, Rosner Z, **Venters H**. Staff Satisfaction, Ethical Concerns, and Burnout in the New York City Jail Health System. *J Correct Health Care.* 2016 Oct;22(4):383-392.

**Venters H.** A Three-Dimensional Action Plan to Raise the Quality of Care of US Correctional Health and Promote Alternatives to Incarceration. *Am J Public Health.* April 2016.104.

Glowa-Kollisch S, Kaba F, Waters A, Leung YJ, Ford E, **Venters H**. From Punishment to Treatment: The "Clinical Alternative to Punitive Segregation" (CAPS) Program in New York City Jails. *Int J Env Res Public Health.* 2016. 13(2),182.

Jaffer M, Ayad J, Tungol JG, MacDonald R, Dickey N, Venters H. Improving Transgender Healthcare in the New York City Correctional System. *LGBT Health.* 2016 1/8/16.

Granski M, Keller A, Venters H. Death Rates among Detained Immigrants in the United States. *Int J Env Res Public Health.* 2015. 11/10/15.

Michelle Martelle, Benjamin Farber, Richard Stazesky, Nathaniel Dickey, Amanda Parsons, **Homer Venters**. Meaningful Use of an Electronic Health Record in the NYC Jail System. *Am J Public Health.* 2015. 8/12/15.

Fatos Kaba, Angela Solimo, Jasmine Graves, Sarah Glowa-Kollisch, Allison Vise, Ross MacDonald, Anthony Waters, Zachary Rosner, Nathaniel Dickey, Sonia Angell, **Homer Venters**. Disparities in Mental Health Referral and Diagnosis in the NYC Jail Mental Health Service. *Am J Public Health.* 2015. 8/12/15.

Ross MacDonald, Fatos Kaba, Zachary Rosner, Alison Vise, Michelle Skerker, David Weiss, Michelle Brittner, Nathaniel Dickey, **Homer Venters**. The Rikers Island Hot Spotters. *Am J Public Health.* 2015. 9/17/15.

Selling Molly Skerker, Nathaniel Dickey, Dana Schonberg, Ross MacDonald, **Homer Venters**. Improving Antenatal Care for Incarcerated Women: fulfilling the promise of the Sustainable Development Goals. *Bulletin of the World Health Organization.*2015.

Jasmine Graves, Jessica Steele, Fatos Kaba, Cassandra Ramdath, Zachary Rosner, Ross MacDonald, Nathanial Dickey, **Homer Venters**. Traumatic Brain Injury and Structural Violence among Adolescent males in the NYC Jail System *J Health Care Poor Underserved.* 2015;26(2):345-57.

Glowa-Kollisch S, Graves J, Dickey N, MacDonald R, Rosner Z, Waters A, **Venters H**. Data-Driven Human Rights: Using Dual Loyalty Trainings to Promote the Care of Vulnerable Patients in Jail. *Health and Human Rights.* Online ahead of print, 3/12/15.

Teixeira PA[1], Jordan AO, Zaller N, Shah D, **Venters H**. Health Outcomes for HIV-Infected Persons Released From the New York City Jail System With a Transitional Care-Coordination

Plan. 2014. *Am J Public Health*. 2014 Dec 18.

Selling D, Lee D, Solimo A, **Venters H.** A Road Not Taken: Substance Abuse Programming in the New York City Jail System. *J Correct Health Care.* 2014 Nov 17.

Glowa-Kollisch S, Lim S, Summers C, Cohen L, Selling D, **Venters H**. Beyond the Bridge: Evaluating a Novel Mental Health Program in the New York City Jail System. *Am J Public Health*. 2014 Sep 11.

Glowa-Kollisch S, Andrade K, Stazesky R, Teixeira P, Kaba F, MacDonald R, Rosner Z, Selling D, Parsons A, **Venters H**. Data-Driven Human Rights: Using the Electronic Health Record to Promote Human Rights in Jail. *Health and Human Rights*. 2014. Vol 16 (1): 157-165.

MacDonald R, Rosner Z, **Venters H**. Case series of exercise-induced rhabdomylosis in the New York City Jail System. *Am J Emerg Med*. 2014. Vol 32(5): 446-7.

Bechelli M, Caudy M, Gardner T, Huber A, Mancuso D, Samuels P, Shah T, **Venters H.** Case Studies from Three States: Breaking Down Silos Between Health Care and Criminal Justice. *Health Affairs*. 2014. Vol. 3. 33(3):474-81.

Selling D, Solimo A, Lee D, Horne K, Panove E, **Venters H**. Surveillance of suicidal and non-suicidal self-injury in the new York city jail system. *J Correct Health Care*. 2014. Apr:20(2).

Kaba F, Diamond P, Haque A, MacDonald R, **Venters H**. Traumatic Brain Injury Among Newly Admitted Adolescents in the New York City Jail System. *J Adolesc Health*. 2014. Vol 54(5): 615-7.

Monga P, Keller A, **Venters H**. Prevention and Punishment: Barriers to accessing health services for undocumented immigrants in the United States. *LAWS*. 2014. 3(1).

Kaba F, Lewsi A, Glowa-Kollisch S, Hadler J, Lee D, Alper H, Selling D, MacDonald R, Solimo A, Parsons A, **Venters H**. Solitary Confinement and Risk of Self-Harm Among Jail Inmates. *Amer J Public Health*. 2014. Vol 104(3):442-7.

MacDonald R, Parsons A, **Venters H.** The Triple Aims of Correctional Health:   Patient safety, Population Health and Human Rights. *Journal of Health Care for the Poor and Underserved*. 2013. 24(3).

Parvez FM, Katyal M, Alper H, Leibowitz R, **Venters H.** Female sex workers incarcerated in New York City jails: prevalence of sexually transmitted infections and associated risk behaviors. *Sexually Transmitted Infections*. 89:280-284. 2013.

Brittain J, Axelrod G, **Venters H.** Deaths in New York City Jails: 2001 – 2009. *Am J Public Health*. 2013 103:4.

Jordan AO, Cohen LR, Harriman G, Teixeira PA, Cruzado-Quinones J, **Venters H.** Transitional Care Coordination in New York City Jails: Facilitating Linkages to Care for People with HIV Returning Home from Rikers Island. *AIDS Behav. Nov.* 2012.

Jaffer M, Kimura C, **Venters H.** Improving medical care for patients with HIV in New York City jails. *J Correct Health Care*. 2012 Jul;18(3):246-50.

Ludwig A, Parsons, A, Cohen, L, **Venters H.** Injury Surveillance in the NYC Jail System, *Am J Public Health* 2012 Jun;102(6).

**Venters H**, Keller, AS. *Psychiatric Services*. (2012) Diversion of Mentally Ill Patients from Court-ordered care to Immigration Detention. Epub. 4/2012.

**Venters H**, Gany, F. *Journal of Immigrant and Minority Health* (2011) Mental Health Concerns Among African Immigrants. 13(4): 795-7.

**Venters H,** Foote M, Keller AS. *Journal of Immigrant and Minority Health.* (2010) Medical Advocacy on Behalf of Detained Immigrants. 13(3): 625-8.

**Venters H,** McNeely J, Keller AS. *Health and Human Rights.* (2010) HIV Screening and Care for Immigration Detainees. 11(2) 91-102.

**Venters H,** Keller AS. *Journal of Health Care for the Poor and Underserved.* (2009) The Immigration Detention Health Plan: An Acute Care Model for a Chronic Care Population. 20:951-957.

**Venters H**, Gany, F. *Journal of Immigrant and Minority Health* (2009) African Immigrant Health. 4/4/09.

**Venters H**, Dasch-Goldberg D, Rasmussen A, Keller AS, *Human Rights Quarterly* (2009) Into the Abyss: Mortality and Morbidity among Detained Immigrant. 31 (2) 474-491.

**Venters H**, *The Lancet* (2008) Who is Jack Bauer? 372 (9653).

**Venters H**, Lainer-Vos J, Razvi A, Crawford J, Shaf'on Venable P, Drucker EM, *Am J Public Health* (2008) Bringing Health Care Advocacy to a Public Defender's Office. 98 (11).

**Venters H**, Razvi AM, Tobia MS, Drucker E. *Harm Reduct J.* (2006) The case of Scott Ortiz: a clash between criminal justice and public health. Harm Reduct J. 3:21

Cloez-Tayarani I, Petit-Bertron AF, **Venters HD**, Cavaillon JM (2003) *Internat. Immunol.* Differential effect of serotonin on cytokine production in lipopolysaccharide-stimulated human peripheral blood mononuclear cells.15,1-8.

Strle K, Zhou JH, Broussard SR, **Venters HD**, Johnson RW, Freund GG, Dantzer R, Kelley KW, (2002) *J. Neuroimmunol.* IL-10 promotes survival of microglia without activating Akt. 122, 9-19.

**Venters HD,** Broussard SR, Zhou JH, Bluthe RM, Freund GG, Johnson RW, Dantzer R, Kelley KW, (2001) *J. Neuroimmunol.* Tumor necrosis factor(alpha) and insulin-like growth factor-I in the brain: is the whole greater than the sum of its parts? 119, 151-65.

**Venters HD,** Dantzer R, Kelley KW, (2000) *Ann. N. Y. Acad. Sci.* Tumor necrosis factor-alpha

induces neuronal death by silencing survival signals generated by the type I insulin-like growth factor receptor. 917, 210-20.

**Venters HD,** Dantzer R, Kelley KW, (2000) *Trends. Neurosci.* A new concept in neurodegeneration: TNFalpha is a silencer of survival signals. 23, 175-80.

**Venters HD,** Tang Q, Liu Q, VanHoy RW, Dantzer R, Kelley KW, (1999) *Proc. Natl. Acad. Sci. USA.* A new mechanism of neurodegeneration: A proinflammatory cytokine inhibits receptor signaling by a survival peptide, 96, 9879-9884.

**Venters HD,** Ala TA, Frey WH 2nd , (1998) Inhibition of antagonist binding to human brain muscarinic receptor by vanadium compounds. *Recept. Signal. Transduct.* 7, 137-142.

**Venters HD**, Tang Q, Liu Q, VanHoy RW, Dantzer R, Kelley KW, (1999) *Proc. Natl. Acad. Sci. USA.* A new mechanism of neurodegeneration: A proinflammatory cytokine inhibits receptor signaling by a survival peptide, 96, 9879-9884.

**Venters HD,** Ala TA, Frey WH 2nd , (1998) Inhibition of antagonist binding to human brain muscarinic receptor by vanadium compounds. *Recept. Signal. Transduct.* 7, 137-142**.**

**Venters HD**, Bonilla LE, Jensen T, Garner HP, Bordayo EZ, Najarian MM, Ala TA, Mason RP, Frey WH 2nd, (1997) Heme from Alzheimer's brain inhibits muscarinic receptor binding via thiyl radical generation. *Brain. Res.* 764, 93-100.

Kjome JR, Swenson KA, Johnson MN, Bordayo EZ, Anderson LE, Klevan LC, Fraticelli AI, Aldrich SL, Fawcett JR, **Venters HD**, Ala TA, Frey WH 2nd (1997) Inhibition of antagonist and agonist binding to the human brain muscarinic receptor by arachidonic acid. *J. Mol. Neurosci.* 10, 209-217.

## *Honors and Presentations (past 10 years)*

**Keynote Address**, Academic Correctional Health Conference, April 2020, Chapel Hill, North Carolina.

**TedMed Presentation**, Correctional Health, Boston MA, March 2020.

**Finalist, Prose Award for Literature**, Social Sciences category for *Life and Death in Rikers Island*, February, 2020.

**Keynote Address,** John Howard Association Annual Benefit, November 2019, Chicago IL.

**Keynote Address,** Kentucky Data Forum, Foundation for a Healthy Kentucky, November 2019, Cincinnati Ohio.

**Oral Presentation,** Dual loyalty and other human rights concerns for physicians in jails an prisons. Association of Correctional Physicians, Annual meeting. 10/16, Las Vegas.

**Oral Presentation,** Clinical Alternatives to Punitive Segregation: Reducing self-harm for

9

incarcerated patients with mental illness. American Public Health Association Annual Meeting, November 2015, Chicago IL.

**Oral Presentation,** Analysis of Deaths in ICE Custody over 10 Years . American Public Health Association Annual Meeting, November 2015, Chicago IL.

**Oral Presentation,** Medication Assisted Therapies for Opioid Dependence in the New York City Jail System. American Public Health Association Annual Meeting, November 2015, Chicago IL.

**Oral Presentation,** Pathologizing Normal Human Behavior: Violence and Solitary Confinement in an Urban Jail. American Public Health Association Annual Meeting, November 2014, New Orleans, LA.

**Training,** International Committee of the Red Cross and Red Crescent, Medical Director meeting 10/15, Presentation on Human Rights and dual loyalty in correctional health.

**Paper of the Year,** American Public Health Association. 2014. (Kaba F, Lewis A, Glowa-Kollisch S, Hadler J, Lee D, Alper H, Selling D, MacDonald R, Solimo A, Parsons A, Venters H. Solitary Confinement and Risk of Self-Harm Among Jail Inmates. *Amer J Public Health*. 2014. Vol 104(3):442-7.)

**Oral Presentation,** Pathologizing Normal Human Behavior: Violence and Solitary Confinement in an Urban Jail. *American Public Health Association* Annual Meeting, New Orleans LA, 2014.

**Oral Presentation,** Human rights at Rikers: Dual loyalty among jail health staff. American Public Health Association Annual Meeting, New Orleans LA, 2014.

**Poster Presentation**, Mental Health Training for Immigration Judges. American Public Health Association Annual Meeting, New Orleans LA, 2014.

**Distinguished Service Award;** Managerial Excellence. Division of Health Care Access and Improvement, NYC DOHMH. 2013.

**Oral Presentation,** Solitary confinement in the ICE detention system. American Public Health Association Annual Meeting, Boston MA, 2013.

**Oral Presentation**, Self-harm and solitary confinement in the NYC jail system. American Public Health Association Annual Meeting, Boston MA, 2013.

**Oral Presentation**, Implementing a human rights practice of medicine inside New York City jails. American Public Health Association Annual Meeting, Boston MA, 2013.

**Poster Presentation,** Human Rights on Rikers: integrating a human rights-based framework for healthcare into NYC's jail system. *American Public Health Association* Annual Meeting, Boston MA, 2013.

**Poster Presentation**, Improving correctional health care: health information exchange and the affordable care act. *American Public Health Association* Annual Meeting, Boston MA, 2013.

**Oral Presentation**, Management of Infectious Disease Outbreaks in a Large Jail System. American Public Health Association Annual Meeting, Washington DC, 2011.

**Oral Presentation,** Diversion of Patients from Court Ordered Mental Health Treatment to Immigration Detention. *American Public Health Association* Annual Meeting, Washington DC, 2011.

**Oral Presentation**, Initiation of Antiretroviral Therapy for Newly Diagnosed HIV Patients in the NYC Jail System. *American Public Health Association* Annual Meeting, Washington DC, 2011.

**Oral Presentation,** Medical Case Management in Jail Mental Health Units. *American Public Health Association* Annual Meeting, Washington DC, 2011.

**Oral Presentation**, Injury Surveillance in New York City Jails. *American Public Health Association* Annual Meeting, Washington DC, 2011.

**Oral Presentation,** Ensuring Adequate Medical Care for Detained Immigrants. Venters H, Keller A, American Public Health Association Annual Meeting, Denver, CO, 2010.

**Oral Presentation,** HIV Testing in NYC Correctional Facilities. Venters H and Jaffer M, *American Public Health Association,* Annual Meeting, Denver, CO, 2010.

**Oral Presentation,** Medical Concerns for Detained Immigrants. Venters H, Keller A, *American Public Health Association* Annual Meeting, Philadelphia, PA, November 2009.

**Oral Presentation,** Growth of Immigration Detention Around the Globe. Venters H, Keller A, *American Public Health Association* Annual Meeting, Philadelphia, PA, November 2009.

**Oral Presentation,** Role of Hospital Ethics Boards in the Care of Immigration Detainees. Venters H, Keller A, *American Public Health Association* Annual Meeting, Philadelphia, PA, November 2009.

**Oral Presentation,** Health Law and Immigration Detainees. Venters H, Keller A, *American Public Health Association* Annual Meeting, Philadelphia, PA, November 2009.

**Bro Bono Advocacy Award,** Advocacy on behalf of detained immigrants. Legal Aid Society of New York, October 2009.

**Oral Presentation,** Deaths of immigrants detained by Immigration and Customs Enforcement. Venters H, Rasmussen A, Keller A, *American Public Health Association* Annual Meeting, San Diego CA, October 2008.

**Poster Presentation,** Death of a detained immigrant with AIDS after withholding of prophylactic Dapsone. Venters H, Rasmussen A, Keller A, *Society of General Internal Medicine* Annual Meeting, Pittsburgh PA, April 2008.

**Poster Presentation,** Tuberculosis screening among immigrants in New York City reveals higher rates of positive tuberculosis tests and less health insurance among African immigrants. *Society of General Internal Medicine* Annual Meeting, Pittsburgh PA, April 2008.

**Daniel Leicht Award for Achievement in Social Medicine,** Montefiore Medical Center, Department of Family and Social Medicine, 2007.

**Poster Presentation**, Case Findings of Recent Arestees. Venters H, Deluca J, Drucker E. *Society of General Internal Medicine* Annual Meeting, Toronto Canada, April 2007.

**Poster Presentation,** Bringing Primary Care to Legal Aid in the Bronx. Venters H, Deluca J, Drucker E. *Society of General Internal Medicine* Annual Meeting, Los Angeles CA, April 2006.

**Poster Presentation**, A Missed Opportunity, Diagnosing Multiple Myeloma in the Elderly Hospital Patient. Venters H, Green E., *Society of General Internal Medicine* Annual Meeting, New Orleans LA, April 2005.

## *Grants: Program*

San Diego County: Review of jail best practices (COCHS), 1/2020, $90,000.

Ryan White Part A - Prison Release Services (PRS). From HHS/HRSA to Correctional Health Services (NYC DOHMH), 3/1/16-2/28/17 (Renewed since 2007). Annual budget $ 2.7 million.

Ryan White Part A - Early Intervention Services- Priority Population Testing. From HHS/HRSA to Correctional Health Services (NYC DOHMH), 3/1/16-2/28/18 (Renewed since 2013). Annual budget $250,000.

Comprehensive HIV Prevention. From HHS to Correctional Health Services (NYC DOHMH), 1/1/16-12/31/16. Annual budget $500,000.

HIV/AIDS Initiative for Minority Men. From HHS Office of Minority Health to Correctional Health Services (NYC DOHMH), 9/30/14-8/31/17. Annual budget $375,000.

SPNS Workforce Initiative, From HRSA SPNS to Correctional Health Services (NYC DOHMH), 8/1/14-7/31/18. Annual budget $280,000.

SPNS Culturally Appropriate Interventions. From HRSA SPNS to Correctional Health Services (NYC DOHMH), 9/1/13-8/31/18. Annual budget $290,000.

Residential substance abuse treatment. From New York State Division of Criminal Justice Services to Correctional Health Services (NYC DOHMH), 1/1/11-12/31/17. Annual budget $175,000.

Community Action for Pre-Natal Care (CAPC). From NY State Department of Health AIDS Institute to Correctional Health Services (NYC DOHMH), 1/1/05-12/31/10. Annual budget $290,000.

Point of Service Testing. From MAC/AIDS, Elton John and Robin Hood Foundations to Correctional Health Services (NYC DOHMH), 11/1/09-10/31/12. Annual budget $100,000.

Mental Health Collaboration Grant. From USDOJ to Correctional Health Services (NYC DOHMH), 1/1/11-9/30/13. Annual budget $250,000.

## Teaching

**Instructor,** Health in Prisons Course, Bloomberg School of Public Health, Johns Hopkins University, June 2015, June 2014, April 2019.

**Instructor**, Albert Einstein College of Medicine/Montefiore Social Medicine Program Yearly lectures on Data-driven human rights, 2007-present.

## Other Health & Human Rights Activities

**DIGNITY Danish Institute Against Torture**, Symposium with Egyptian correctional health staff regarding dual loyalty and data-driven human rights. Cairo Egypt, September 20-23, 2014.

**Doctors of the World,** Physician evaluating survivors of torture, writing affidavits for asylum hearings, with testimony as needed, 7/05-11/18.

**United States Peace Corps**, Guinea Worm Educator, Togo West Africa, June 1990- December 1991.
> -*Primary Project;* Draconculiasis Eradication. Activities included assessing levels of infection in 8 rural villages and giving prevention presentations to mothers in Ewe and French
> -*Secondary Project;* Malaria Prevention.

## Books

**Venters H.** *Life and Death in Rikers Island*. Johns Hopkins University Press. 2/19.

## Chapters in Books

**Venters H.** Mythbusting Solitary Confinement in Jail. In Solitary Confinement Effects, Practices, and Pathways toward Reform. Oxford University Press, 2020.

MacDonald R. and **Venters H.** Correctional Health and Decarceration. In Decarceration. Ernest Drucker, New Press, 2017.

## Membership in Professional Organizations

**American Public Health Association**

## *Foreign Language Proficiency*

**French**     Proficient
**Ewe**         Conversant

## *Prior Testimony and Deposition*

Benjamin v. Horn, No. 1:75-cv-03073 (S.D.N.Y.), as expert for defendants, 2015

Rodgers v. Texas, No. 2:16-cv-00216 (N.D. Tx.), as expert for plaintiffs, 10/19/17

Fikes v. Abernathy, No. 17:16-cv-00843 (N.D. Ala.), as expert for plaintiffs, 10/30/17.

Fernandez v. City of New York, No. 1:17-cv-02431 (S.D.N.Y.), as defendant in role as city employee, 4/10/18.

Charleston v. Corizon Health, Inc., No. 2:17-cv-03039 (E.D. Pa.), as expert for plaintiffs, 4/20/18.

Atencio v. Bd. of Cty. Comm'rs. of Santa Fe Cty., No. 1:17-cv-00617 (D.N.M.), as expert for plaintiffs, 7/23/18.

Hammonds v. Dekalb County, Ala., No. 4:16-cv-01558 (N.D. Ala.), as expert for plaintiffs, 11/30/2018.

Mathiason v. Rio Arriba County NM, No. D-117-CV-2007-00054, as expert for plaintiff, 2/7/19.

Hutchinson v. Bates, No. 2:17-cv-00185 (M.D. Ala.), as expert for plaintiff, 3/27/19.

Lewis v. Gautreaux, No. 3:16-cv-00352 (M.D. La.), as expert for plaintiff, 6/24/19.

Belcher v. Lopinto, No. 2:18-cv-07368 (E.D. La.), as expert for plaintiffs, 12/5/2019.

Imperati v. Semple, No. 3:18-cv-01847 (D. Conn.), as expert for plaintiffs, 3/11/20.

USA v. Pratt, No. 2:19-cr-00213 (W.D. Pa.) (Video Hearing 4/28/20).

USA v. Nelson, No. 1:19-cr-00021 (W.D. Pa.) (Video Hearing 5/4/20).

Chunn v. Edge, No. 1:20-cv-01590 (E.D.N.Y.) (Video Hearing 5/12/20, Video Deposition 4/30/20).

Fee Schedule

Case review, reports, testimony $500/hour.
Site visits and other travel, $2,500 per day (not including travel costs).