# EXHIBIT 2

Page 1

```
 1
 2          UNITED STATES DISTRICT COURT
 3          SOUTHERN DISTRICT OF NEW YORK
 4
 5   CESAR                    )
     FERNANDEZ-RODRIGUEZ,     )
 6   ROBER GALVEZ-CHIMBO,     )
     SHARON HATCHER,          )No.
 7   JONATHAN MEDINA, JAMES   )20 Civ. 3315(ER)
     WOODSON, individually    )
 8   and on behalf of all     )
     others similarly         )
 9   situated,                )
                 Petitioners, )
10                            )
                 vs.          )
11                            )
     MARTI LICON-VITALE, in   )
12   her official capacity    )
     as Warden of the         )
13   Metropolitan             )
     Correctional Center,     )
14          Respondent.       )
     _____ )
15
16
17
18        VIDEOCONFERENCE DEPOSITION OF
19               CHARISMA EDGE
20          Wednesday, May 20, 2020
21
22
23   Reported By:
24   CATHI IRISH, RPR, CRR, CLVS, CCR
25
```

Page 22

1                     EDGE

2    but acting warden Hazelwood did not yet

3    arrive?

4         A.   Yes.  I'm trying to remember

5    her -- what day she actually look leave.

6    It was a day or so before Mr. Hazelwood

7    arrived, yes.

8         Q.   Okay.  So when did the MCC first

9    start any type of planning to address a

10   potential outbreak of COVID-19 at the

11   facility?

12        A.   I don't recall initially the date

13   for the planning.

14        Q.   Do you recall the month when

15   planning first started?

16        A.   March.

17        Q.   Do you recall when in March?

18        A.   It was the latter part of March.

19        Q.   The second half of March, would

20   that be fair to say?

21        A.   That's fair to say.

22        Q.   Did you get some exhibits a few

23   hours before this deposition started?

24        A.   Yes.

25        Q.   And do you have them in front of

```
 1                    EDGE
 2    point?
 3         A.    This is the first time I'm seeing
 4    it.
 5         Q.    Were you aware of the Federal
 6    Defenders of New York making the request
 7    reflected at the bottom of the e-mail for
 8    David Patton for information about the
 9    MCC's planning for COVID-19?
10         A.    No.
11         Q.    We can put that away.
12              As of March 15th of 2020, is it
13    accurate to say that the MCC did not have
14    any protocol in place for testing inmates
15    for COVID-19?
16         A.    You're saying beginning March
17    15th, did we do any testing?
18         Q.    Did you have any protocol in
19    place for how, if at all, you would test
20    inmates prior to March 15th?
21         A.    Not that I'm aware of.
22         Q.    When is the first time the MCC
23    has had test kits available to conduct
24    tests to process either within the MCC or
25    through a commercial lab for COVID-19?
```

Page 49

1                      EDGE

2    attention so that's what I recall about

3    conversations related to placement.

4        Q.    It's just important for the

5    deposition that the record be clear so I

6    just want to make sure it is.

7              Are you saying you do not

8    remember having any conversations about

9    whether it was medically appropriate to

10   house inmates who had COVID-19 in the

11   special housing unit?

12             MS. ROVNER:  Objection.

13   BY MR. DEVLIN-BROWN:

14       Q.    You can answer.

15       A.    What I'm saying is the words

16   "medically appropriate," I do not recall

17   those words being used but I do recall

18   discussing whether or not inmates would

19   have medical attention, would medical be

20   available, that's what I recall.

21       Q.    Do you recall anyone at the MCC

22   recommending that inmates with COVID-19

23   not be sent to the special housing unit?

24       A.    I do not recall that suggestion.

25             MR. DEVLIN-BROWN:  Could you take

```
                                            Page 52
 1                      EDGE
 2     contact investigations are recommended or
 3     should be done when there is a positive
 4     case.
 5         Q.   To be clear, in this case
 6     reflected in the memo in Exhibit 4, you do
 7     not know one way or the other if a contact
 8     investigation was ever conducted with
 9     respect to which staff this positive
10     inmate had contact with?
11         A.   No, I do not know about the
12     contact investigation.
13         Q.   So this first inmate who was
14     determine by the MCC to have COVID-19 was
15     housed on 11 South; is that correct?
16         A.   Yes.
17         Q.   And that's a dormitory unit; is
18     that right?
19         A.   That's right.
20         Q.   Do you know approximately how
21     many inmates 11 South holds when it's
22     fully occupied?
23         A.   156 inmates.
24         Q.   Was it at or near full occupancy
25     at the time of this incident?
```

                         EDGE

1

2       A.    I don't know of the numbers or

3    the capacity at that time.

4       Q.    Following the diagnosis of this

5    first inmate with COVID-19, what steps

6    were taken to identify, if any, who on

7    11 South among the inmate population had

8    contact with this inmate?

9       A.    You're asking about the inmates

10   who came in contact with the inmate who

11   was removed, placed on G?

12      Q.    Yeah, I'm asking if to your

13   knowledge there was any effort by the MCC

14   to identify those inmates on 11 South who

15   had been in close contact with the patient

16   who had been first identified as having

17   COVID-19.

18      A.    I don't know about any contact

19   investigation.  What I do know is that the

20   entire unit was placed on quarantine as a

21   precaution.

22      Q.    So to be clear, by placing the

23   entire unit on quarantine, does that mean

24   no inmates who were then residing on

25   11 South were moved from 11 South to

```
                                    Page 54
 1                  EDGE
 2   another unit and no one came into 11 South
 3   from outside that unit?
 4        A.   That is correct.
 5        Q.   When did that quarantine go into
 6   effect in terms of how quickly after this
 7   first case was diagnosed?
 8        A.   Well, to my recollection, as soon
 9   as it was discovered that the inmate was
10   positive or asymptomatic, then the
11   quarantine was immediately placed in
12   effect.
13        Q.   Do you recall any efforts other
14   than putting a quarantine on the entire
15   unit to determine which inmates may have
16   been in close contact with the infected
17   person?
18        A.   I do know -- I am not aware about
19   the contact investigation aspect.  I am
20   aware of the quarantine aspect.
21        Q.   Do you recall any discussion
22   about whether or not to move inmates who
23   had close contact with the affected inmate
24   out of 11 South to isolation themselves?
25        A.   I don't recall if there was
```

```
                                          Page 55
 1                      EDGE
 2    another inmate related to the 11 South,
 3    whether they were placed on isolation but
 4    again the entire unit was placed on
 5    quarantine status for precaution.
 6         Q.   Following the diagnosis on March
 7    23rd, were any steps implemented to
 8    provide additional protective equipment to
 9    the inmates on 11 South?
10         A.   Additional PPE, are you referring
11    to masks?
12         Q.   It wasn't a great question.  Let
13    me break it down.
14              Prior to March 23rd, the inmates
15    on 11 South did not have masks; is that
16    correct?
17         A.   That is correct.
18         Q.   When were masks first issued to
19    inmates on 11 South?
20         A.   Masks were issued to the inmate
21    population I believe sometime in April.
22         Q.   Was there any increase in the
23    amount of sanitation supplies, soap,
24    cleaning equipment provided immediately
25    after this original case on March 23rd to
```

Page 92

1              EDGE

2      A.   Indicated by a regularly

3   scheduled basis, we have meetings Monday

4   and every Friday and during portions of

5   those meetings we do have a portion set

6   aside for COVID so I would say yes, a

7   regularly scheduled basis.

8      Q.   Who's at these meetings on Monday

9   and Friday?

10     A.   The executive staff.

11     Q.   And who is the executive staff,

12  what does that consist of?

13     A.   The warden, all the associate

14  wardens, the executive assistant and the

15  captain, and the psychologist is there as

16  well, medical is there, and if there's

17  something that specifically we need

18  clarification on they may stay but there's

19  a portion where they do step out and those

20  are the participants of the meeting.

21     Q.   Who is there for medical?

22     A.   The health services -- at this

23  time the health services -- excuse me, the

24  assistant health services administrator

25  but he's on leave, the health services

```
 1                    EDGE
 2   received any RIS request, again prior to
 3   COVID-19, that I'm aware of.  They all
 4   happened after COVID.
 5       Q.   Since the COVID pandemic has
 6   arrived, can you estimate how many times
 7   the MCC has filed a motion for
 8   compassionate release based on requests
 9   from the inmate?
10       A.   That I don't.  I'm not aware how
11   many times we filed a motion.
12       Q.   Are you aware of any one way or
13   the other?
14       A.   I don't recall there being any
15   approved based on the MCC -- from the
16   institution standpoint to file a motion,
17   I'm not aware of any.
18       Q.   How, if at all, has the
19   compassionate release evaluation changed
20   since the COVID pandemic in terms of
21   factors that the MCC considers in
22   evaluating applications, if it has?
23       A.   I know there is a AG memo
24   indicating there should be a heightened
25   increase use for -- that's for home
```

1                    EDGE

2      submitted or reviewed for home confinement

3      and it's approved, then there's no need to

4      then continue the reviews for

5      compassionate release because the

6      vulnerability to that inmate no longer

7      exists if they have been approved for home

8      confinement.  So the two home confinement

9      and compassionate release are two

10     separate, they fall under two separate

11     authorities, whereas home confinement is a

12     review based on from the institution's

13     perspective, whereas compassionate release

14     the warden make a recommendation, it's

15     sent to central office, and then the

16     director coordinates with the United

17     States Attorney's Office and they make a

18     motion to the court.  So those are two

19     separate processes.

20          Q.   Okay.  In terms of the time it

21     takes to review a compassionate release

22     application, is it fair to say a backlog

23     of such applications developed because of

24     the volume of inmates filing them

25     following the COVID-19 pandemic?

```
 1                    EDGE
 2        A.    Yes.
 3        Q.    Were you recently able to
 4   accelerate your review of those and clear
 5   the backlog?
 6        A.    Yes.
 7        Q.    And how did you do that?
 8        A.    How did we clear the backlog?
 9        Q.    Did you receive additional staff
10   or other tools that enabled you to clear
11   the backlog in recent weeks?
12        A.    The staff that we currently have
13   did the review and that's how the backlog
14   was cleared.
15        Q.    So the staff that would
16   ordinarily review these things simply
17   reviewed them more quickly; is that fair
18   to say?
19             MS. ROVNER:  Objection.
20             THE WITNESS:  That's fair to say.
21   BY MR. DEVLIN-BROWN:
22        Q.    Let's turn to home confinement
23   which I think you were referring to before
24   as well.
25             Actually sorry, before I get
```

1                     E D G E

2    first.

3         A.    Pre-COVID, we have a system

4    called Insight and it's a database that's

5    generated or initiated from the unit team

6    secretary and it's an RRC or residential

7    reentry center referral and so home

8    confinement and RRC are acronyms, they are

9    processed the same way.  Home confinement

10   is then determined from the RRM, the

11   residential reentry manager based on the

12   RRC referral, if you will.

13        Q.    Okay.

14        A.    Yeah, a database.

15        Q.    Okay.  So how has the home

16   confinement review process changed since

17   the COVID-19 pandemic?

18        A.    Well, I would say with the

19   guidance of the Attorney General's memo,

20   we've been given a more stringent -- I

21   won't say stringent but criteria to

22   specifically increase the use of home

23   confinement.

24             MR. DEVLIN-BROWN:  If I could

25        show you what's been marked as Exhibit

```
 1                    E D G E
 2     this was definitely discussed.
 3         Q.    Okay.  What do you remember about
 4     discussions you had about implementing the
 5     memo?
 6         A.    I had a discussion with
 7     Mr. Demosthenes about processing home
 8     confinement in an expeditious manner.
 9         Q.    I mean the memo provides the BOP
10     with authority to release inmates on home
11     confinement who would have been ineligible
12     before; right?
13         A.    What do you mean by ineligible?
14     My understanding is not that we would take
15     an ineligible inmate and make him
16     eligible.  My understanding is that we
17     would make greater use of it but I don't
18     believe that it would be a fair assessment
19     that an ineligible inmate would now be
20     eligible.
21         Q.    To be clear, are you saying that
22     in your view, the only inmates who would
23     be eligible for release after this memo
24     would be the same inmates who were
25     eligible for release before?
```

1                    EDGE

2        A.    Yes.   My understanding is not --

3   is to increase the use or to run rosters

4   and to maybe perhaps review people faster

5   or quicker and not wait for the specific

6   time frame because as I already indicated,

7   home confinement is generated, the review

8   process is the same as the RRC packet and

9   typically inmates are reviewed for halfway

10  house placement based on a certain time

11  frame, like 17 to 19 months they are

12  reviewed, but this to me indicated that

13  the review process should be immediate but

14  it doesn't say, my understanding is not

15  that an ineligible inmate would be deemed

16  eligible.

17        Q.    Was vulnerability to COVID-19 a

18  factor in releasing on home confinement?

19        A.    Yes.

20        Q.    And was that a factor before this

21  memo or only after this memo?

22        A.    Well, COVID-19 didn't exist prior

23  to the memo so I would say that as a

24  result of this memo.

25        Q.    Well, you had already had a

```
                                    Page 153
 1                    E D G E
 2            THE VIDEOGRAPHER:  We're going
 3       off the record at 3:08 p.m.  This
 4       marks the end of media unit 2.
 5            (Recess taken from 3:08 p.m. to
 6       3:20 p.m.).
 7            THE VIDEOGRAPHER:  We're back on
 8       the record at 3:21 p.m.  This marks
 9       the beginning of media 3.
10  BY MR. DEVLIN-BROWN:
11       Q.   Okay, so Ms. Edge, before we took
12  a break, I had asked you if you had
13  concerns about how the home confinement
14  process was implemented at the MCC
15  following Attorney General Barr's memo.
16  You had said that you did have concerns
17  and I asked you what they were and you
18  said the reviews were not being done.
19            Can you explain what you mean by
20  that?
21       A.   Meaning the staff that are
22  responsible for reviewing the request were
23  not available to review the request.  They
24  were reassigned.
25       Q.   And which staff were these by
```

```
                                          Page 154
 1                    EDGE
 2    position and name?
 3        A.    The case managers, they conduct
 4    the review so those case managers would be
 5    Flores -- and again the first names I'm
 6    not familiar with because we call
 7    everybody by their last names -- so that
 8    would be Flores, Jenkins-Cardew, Olivares.
 9        Q.    Did you say the case managers
10    were reassigned?
11        A.    Yes.
12        Q.    Reassigned to what?
13        A.    To work custody.
14        Q.    And work custody means what?
15        A.    Meaning that custody they were
16    working correctional posts.
17        Q.    Okay.  Did that happen to a large
18    number of case managers?
19        A.    All of the case managers.
20        Q.    And do you know why they were
21    reassigned to that?
22        A.    A decision was made to implement
23    a 12-hour roster and to utilize
24    non-custody staff which included unit team
25    staff.
```

```
                                    Page 155

 1                    E D G E
 2        Q.   When was that decision made?
 3        A.   The decision was made the latter
 4   part of March and then it was implemented
 5   April 5th.
 6        Q.   So it was implemented shortly
 7   after the Attorney General's memo came
 8   down?
 9        A.   Yes.
10        Q.   Did you know that the case
11   managers were being reassigned to
12   corrections posts?
13        A.   I did not know until I received
14   the e-mail along with everyone else.
15        Q.   What e-mail are you referring to?
16        A.   The e-mail indicating that staff
17   will be reassigned.
18        Q.   I see.  And did that e-mail, that
19   e-mail came down in late March to be
20   effective April 5th if I understand you.
21        A.   Correct.
22        Q.   So as of the time the Attorney
23   General's memo was issued on April 4th,
24   did you understand at that time these case
25   managers were not going to be available to
```

```
                            EDGE
 1
 2    do the review in a timely manner?
 3        A.   Well, the memo, the AG memo was
 4    April 3rd, not April 4th, and when the
 5    memo was sent out or disseminated, I
 6    didn't know to the extent that it would
 7    impact or how many of my staff would be
 8    reassigned.
 9        Q.   And when did you figure out how
10    big an impact it would have on your staff?
11        A.   The date that it became
12    effective.
13        Q.   Did that give you concerns right
14    away that there was going to be delay in
15    processing home confinement?
16        A.   Yes.
17        Q.   Did you express your concerns to
18    anyone?
19        A.   Yes.
20        Q.   To whom?
21        A.   To the warden.
22        Q.   To the warden or acting warden or
23    both?
24        A.   To both.
25        Q.   Tell me about what you told the
```

```
1                    EDGE
2    warden.
3         A.   That I needed the staff in order
4    to do the work, simple.
5         Q.   What was her response?
6         A.   That it was -- it wasn't a direct
7    response but ultimately I didn't get the
8    staff.
9         Q.   What response did she give you
10   exactly?
11        A.   That the staff would not be
12   returning in addition to other, you know.
13        Q.   In addition to what?
14        A.   In addition to other -- just the
15   staff would not be returned.  They would
16   be utilized on the custody roster.
17        Q.   Did she give you any suggestions
18   about how to process the cases given that
19   the staff were going to be used for the
20   custody roster?
21        A.   No.
22        Q.   What did you do after she told
23   you that the staff would not be coming
24   back to support that?
25        A.   I had a conversation with
```

```
 1                    EDGE
 2   Mr. Demosthenes and he and I did the best
 3   we could with the request.
 4        Q.   What was Mr. Demosthenes's
 5   reaction?
 6        A.   He was puzzled as to how we would
 7   get all the requests done in the time
 8   frame.
 9        Q.   I'm trying to figure out when the
10   warden went on leave.  It was around this
11   time; right?
12        A.   We received -- Mr. Hazelwood
13   reported to us April 9th so her last day
14   was maybe -- what day is April 9th?
15        Q.   I can figure it out.
16             A Thursday.
17        A.   Thursday.  So I think there was
18   an e-mail sent out maybe like a couple
19   days prior to that she would not be at
20   work.
21        Q.   So when the acting warden
22   Hazelwood arrived, did you on April 9th,
23   did you communicate with him about this?
24        A.   I don't remember if it was
25   April -- I probably did tell him April 9th
```

```
 1                     EDGE
 2    but I know I communicated it early on
 3    after having a meeting.
 4        Q.   Was this just a one-on-one
 5    meeting with you and him or were there
 6    other people there?
 7        A.   There were other people there.
 8        Q.   The executive staff?
 9        A.   Correct.
10        Q.   And what did you tell the acting
11    warden at that meeting about your
12    situation?
13        A.   That I needed unit team staff to
14    process RIS in addition to just their
15    regular work.
16        Q.   And what did he say?
17        A.   That unit team staff, this is not
18    verbatim, you know.
19        Q.   Of course.
20        A.   In essence, unit team staff, they
21    would be utilized on the custody roster.
22        Q.   Did he give you any other
23    suggestions about how you might find the
24    resources to process these cases?
25        A.   No.
```

```
 1                     EDGE
 2        Q.    Did you raise it with anyone else
 3    at the MCC, your concerns?
 4        A.    Yes.
 5        Q.    Who else?
 6        A.    When -- well, exec staff knew
 7    about it.   Those are my peers.   I
 8    definitely didn't discuss it with any
 9    support with the exception of
10    Mr. Demosthenes because he was directly
11    involved, and obviously he knew what was
12    going on because he was doing the work of
13    someone else but the attorreys new as
14    well.
15        Q.    The MCC attorneys?
16        A.    Yes.
17        Q.    Did you write any e-mails or
18    memos or anything about your concerns?
19        A.    I did write some e-mails.
20        Q.    To who, other than the attorneys,
21    to who?
22        A.    The exec staff.
23        Q.    Do you know the date of those
24    e-mails or would you be able to figure it
25    out?
```

1                      EDGE
2         Q.   Were you satisfied that that was
3     a good explanation?
4         A.   No.
5         Q.   Why not?
6         A.   Because I know that they could --
7     they didn't have to be in custody.
8         Q.   Why did you think they didn't
9     need to be in custody?
10        A.   There could have been someone
11    else to work in their place.
12        Q.   You didn't think that the MCC was
13    so short-staffed that they had no choice
14    but to assign these people to the custody
15    roster?
16        A.   The staff didn't have to be in
17    custody.  Those particular individuals did
18    not have to be in custody.
19        Q.   So did you eventually get help
20    that you needed from this?
21        A.   Yes.
22        Q.   When did you get help?
23        A.   When the staff returned.
24        Q.   And when was that?
25        A.   I believe it was April 26th.

```
                                    EDGE
1
2         Q.   Can you just explain to me sort
3    of how it was done?
4         A.   We identified some inmates
5    that -- we ran a roster and some inmates
6    were identified either by the Office of
7    General Counsel and then the Office of
8    Research, I forgot the acronyms, Office of
9    Research, and then there was a roster
10   generated, some inmates identified as
11   possibly meeting the criteria and we were
12   instructed to review those inmates.  In
13   addition, there was an at-risk list that
14   was identified and then those inmates were
15   reviewed.
16        Q.   And when did that review take
17   place?
18        A.   The at-risk list?
19        Q.   Yeah.
20        A.   They happened at different times,
21   we receive the information at different
22   times so when the Regent sent us the
23   information, it had to be sometime in
24   April, the beginning of April.
25        Q.   Okay.  And just so I'm clear,
```

```
 1                    EDGE
 2   this is the process that resulted in a
 3   list of about 205 vulnerable inmates?
 4       A.    I don't know if it was 205 but it
 5   was an extensive list.
 6       Q.    How did the MCC use that data on
 7   inmates being in this vulnerable category,
 8   how did it factor into the decision the
 9   MCC makes as to where to house them or any
10   number of things?
11       A.    Well, 11 South was identified as
12   an area or a housing unit that would
13   probably be better for them because it's a
14   dorm setting and a decision was that it
15   would just be a little -- that environment
16   is a little bit more amenable to the -- I
17   would say the high risk inmates so we did
18   try to group all of those quote/unquote
19   high risk inmates together in one location
20   as opposed to throughout the institution.
21       Q.    And that was before the first
22   cases of COVID in the facility?
23       A.    Yes.
24       Q.    Okay.  All right, turning to
25   sanitation which I think is one of the
```

```
 1                    E D G E
 2       Q.   I guess -- what do they wipe it
 3    down with, like paper towels or is there
 4    cloth rags or what?
 5       A.   Cloth rags.
 6       Q.   Okay.  So what about masks for
 7    the inmates, were you involved at all in
 8    decisions about ordering masks and
 9    providing masks to inmates?
10       A.   I was not involved in ordering
11    the masks, that was guidance, that was
12    sent down from -- we had no -- no decision
13    internally.  That was decided for us.  So
14    the masks, you receive the masks and you
15    distribute the masks.
16       Q.   And initially the masks given to
17    the inmates were what kind of masks?
18       A.   They were the surgical masks.
19       Q.   Do you know how often they were
20    provided to the inmates?
21       A.   Once a week.
22       Q.   How many masks a week?
23       A.   One mask a week.
24       Q.   When did that start, if you know?
25       A.   That was sometime in April.
```