# EXHIBIT 6

```
 1   UNITED STATES DISTRICT COURT

 2   SOUTHERN DISTRICT OF NEW YORK

 3   CIVIL ACTION NO. 1:20-civ-03315 (ER)

 4   ------------------------------------------------x

 5   CESAR FERNANDEZ-RODRIGUEZ, ROBER GALVEZ-CHIMBO,

 6   SHARON HATCHER, JONATHAN MEDINA, and JAMES

 7   WOODSON, individually and on behalf of all others

 8   similarly situated,

 9                     Petitioners,

10            v.

11   MARTI LICON-VITALE, in her official capacity as

12   Warden of the Metropolitan Correctional Center,

13                     Respondent.

14   ------------------------------------------------x

15                            Remote Deposition

16                            May 22, 2020

17                            10:54 a.m.

18

19        DEPOSITION VIA VIDEOCONFERENCE OF

20             ROBERT HAZLEWOOD

21

22

23             lipka.com, inc.

24             (888) lipka-com

25             transcripts@lipka.com 0002
```

Page 1

For the Exclusive Use of Covington & Burling, LLP.
Use by any other party voids the certification

**Robert Hazlewood**

1          Q.     Mr. Hazlewood, if an inmate fell ill

2    with COVID-19 symptoms at the MCC, what could they

3    do to report it?

4          A.     Tell any staff member.

5          Q.     Could they do it by paper or what is

6    referred to as cop-out, I understand?

7          A.     They could.

8          Q.     Do you know if any medical request

9    cop-outs were received while you were acting

10   warden?

11         A.     I don't specifically recall that.

12         Q.     Do you know whether those medical

13   cop-outs would have been retained?

14         A.     Ordinarily a medical cop-out would

15   be responded to if it's in paper and returned to

16   the inmate.  If it was done electronically via

17   e-mail, then there would be a record of it there.

18         Q.     Are you aware that medical cop-outs

19   at the MCC were being shredded until earlier this

20   month?

21              MR. OESTERICHER:  Objection.

22         A.     No, I'm not aware of that.

23         Q.     This is your first time hearing

24   about that?

25         A.     Yes.

**For the Exclusive Use of Covington & Burling, LLP.**
**Use by any other party voids the certification**

Robert Hazlewood

```
 1    leave while you were acting warden?

 2           A.    Not to my knowledge.

 3           Q.    Approximately how many inmates had

 4    COVID-19 symptoms while you were the acting

 5    warden?

 6                 MR. OESTERICHER:  Objection.

 7           A.    I don't recall the exact number.  I

 8    believe that by the time I left, the number of

 9    symptomatic inmates had dropped to nine total.

10           Q.    From a high of what?

11           A.    I can't be sure of the number, but I

12    believe it was 19, a high of 19 when I arrived,

13    and it dropped to approximately nine by the time I

14    departed.

15           Q.    And what is your basis for those

16    numbers?

17           A.    The number of inmates that were

18    housed in Unit 3, which was our isolation unit.

19           Q.    We talked about positive inmates and

20    contact tracing.  Was there any contact tracing

21    with respect to symptomatic inmates who had not

22    tested positive?

23           A.    I don't recall.

24           Q.    So you are not aware of any such

25    contact tracing?
```

**For the Exclusive Use of Covington & Burling, LLP.**
**Use by any other party voids the certification**

**Robert Hazlewood**

```
 1                 MR. OESTERICHER:  Objection.

 2          A.    It may have been happening, but I

 3   cannot say for sure if that was happening.

 4          Q.    So as the acting warden of the

 5   facility, you didn't know one way or the other?

 6          A.    I can't say with certainty now

 7   whether there was contact tracing done for

 8   symptomatic inmates that weren't verified with a

 9   test.

10          Q.    Did the MCC alert staff who had come

11   into close contact with a symptomatic inmate?

12          A.    Yes.  It was reported to me that the

13   contact tracing that was done -- excuse me, repeat

14   that question again.

15          Q.    If you had an inmate who had not

16   tested positive but was otherwise symptomatic and

17   they had come into close contact with staff, would

18   you alert the staff to that fact?

19          A.    I don't recall specifically if that

20   was done.

21          Q.    When you arrived at the facility,

22   Warden, 12 staff had already tested positive; is

23   that correct?

24          A.    I believe that was the number, yes.

25          Q.    And by the time you returned to FCI
```

**For the Exclusive Use of Covington & Burling, LLP.**
**Use by any other party voids the certification**

Robert Hazlewood

```
 1   symptomatic inmates should be immediately

 2   isolated?

 3         A.    Yes.  That's what we did.

 4         Q.    That's what you did.  The MCC

 5   followed that guidance?

 6         A.    So when inmates were identified as

 7   symptomatic, they were isolated and they remained

 8   in isolation, to my recollection, up to 14 days

 9   post resolution of symptoms.

10         Q.    But they were not tested before they

11   reentered their unit?

12               MR. OESTERICHER:  Objection.

13         A.    Not during my time there.

14         Q.    Were any inmates isolated during

15   your time as acting warden?

16         A.    Yes.

17         Q.    Were any inmates isolated in

18   solitary confinement or the special housing unit?

19         A.    Yes.

20         Q.    Is solitary confinement normally

21   used for punishment?

22               MR. OESTERICHER:  Objection.

23         A.    It can be.

24         Q.    Do you think the prospect of being

25   placed in solitary confinement or the SHU would
```

Page 49

**For the Exclusive Use of Covington & Burling, LLP.**
**Use by any other party voids the certification**

```
 1            Q.     Right.  So my question was, while
 2     you were acting warden, you did not have the list
 3     of the inmates who had been deemed vulnerable to
 4     COVID-19?
 5                   MR. OESTERICHER:  Objection.
 6            A.     I don't recall seeing that list.
 7            Q.     Were there any special measures
 8     taken to protect these vulnerable inmates?
 9            A.     It's my recollection that the
10     inmates were housed in a unit together.  I believe
11     it was 11 South.
12            Q.     Your understanding is that the
13     vulnerable inmates were placed in 11 South?
14            A.     That's my recollection, prior to my
15     arrival.
16            Q.     That's before you became warden?
17            A.     Yes.
18            Q.     Do you know if everyone on the list
19     that you haven't seen was placed in 11 South?
20                   MR. OESTERICHER:  Objection.
21            A.     Since that was done prior to my
22     arrival, I can't answer that.
23            Q.     By the time you arrived at the MCC,
24     had the Bureau of Prisons issued any guidance on
25     home confinement in light of COVID-19?
```

Page 57

For the Exclusive Use of Covington & Burling, LLP.
Use by any other party voids the certification

```
 1           A.    Yes.
 2           Q.    How about the Attorney General of
 3    the United States?
 4           A.    Yes.
 5           Q.    Did you understand that home
 6    confinement guidance to apply to the MCC?
 7           A.    Yes.
 8           Q.    Did you understand that guidance to
 9    be recommending immediate and increased use of
10    home confinement?
11           A.    For eligible inmates meeting the
12    criteria, yes.
13           Q.    And prioritizing those that were at
14    high risk?
15           A.    Among other considerations, yes.
16           Q.    Did that guidance say that it should
17    be implemented as quickly as possible?
18                 MR. OESTERICHER:   Objection.
19           A.    Yes.
20           Q.    Are you familiar with the Attorney
21    General's April 3rd memo on this subject?
22           A.    Yes.
23           Q.    Did that memo expand the population
24    of inmates eligible for home confinement?
25           A.    Yes.
```

**For the Exclusive Use of Covington & Burling, LLP.**
**Use by any other party voids the certification**

```
1          A.     That's right.  This e-mail was sent
2    while I was still TDY there.  There's no date that
3    I can see on this e-mail or memo but it was sent
4    while I was still there.
5          Q.     I agree there is no date.  That's
6    how it was produced to us unfortunately.  You do
7    agree that the policy did not go into effect until
8    April 26th, 2020; is that right?
9               MR. OESTERICHER:  Objection.
10         A.     There were reviews being done prior
11   to this -- prior to the unit staff being returned
12   to their normal duties.  As I said, there were
13   already unit staff that had been returned to their
14   normal duties prior to April 26th.  This was
15   notification that all remaining staff were going
16   to be returned to their normal duties.
17         Q.     And that was going to take effect on
18   April 26th, is that correct, all units being
19   returned to their normal duties?
20         A.     All those that had not already done
21   so.
22         Q.     And how many had been already
23   returned to their normal duties?
24         A.     I believe it was probably seven or
25   eight.
```

Page 67

For the Exclusive Use of Covington & Burling, LLP.
Use by any other party voids the certification

```
 1              Q.     Out of how many?

 2              A.     I believe the total was 15.

 3                     MR. SPRAGUE:  I'd like to mark this

 4              next Exhibit as 11.  It can be found in the

 5              zip drive I sent you.

 6                     THE WITNESS:  I see it.

 7                     (Petitioner's Exhibit 11, document

 8              titled North East Region COVID-19 Reporting

 9              Date, marked for identification.)

10              Q.     Do you recognize this document?

11              A.     Yes.

12              Q.     What is it?

13              A.     It's a report from the human

14      resources department to the emergency operation

15      center in the northeast which describes our

16      staffing, and it was sent daily.

17              Q.     What does "Staff on TDY status,"

18      represent under NYM 35?

19              A.     Those are staff that are on loan so

20      to speak from other bureau facilities to assist at

21      New York while on temporary duty.

22              Q.     So there were 35 staff members at

23      the MCC on temporary duty.  Do I understand

24      correctly?

25              A.     That sounds right.
```

Page 68

Robert Hazlewood

```
 1   institution, and in particular, the unit staff.

 2         Q.    Were you concerned that having unit

 3   staff dedicated towards custody would impede your

 4   ability to implement the Attorney General's

 5   guidance?

 6         A.    Yes, and that's why I set that in

 7   motion, and it's important to also understand that

 8   there was another effort underway at MCC to ensure

 9   that inmates were receiving legal calls and court

10   conference calls, so I also needed staff for that

11   effort as well.

12         Q.    How many release recommendations

13   were sent to you for your review during your time

14   as acting warden?

15         A.    I don't recall.

16         Q.    Do you recall any?

17         A.    I do recall some.  I don't recall

18   the number.

19         Q.    How many home confinement

20   recommendations did you send to the to BOP's

21   Regional Office For Residential Reentry Management

22   while you were the acting warden of the MCC?

23         A.    For approval?

24         Q.    Yes.

25         A.    I don't recall sending any for
```

Page 71

Robert Hazlewood

```
 1   approval.
 2          Q.    So from April 9th to April 24th, no
 3   home confinement recommendations were sent to the
 4   regional RRM?
 5          A.    Not that I recall.
 6          Q.    How many people were released to
 7   home confinement during your time as acting warden
 8   at the MCC?
 9          A.    I don't recall that number.
10          Q.    Do you recall anyone being released
11   on a home confinement while you were the acting
12   warden at the MCC?
13          A.    I don't recall.
14          Q.    So no?
15          A.    I'm sorry?
16              MR. OESTERICHER:  Objection.
17          Q.    You do not recall anyone being
18   released to home confinement while you were the
19   acting warden of the MCC?
20              MR. OESTERICHER:  Objection.
21          A.    I don't recall.
22          Q.    You don't recall if any were or you
23   can't recall whether they were or not?  I'm just
24   trying --
25          A.    I don't recall whether they were or
```

Page 72

1   compassionate release could be sent to a court

2   without written approval of the warden; is that

3   correct?

4           A.    Right, that's right.

5           Q.    Did you review any requests for a

6   compassionate release during your time as acting

7   warden?

8           A.    I don't recall any.

9           Q.    During your time as acting warden,

10  did you recommend any people for compassionate

11  release?

12          A.    I do not recall doing so.

13          Q.    During your time as the acting

14  warden of the MCC, did the MCC have a policy on

15  furloughs?

16          A.    Only that which was in place already

17  for the Bureau of Prisons.  It was a set of

18  criteria and policy that's utilized.  There was

19  also the memo that came out in April which talked

20  about some additional considerations for

21  furloughs.

22          Q.    Was the furlough policy amended in

23  any way to account for the COVID-19 pandemic?

24              MR. OESTERICHER:  Objection.

25          A.    There was a memo that came out in

Page 77