# EXHIBIT 7

```
 1   UNITED STATES DISTRICT COURT

 2   SOUTHERN DISTRICT OF NEW YORK

 3   CIVIL ACTION NO. 1:20-civ-03315 (ER)

 4   ------------------------------------------------x

 5   CESAR FERNANDEZ-RODRIGUEZ, ROBER GALVEZ-CHIMBO,

 6   SHARON HATCHER, JONATHAN MEDINA, and JAMES

 7   WOODSON, individually and on behalf of all others

 8   similarly situated,

 9                         Petitioners,

10              v.

11   MARTI LICON-VITALE, in her official capacity as

12   Warden of the Metropolitan Correctional Center,

13                         Respondent.

14   ------------------------------------------------x

15                               Remote Deposition

16                               May 32, 2020

17                                 10:09 a.m.

18

19        DEPOSITION VIA VIDEOCONFERENCE OF

20             MARTI LICON-VITALE

21

22

23             lipka.com, inc.

24             (888) lipka-com

25             transcripts@lipka.com
```

                                                            Page 1

**Marti Licon-Vitale**

Volume I                                                          5/21/2020

```
 1  hadn't had any visitation, legal or social, for --
 2  probably since February 28th.
 3          Q.     And was that other issue the
 4  incident involving a correctional officer who
 5  reportedly brought a loaded gun into the facility?
 6                 MR. OESTERICHER:  Objection.
 7          A.     It was involving the possibility of
 8  an introduction of contraband.
 9          Q.     Was it a loaded gun?
10          A.     Yes, it was a loaded gun.
11          Q.     In addition to that, had anything
12  been done as of March 1st to plan for COVID-19?
13                 MR. OESTERICHER:  Objection.
14          A.     Not that I'm aware of.
15          Q.     Let's move forward to approximately
16  the middle of March, again of this year.  At that
17  time had the MCC done anything to prepare for
18  dealing with COVID-19?
19          A.     We had begun the enhanced screening
20  at our staff entrance sites.
21          Q.     Anything else?
22          A.     I believe we had already begun
23  passing out PPE --
24          Q.     Okay.
25          A.     -- to our staff.
```

**For the Exclusive Use of Covington & Burling, LLP.**
**Use by any other party voids the certification**

1          Q.      Meaning the nine who were in the
2    cell with the person from the MDC?
3          A.      Correct.
4          Q.      Other than those nine, were any
5    inmates at the MCC being screened prior to on or
6    about March 23rd when you had your first positive
7    COVID-19 inmate?
8          A.      Prior to, no.
9          Q.      And the staff were given PPE, as of
10   the middle of March staff were given PPE.  Was
11   that all staff?
12         A.      That was staff who were working in
13   areas that had inmates who were quarantined or
14   were isolated.
15         Q.      As of the middle of March, was there
16   any testing protocol in place at that time?
17         A.      There was no testing protocol in
18   place at the institution.  When an inmate had
19   symptoms, we would take them out to the hospital
20   to be tested there.
21         Q.      As of the middle of March, did the
22   MCC have any testing equipment within the
23   facility?
24         A.      I don't believe we had any tests
25   available.

                                              Page 19

For the Exclusive Use of Covington & Burling, LLP.
Use by any other party voids the certification

```
 1   I don't know a specific date.
 2          Q.    What location in the facility?
 3          A.    There's a unit on the 3rd floor that
 4   was available.
 5          Q.    What unit?
 6          A.    Unit C.  I think we call it Unit C
 7   on the 3rd floor.
 8          Q.    As of the middle of March, did the
 9   MCC know where it was going to place inmates who
10   were symptomatic for COVID-19 but had not yet
11   tested positive?
12          A.    I can't say that we knew at that
13   date where we were going to place them.
14          Q.    Was there ever consideration given
15   to transferring inmates from the MCC to another
16   facility as a response to COVID-19?  And what I'm
17   focusing on at the moment is March.
18               MR. OESTERICHER:  Objection.  Asked
19         and answered.
20               THE WITNESS:  I can't answer or can?
21               MR. OESTERICHER:  Can.
22          A.    We were making an attempt to move
23   inmates but then as, you know, as the COVID
24   direction kept moving forward because it was very
25   fluid, we stopped the attempt to move inmates to
```

Page 22

For the Exclusive Use of Covington & Burling, LLP.
Use by any other party voids the certification

**Marti Licon-Vitale**

Volume I                                                      5/21/2020

```
 1   consideration inmates who had high blood pressure.
 2           Q.     Any other reasons why it went from
 3   23 to whatever higher number was arrived at?
 4           A.     I think diabetes was another
 5   criteria that we had not necessarily taken into
 6   account.
 7           Q.     Any others other than those two?
 8           A.     Not that I remember.
 9           Q.     So rolling forward a little bit,
10   going back to that March 20th conference hosted by
11   Chief Judge McMahon, do you know as of that time
12   approximately how many masks the MCC had?
13           A.     No, I don't remember.
14           Q.     Did you tell Chief Judge McMahon
15   during that conference that the MCC had a total of
16   130 masks?
17           A.     130 sounds familiar for the N-95.
18           Q.     Did you tell Chief Judge McMahon
19   during that conference that the MCC at that time,
20   March 20th, had 30 N-95's and 100 surgical masks
21   for a total of 130?  Did you tell her that in
22   substance?
23           A.     I may have.  I don't remember.
24           Q.     Do you have any reason to dispute
25   that?
```

**For the Exclusive Use of Covington & Burling, LLP.**
**Use by any other party voids the certification**

```
 1                    MR. OESTERICHER:  Objection.
 2           A.    No.
 3           Q.    Did you tell Chief Judge McMahon at
 4   that conference that the use of gloves by staff
 5   was optional?
 6           A.    Yes.
 7           Q.    Did you tell Chief Judge McMahon at
 8   that conference that the MCC was not screening
 9   inmates for COVID-19 symptoms other than new
10   arrivals to the facility?  Did you tell her that
11   in substance?
12           A.    I may have, yes.
13           Q.    Any reason to dispute that?
14                 MR. OESTERICHER:  Objection.
15           A.    No.
16           Q.    Can you tell me what the MCC did to
17   acquire testing equipment or supplies?  In other
18   words, who did what, when, to get testing
19   equipment?
20           A.    At any point do you mean?
21           Q.    Yes.  Well, let me do it this way.
22   We've been told in response to our interrogatory
23   requests in this case that the first test kits
24   were ordered by the MCC on April 10th.  Do you
25   agree with that?
```

Page 25

**For the Exclusive Use of Covington & Burling, LLP.**
**Use by any other party voids the certification**

**Marti Licon-Vitale**

```
 1              A.     No.
 2              Q.     When does the MCC plan to start
 3    using the Abbott test machine?
 4              A.     We've already started.
 5              Q.     When?
 6              A.     Two days ago.
 7              Q.     How many people have been tested so
 8    far?
 9              A.     We've tested one inmate who came
10    into the institution.
11              Q.     Anybody else?
12              A.     No.
13              Q.     Just so I have this, four an hour,
14    results in how many a day?
15              A.     15 -- for four an hour, you get
16    results in 15 minutes.
17              Q.     So how many people a day could you
18    test if you chose to use the machine to maximum
19    capacity?
20              A.     I guess four an hour all day long.
21              Q.     I guess what I'm saying, Warden, is
22    how many hours do you have staff that could
23    administer the test to inmates?
24              A.     So we have medical staff available
25    beginning at 6:00 a.m. and I think they're here
```

Page 28

1    there were 786 inmates at the MCC.

2         A.    Okay.

3         Q.    Is it fair to say that if you take

4    that number and add on new arrivals, you're

5    somewhere in the neighborhood of 800 inmates who

6    have been at the facility since March 1st?

7         A.    Yes.

8         Q.    So less than 1 percent of the MCC

9    inmate population since March 1st have tested

10   positive; correct?

11        A.    Correct.

12        Q.    And do you have an explanation for

13   the difference in the two percentages we've just

14   identified, over 20 percent positives for staff,

15   less than 1 percent positives for inmates?

16             MR. OESTERICHER:  Objection.

17        A.    Testing was not available.

18        Q.    And do you know how many inmates in

19   total were tested or have been tested?

20        A.    I think 11.

21        Q.    Your letter to Chief Judge Mauskopf

22   from Tuesday says 10.  Would you accept that?

23        A.    Well, I guess I'm --

24        Q.    I'm sorry, I apologize.  Finish.

25        A.    At one point we did have an

For the Exclusive Use of Covington & Burling, LLP.
Use by any other party voids the certification

```
 1   additional inmate that we tested with the Abbott
 2   machine.
 3          Q.     In the last two days?
 4          A.     Yes.
 5          Q.     So five out of 11, so that's close
 6   to 50 percent of the inmate population that has
 7   been tested have tested positive; correct?
 8          A.     Okay, yes.
 9          Q.     Do you have any estimate of how many
10   inmates would have tested positive for COVID-19
11   had they all been tested?  Do you have any
12   estimate of that?
13              MR. OESTERICHER:  Objection.
14          A.     I do not.
15          Q.     Have you discussed that with anybody
16   at the MCC since the beginning of March, meaning
17   "I wonder how many inmates we would have positive
18   if we tested them all"?  Has that been discussed
19   in sum or substance with anybody at the MCC?
20              MR. OESTERICHER:  Objection to the
21          extent --
22          A.     No.
23              MR. OESTERICHER:  She answered no
24          but to the extent you were consulting
25          lawyers, that's objectionable.
```

Page 52

For the Exclusive Use of Covington & Burling, LLP.
Use by any other party voids the certification

1       Q.    Do you agree with the general
2   proposition that the more people you test, the
3   more positive results you're going to get?  Do
4   you?
5       A.    Yes.
6             MR. VINEGRAD:  That was a serious
7        question for reasons that, Jeff, you're
8        probably aware of.
9       Q.    The screening of inmates, as of
10   March -- in March, what was done to screen inmates
11   for COVID-19?
12       A.    In reference to once an inmate has
13   symptoms?
14       Q.    In other words, let me do this.  If
15   an inmate was screened -- we talked before about
16   the classes of inmates who were screened.
17             I'm now asking a different question.
18   I'm talking about the screening process, itself.
19   Are you with me?
20       A.    Okay.  The medical staff.
21       Q.    Yes.  What did the screening consist
22   of?
23       A.    Okay.  The screening consisted of
24   taking the inmates' temperature and asking them
25   the same questions that we were asking the staff

Page 53

For the Exclusive Use of Covington & Burling, LLP.
Use by any other party voids the certification

```
 1              A.    I can't tell you -- my assumption
 2    would be that the correctional officer collects
 3    the cop-outs.  Once medical comes, they would hand
 4    them to the medical staff at that point.
 5              Q.    Are they retained?
 6              A.    I don't know.
 7              Q.    Are you aware that the medical
 8    cop-outs were being shredded until earlier this
 9    month?
10              MR. OESTERICHER:  Objection.
11              A.    No.
12              Q.    Is this the first you're hearing
13    that?
14              A.    It's the first I hear that it's
15    happening here.
16              Q.    Here, MCC, until early May.  Is this
17    the first time you're hearing that?
18              A.    Yes, it is.
19              Q.    Do you know why that was happening?
20              MR. OESTERICHER:  Objection.
21              A.    I am not aware that we were doing
22    medical cop-outs on paper.  Our medical cop-outs
23    are electronic, and those can't be shredded.
24              Q.    This lawsuit was brought on April
25    28th.  Does that sound right?
```

For the Exclusive Use of Covington & Burling, LLP.
Use by any other party voids the certification

```
 1              A.    I don't know.
 2              Q.    Would you agree with me that that is
 3    not the appropriate lapse of time for somebody who
 4    reports, "I need medical help.  I'm suffering from
 5    these symptoms, these are COVID-19 symptoms," and
 6    a response two weeks later?  Would you agree with
 7    me that that is not appropriate?
 8              A.    I would agree.
 9              Q.    As far as you know, how long is it
10    after an inmate is determined to have COVID-19
11    symptoms that they're isolated?  How long after
12    it's first determined that they have those
13    symptoms are they isolated?
14              A.    They're isolated immediately.
15              Q.    Do you have any explanation for the
16    accounts of inmates who have waited for one to two
17    weeks in between the time they recorded having
18    COVID-19 symptoms and the time that they were
19    isolated?
20                    Do you have any explanation for that?
21                    MR. OESTERICHER:  Objection.
22              A.    No.
23              Q.    Do you agree that that is not an
24    appropriate passage of time?
25              A.    That is not an appropriate passage
```

Page 62

For the Exclusive Use of Covington & Burling, LLP.
Use by any other party voids the certification

```
 1   of time, I agree.
 2           Q.     Is there any effort to track the
 3   medical condition of inmates who are symptomatic
 4   for COVID-19 at any point after they're first
 5   treated?
 6                  MR. OESTERICHER:  Objection.
 7           Q.     Do they get follow-on treatment?
 8           A.     Can you repeat the beginning of that
 9   question?
10           Q.     I'll repeat the whole question.
11                  After an inmate who is symptomatic
12   for COVID-19 is determined to have recovered, is
13   there any follow-on checking or treatment to see
14   if they are, in fact, now healthy?
15           A.     I don't know.
16           Q.     Why was the SHU used to isolate
17   inmates who were determined to have COVID-19?
18           A.     Initially because it was the easiest
19   place to make an entire range available so that we
20   would only be placing symptomatic inmates in
21   there, which was for approximately one week.
22           Q.     And it was one week what, that the
23   SHU was used?
24           A.     Correct.
25           Q.     And the SHU, just for the record, I
```

For the Exclusive Use of Covington & Burling, LLP.
Use by any other party voids the certification

1    know you know this, that is the place which

2    typically is used for disciplinary reasons,

3    correct, for inmates?

4            A.    It's the special housing units.  We

5    place disciplinary inmates in there and we also

6    place inmates who are pending discipline or are

7    being protected.

8            Q.    For the first two of those three

9    categories, though, basically if an inmate does

10   something bad or is being investigated for doing

11   something bad, they go to the SHU; right?

12           A.    Yes, or are being investigated for

13   possibly needing protection.

14           Q.    Is it fair to say that the

15   conditions for the inmates in the SHU are not as

16   favorable as conditions in an ordinary cell in the

17   facility?

18           A.    That is true.

19           Q.    Was there any effort made to explain

20   to inmates at the MCC that if they were going to

21   be sent to the SHU because of COVID-19, that it

22   was for their own health and safety and should not

23   be viewed as a form of punishment?

24              MR. OESTERICHER:  Objection.

25           A.    Yes.

Page 64

For the Exclusive Use of Covington & Burling, LLP.
Use by any other party voids the certification

1          Q.       How do you know that?

2          A.       Because they should have been

3    proceeded with a detention order indicating on the

4    detention order why they were being placed in the

5    housing unit.

6          Q.       And do you know if that, in fact,

7    happened?

8          A.       I don't know if, in fact, it

9    happened.   It is our procedure.

10         Q.       Do you know what, in fact,

11   correction officers were telling inmates who were

12   symptomatic for COVID-19 about going to the SHU?

13   Do you know what was actually happening with that?

14         A.       No.   I wasn't there.

15         Q.       Was there any effort made to improve

16   the conditions in the SHU for the inmates who were

17   sent there because of COVID-19?

18         A.       No.

19         Q.       Do you agree that that would have

20   been appropriate to do for those inmates, these

21   non-disciplinary inmates who were sent there for

22   medical reasons?

23         A.       Well, they were celled alone which

24   is an improvement from having to share a cell.

25   For the most part, if they were isolated, it was a

For the Exclusive Use of Covington & Burling, LLP.
Use by any other party voids the certification

```
 1   when, I can't tell you who.
 2           Q.    Or why?
 3           A.    Or why.
 4           Q.    The inmates who have COVID-19 risk
 5   factors, you understand what that means?
 6           A.    I'm assuming that that means
 7   individuals who have already have high-risk
 8   factors to begin with.
 9           Q.    Right.
10           A.    Okay.
11           Q.    You know what those are as
12   pronounced by the CDC, are you generally familiar?
13           A.    I think I'm familiar.
14           Q.    That group of inmates, were they
15   quarantined?
16               MR. OESTERICHER:  Objection.
17           A.    They weren't -- the group was moved
18   to 11 South for the most part prior to the COVID.
19   They were quarantined, yes, in 11 South, yes.
20           Q.    And then at some point, it was
21   determined that there were one or more inmates
22   from 11 South who actually tested positive for
23   COVID-19; am I right?
24           A.    Yes.
25           Q.    Did the remaining inmates on 11
```

**For the Exclusive Use of Covington & Burling, LLP.**
**Use by any other party voids the certification**

```
 1   South remain in that unit?

 2        A.   Yes.

 3        Q.   Are you familiar with the general

 4   COVID-19 protocol for social distancing?

 5        A.   Yes.

 6        Q.   Are there locations within the MCC

 7   in which inmates are not able to practice social

 8   distancing?

 9        A.   Because of the six-foot rule do you

10   mean?

11        Q.   Yes.

12        A.   11 South can be difficult.  That's

13   why they're provided with masks and informed to

14   wash their hands continually.

15        Q.   And when were they first provided

16   with masks, approximately when?

17        A.   Maybe March -- the week of March --

18   the end of March I guess.

19        Q.   And what type of masks were they

20   provided at that time?

21        A.   Surgical masks.

22        Q.   And how many?

23        A.   At the time I don't know if it was

24   one or two.

25        Q.   Were they paper masks?
```

Page 70

```
 1              A.     They were surgical masks.
 2              Q.     Were they able to be washed and
 3    reused?
 4              A.     Those could not be washed, no.
 5              Q.     When was the first time that inmates
 6    were given masks that could be washed and reused?
 7              A.     I can't give you a specific date.  I
 8    think it was prior to me going out.  It was prior
 9    to me going out.  I can't give you a date but it
10    was prior to April 5th.
11              Q.     About how long before you went out
12    did that happen?
13              A.     I don't recall.
14              Q.     What are the other open dorm
15    areas in the facility other than 11 South?
16              A.     Only 11 South.
17              Q.     The only one?
18              A.     Yes.
19              Q.     As of the time that you went out,
20    early April, how much soap were inmates given?
21              A.     Inmates are either able to purchase
22    their soap or they're provided with soap.  I don't
23    know how often.
24              Q.     How much soap and how often were
25    they provided it before you went out?  Do you
```

Page 71

Marti Licon-Vitale

```
 1    aware.
 2            Q.    Are you aware of reports by inmates
 3    who have stated that they have seen MCC staff not
 4    wearing PPE?
 5            A.    Say that again.
 6            Q.    Are you aware of reports of inmates
 7    who have stated that they have seen MCC staff not
 8    wearing PPE?
 9            A.    I'm not aware of inmates stating
10    that.
11            Q.    Are you aware of anybody stating
12    that?
13            A.    I know that when I walk around, if
14    someone is maybe not wearing a mask or they have
15    it down or they have it up here, I always tell
16    them that "You need to properly wear your mask."
17    They're uncomfortable, it's hard to breathe and if
18    I just happened to come at the wrong time where
19    maybe they're just trying to catch some air, I
20    have to remind them.  It doesn't happen often.
21    It's been on maybe one or two occasions.
22            Q.    Beyond that, have you heard from
23    anybody that inmates have stated that they have
24    seen staff not wearing PPE?
25            A.    No.
```

Page 78

For the Exclusive Use of Covington & Burling, LLP.
Use by any other party voids the certification

```
 1                    MR. OESTERICHER:  Objection.

 2          A.    Sure.

 3          Q.    It makes a difficult experience all

 4   that much more difficult and inhumane; fair?

 5                    MR. OESTERICHER:  Objection.

 6          A.    I guess it's bi-fold in that it is

 7   fair to say that.  However, if inmates followed

 8   the rules and threw their food away once they're

 9   done with their meal, that would prevent the, I

10   guess, the number of vermin that we have.

11          Q.    It would prevent it?

12          A.    Prevent it -- it would definitely --

13   it would reduce it.  We now have a building next

14   door that is empty, has no food in it.  It's dark.

15   I walked in simply because it's our building and I

16   needed to see it.  There aren't any rats in there.

17   There's no food.

18          Q.    How is it that you're saying that

19   it's inmates who leave food as opposed to anything

20   else that could be happening to contribute to the

21   prevalence of vermin in the jail?

22          A.    Because that's what I see.

23          Q.    What do you do when you see that?

24          A.    I pretty much -- I walk around with

25   a trash bag.  I walk around with a trash bag.  I
```

Page 87

For the Exclusive Use of Covington & Burling, LLP.
Use by any other party voids the certification

```
 1          disclose any confidential communications

 2          with your attorney.

 3     Q.    I'm asking for your position,

 4 Warden.  Did you support that request or oppose

 5 that request?

 6          MR. OESTERICHER:  Objection.

 7     A.    Ask me the question again.

 8     Q.    Did you support the petitioners'

 9 request in this case to be able to have

10 representatives of theirs inspect the MCC?

11          MR. OESTERICHER:  The same

12          objection.

13     A.    I opposed it.

14     Q.    Why?

15     A.    Because it would take time away from

16 the staff that have other duties, to walk staff

17 around.

18     Q.    Once you learned that the Court had

19 ordered the inspection, what, if any, steps did

20 you take as a result?

21     A.    Actually, we didn't take any

22 additional steps because, as I mentioned earlier,

23 we had already had the cleaning company come in.

24 They had already started working on cleaning the

25 first floor.
```

For the Exclusive Use of Covington & Burling, LLP.
Use by any other party voids the certification

```
 1              When we saw that they were doing a
 2  great job, we started enlisting them to go to the
 3  other floors to strip those floors down, wax them
 4  down, and this all occurred prior to knowing of
 5  any visitation.
 6              So to say steps taken into place --
 7  there were things that are just being done in
 8  order to just increase the sanitation of this
 9  institution because that's what it should be.
10  It's not because someone is coming over.
11       Q.    Are there records that document when
12  the cleaning company came in and performed
13  cleaning services on the other floors, not the
14  first floor?
15       A.    We do have a record because they --
16  we would have to inform our correctional services
17  staff that they would be here and that they would
18  be going to the different floors and to allow them
19  to go to the floors.  So we do have documentation,
20  yes.
21  REQ          MR. VINEGRAD:  Jeff, I request that
22          documentation.
23               MR. OESTERICHER:  Put it in
24          writing.
25       Q.    Were any steps taken within the
```

For the Exclusive Use of Covington & Burling, LLP.
Use by any other party voids the certification

Marti Licon-Vitale

 1   **facility to prepare for the inspection, once you**

 2   **learned that the judge had ordered it, other than**

 3   **what you just testified to?**

 4         A.    Anytime someone is going to come to

 5   the facility, we are going -- it's like someone

 6   coming to your house.  You're going to make sure

 7   that, you know, your bed is made, you vacuumed the

 8   floor and the dishes are in not in the machine.

 9              So we didn't do anything different

10   with this visit than we would have if I knew that

11   my boss was coming or if my director was coming to

12   the institution.

13         Q.    **Was anything done relating to**

14   **COVID-19 in particular to prepare for the**

15   **inspection?**

16         A.    Not for the inspection, no.

17   Whatever we were doing for COVID, we were doing

18   for COVID and not for the inspection.

19         Q.    **Do you know if anybody else in the**

20   **facility took any steps with respect to the**

21   **condition of the facility, again, in response to**

22   **the fact that there was going to be a court**

23   **ordered inspection?**

24         A.    I became aware that there were

25   additional signs that were put up, but it wasn't

**For the Exclusive Use of Covington & Burling, LLP.**
**Use by any other party voids the certification**

```
 1              A.     Yes.

 2              Q.     When did the system go electronic?

 3              A.     I want to say sometime last year.

 4              Q.     Got it.  So how, if at all, has the

 5      time period for evaluating potential referrals for

 6      home confinement changed at the MCC due to

 7      COVID-19?

 8              A.     The system is electronic.  That just

 9      became a priority.  There are other things that we

10      no longer have to do because we're not accepting

11      new inmates so we're not having to do all of the

12      orientation and initial classification and

13      providing clothes, and there's a lot of things

14      we're not doing now.  So we're able to focus on

15      that and getting those halfway -- those home

16      confinement states requested.  I can't tell --

17      give you a time frame of how long it takes.  I

18      haven't really been here long enough to assess

19      that.

20              Q.     Are you familiar with Attorney

21      General Barr's March 26th and April 3rd memoranda

22      on the topic of home confinement?

23              A.     Yes.

24              Q.     Are you aware that Attorney General

25      Barr declared that basically there was an
```

Page 96

For the Exclusive Use of Covington & Burling, LLP.
Use by any other party voids the certification

```
 1  emergency situation that justified the
 2  prioritization of home confinement as a measure to
 3  deal with COVID-19?  Correct?
 4          A.   Yes.
 5          Q.   Are you aware that he directed all
 6  the institutions within the Federal Bureau of
 7  Prisons to focus on that task, meaning determining
 8  that there were inmates at the facility who were
 9  eligible for referral to home confinement, that
10  that was to be undertaken immediately?  Are you
11  aware of that?
12          A.   I am aware.
13          Q.   And you're aware that he directed
14  that this be done and that time was of the
15  essence?  Are you aware that he said that?
16          A.   I am aware.
17          Q.   And you're aware that he directed
18  that institutions prioritize all at-risk inmates,
19  meaning at risk for COVID-19, and not just inmates
20  who were previously eligible for home confinement?
21          A.   Yes.
22          Q.   And you're aware as well that the
23  Bureau of Prisons directed that it was imperative
24  to promptly review those inmates for potential
25  referral to home confinement?
```

Page 97

For the Exclusive Use of Covington & Burling, LLP.
Use by any other party voids the certification

```
 1              A.    Yes.

 2              Q.    And are you aware that that

 3   included, according to the Bureau of Prisons

 4   directives, reviewing inmates for potential

 5   referral to home confinement as a population

 6   management strategy?

 7              A.    Yes.

 8              Q.    Meaning a way to get inmates out of

 9   the facility; right?

10              A.    Correct.  Correct.

11              Q.    A very different situation than had

12   been in place prior to that time with respect to

13   home confinement; correct?

14              A.    Correct.

15              Q.    These were big changes; correct?

16              A.    Correct.

17              Q.    And you were being directed by the

18   Attorney General of the United States to implement

19   them immediately; right?

20                    MR. OESTERICHER:  Objection.

21              A.    Yes.

22              Q.    So tell me as best as you know, what

23   exactly did the MCC do in response to Attorney

24   General Barr's and the Bureau of Prisons'

25   directives, the ones that you've just been
```

Page 98

**For the Exclusive Use of Covington & Burling, LLP.**
**Use by any other party voids the certification**

**Marti Licon-Vitale**

```
 1   testifying about for the last couple of minutes?
 2   Tell me exactly what the MCC did, when they did it
 3   and who did it.
 4            A.    We did not immediately start
 5   referring inmates to home confinement because
 6   while COVID was an emergency, we also had the
 7   emergency of our staffing levels because staff
 8   were going out on sick leave.
 9            We had -- we had to -- our priority
10   was to ensure that our units were secured and we
11   had to place all staff on housing units in order
12   to assure the security of the institution and of
13   our community.  So we did not instantly start
14   using our unit team to process home confinement.
15            I do believe that our CMC started
16   processing our home confinement, and that was not
17   right away either because he also was on the unit
18   and he was actually taken off to start doing that
19   procedure, and as we were able to get more staff
20   in, we were able to start taking the case managers
21   whose responsibility it is to make that
22   preparation to do that.
23            So we did not immediately start
24   preparing home confinement referrals.
25            Q.    When did that process of preparing
```

Page 99

**For the Exclusive Use of Covington & Burling, LLP.**
**Use by any other party voids the certification**

1   addressing COVID-19 other than what you've already

2   testified to?

3            A.    No.

4            Q.    Anything about the situation with

5   any of the home confinement referrals?  Did you

6   discuss that with him?

7            A.    I don't think so.

8            Q.    So during the process of reviewing

9   inmates for referral to home confinement -- again,

10  I'm talking about since Attorney General Barr's

11  memos -- are there any considerations that

12  constitute what I'll call automatic disqualifiers,

13  things that automatically render an inmate

14  ineligible?

15           A.    We've got to review every case

16  individually.  I think, you know, automatically is

17  if it's somebody that is in for murder, I would

18  have to think about it twice before I'd let them

19  back out.

20           Q.    Understood, but there's no automatic

21  if you got this particular feature, you can't be

22  sent for home confinement; is that your testimony?

23           A.    It really depends because you could

24  have two inmates who are there for sexual

25  exploitation of a minor, and one of them is

                                                Page 116

 1  electronic and the other one is physical, so I
 2  would be more apt to send the electronic person
 3  home over the person who was physical.
 4          **Q.    My question, to be real precise, is,**
 5  **is there any particular factor, that that one**
 6  **particular factor means that they cannot be**
 7  **referred for home confinement?**
 8                  MR. OESTERICHER:  Objection.
 9          A.    Not anything that is coming to my
10  head.  I have to look at the individual as a
11  whole.
12          **Q.    Right.**
13          A.    There's more factors than one that
14  we have to look at.
15          **Q.    Understood.  I'm just asking if**
16  **there's any one factor or factors that are**
17  **automatic disqualifiers regardless of what else we**
18  **know about the inmate.**
19          A.    Probably severe violence.
20          **Q.    Any others?**
21          A.    Severe violence.  Nothing else I
22  could think of.
23          **Q.    And do you know how many inmates**
24  **have been considered for potential referral for**
25  **home confinement at the MCC since Attorney General**

**For the Exclusive Use of Covington & Burling, LLP.**
**Use by any other party voids the certification**

1   Barr's memo?

2          A.    I don't have that number.

3          Q.    So we've been told by your attorneys

4   in this lawsuit that as of last Friday, there were

5   117 inmates that had been considered.  Does that

6   sound about right to you based on what you know

7   about that process?

8                MR. OESTERICHER:  Objection.

9          A.    I have no knowledge of how many had

10  been referred.

11         Q.    Have you seen any summary charts or

12  anything like any documents that kind of set forth

13  like here is the people who have been considered

14  and here's what we decided, anything like that?

15         A.    I have, and your number is higher in

16  that what I have looked at is a fluid data,

17  electronic data, that is not necessarily going to

18  be updated.  So that's the only thing I've seen.

19         Q.    You have the exhibits right there,

20  right?

21         A.    Yes.

22         Q.    Can you take Exhibit 8.

23         A.    Okay.

24         Q.    Have you seen that document before?

25         A.    No.  This stack of documentation was

For the Exclusive Use of Covington & Burling, LLP.
Use by any other party voids the certification

Marti Licon-Vitale

Volume I                                                        5/21/2020

```
 1   handed to me this morning.
 2          Q.     So you've never seen it before this
 3   morning?
 4          A.     No.
 5          Q.     That's a document that was provided
 6   to us by your lawyers in this case to reflect the
 7   status of the inmates who were considered for home
 8   confinement.  Are you looking at the right
 9   exhibit, Warden?
10          A.     Yes.
11          Q.     You have that chart, right?
12   Litigation number, status, reason for
13   ineligibility, do you see that?
14          A.     Yes.
15          Q.     So there's -- I believe there's 117,
16   do you accept that representation, inmates on this
17   list?  13 is there twice, but it's 117.  That's
18   where I'm coming up with that number just to
19   orient you.
20                 Do you have your own approximation
21   of how many inmates have been considered for home
22   confinement during the period of time we're
23   talking about?  Because you said you thought my
24   number was higher than yours.
25                 MR. OESTERICHER:  Objection.
```

Page 119

**For the Exclusive Use of Covington & Burling, LLP.**
**Use by any other party voids the certification**

Marti Licon-Vitale

```
 1            A.     Can you ask me that question again.
 2            Q.     Approximately how many inmates do
 3    you believe have been considered for home
 4    confinement since Attorney General Barr's memo by
 5    the MCC?
 6            A.     I have absolutely no idea and the
 7    reason I say your number is higher is because I
 8    tried running I guess a data sheet that might
 9    indicate what the numbers were.  Because it's a
10    brand new process so as you know, a brand new
11    process sometimes takes a while to get going.  And
12    I thought that number -- I think it was like a 3
13    on that number so I don't even know if I was
14    running the right thing, so that's why I'm saying
15    that number is just different than mine.
16            Q.     Fair enough.  Do you have any
17    factual base to say that this document that shows
18    117 people is wrong?
19            A.     No.
20            Q.     Is the MCC reviewing for potential
21    referral to home confinement all sentenced inmates
22    at the MCC currently other than inmates who were
23    there on a writ or have a detainer?
24            A.     All inmates are being reviewed who
25    are BOP inmates.
```

Page 120

```
1           Q.     Sentenced inmates; right?

2           A.     Yes.

3           Q.     Other than the writs or detainer

4    inmates, or are those being reviewed too?

5           A.     We're not reviewing detainer

6    inmates because ordinarily when -- I'm sorry, writ

7    inmates, because again, you can look at it, but

8    that may be an individual who has a detainer and

9    they're not going to be eligible.

10          Q.     So according to the information that

11   your lawyers are providing us, there have been 27

12   inmates who have been released since Attorney

13   General Barr's memos.

14                 Do you know how many of those were

15   inmates for whom the MCC recommended release on

16   home confinement?

17          A.     No, I do not know.

18          Q.     You agree, do you not, that if an

19   inmate was released, that could happen a number of

20   different ways?  For example, they could have been

21   released because they served out their sentence;

22   right?

23          A.     Yes.

24          Q.     Correct?

25          A.     Yes.
```

Page 121

```
 1              Q.     They could have been released
 2   because they made a request to a judge for
 3   compassionate release that the judge granted on
 4   their motion as opposed to the Bureau of Prisons'
 5   motion; correct?
 6              A.     Correct.
 7              Q.     They could have been transferred to
 8   another facility; correct?
 9              A.     Unlikely.
10              Q.     Unlikely because of COVID-19 but
11   possible; right?
12              A.     Possible.
13              Q.     Or they could be released because
14   the MCC referred them for home confinement and
15   they were released on that basis; correct?
16              A.     Correct.
17              Q.     Just to be clear, do you have any
18   information as you sit here now as to how many of
19   those 27 inmates fall within the various
20   categories that I've just described?
21              A.     No, none.
22              Q.     Or when that happened, when those 27
23   were released?
24              A.     No.
25              Q.     So the information we were provided
```

Page 122

1    by your lawyers is that 38 of those 117 inmates

2    were deemed to be ineligible for home confinement.

3    Do you have any basis to dispute factually that

4    number?

5           A.    No.

6           Q.    On this list were a number of the

7    people who are ineligible.  Let me just direct you

8    to number 60.  Do you see number 60?

9           A.    Yes.

10          Q.    It says "Primary or prior offense

11   includes violence, sex offense or

12   terrorism-related."  Do you see that?

13          A.    Yes.

14          Q.    And do you know for that inmate

15   whether it was the primary offense or a prior

16   offense that rendered that inmate ineligible?

17               MR. OESTERICHER:  Objection.

18          A.    I don't know.

19          Q.    If I asked you the same questions

20   for every inmate on this list who has that

21   explanation for his ineligibility or her

22   ineligibility "Primary or prior offense includes

23   violence, sex offense or terrorism-related," would

24   you be able to tell me whether it was a primary

25   offense or the prior offense?  Would you be able

For the Exclusive Use of Covington & Burling, LLP.
Use by any other party voids the certification

**Marti Licon-Vitale**

```
 1    to tell me that?

 2           A.    No.

 3           Q.    Somewhere in the MCC, am I correct,

 4    that is documented somewhere?

 5           A.    Yes.

 6           Q.    Are you aware that under -- you

 7    mentioned the May 8th memo a few minutes ago.

 8    Correct?

 9           A.    Yes.

10           Q.    Am I correct that that is the latest

11    memo from the Bureau of Prisons dealing with the

12    topic of home confinement?

13           A.    I believe so.

14           Q.    The latest in a series of memos;

15    correct?

16           A.    Yes.

17           Q.    Are you aware that under the May 8th

18    memo, that the factor that is specified with

19    respect to offenses, it states that in determining

20    whether someone is eligible for home confinement,

21    you verify that their primary offense is not

22    violence, a sex offense or terrorism-related?

23           A.    Yes.

24           Q.    Are you aware that in that May 8th

25    memo, there is no reference to the inmate's prior
```

Page 124

**For the Exclusive Use of Covington & Burling, LLP.**
**Use by any other party voids the certification**

1  offense being violence, a sex offense or

2  terrorism-related?

3             MR. OESTERICHER:  Objection.

4        A.    Okay.

5        Q.    You accept that?

6        A.    Yes.

7        Q.    Okay.  So that under the May 8th

8  memo, am I correct that if an inmate has a prior

9  offense, not a primary, a prior offense for

10 violence, a sex offense or terrorism-related, that

11 is not a factor in rendering them ineligible for

12 home confinement?  Would you agree with me?

13            MR. OESTERICHER:  Objection.

14       A.    It is not a factor in the

15 memorandum, no.

16       Q.    Was there any effort by the MCC to

17 look at the 38 inmates who are considered

18 ineligible based on primary or prior offense to

19 see whether any of them only had a prior offense

20 of the type described in the memo as opposed to a

21 primary one?

22       A.    So when an inmate is reviewed for

23 home confinement or for halfway house, that review

24 is predominantly done by the case manager.

25       Q.    Um-hum.

Page 125

**Marti Licon-Vitale**

```
 1            A.     In reference to if they approve or
 2    deny, recommend or not, the inmate is notified and
 3    the inmate has a right to file an administrative
 4    remedy and appeal that decision.
 5            Q.     Do you believe it would be
 6    appropriate for the MCC to determine now if there
 7    were inmates deemed ineligible for home
 8    confinement referral because they had a prior
 9    offense involving violence, sex offense or
10    terrorism-related, in light of the fact that the
11    May 8th memo does not speak about prior offenses
12    of that type?
13                   MR. OESTERICHER:  Objection.
14            A.     I would say that the inmate's file
15    in its entirety has to be reviewed and I would
16    look at prior offenses to make a final
17    determination regardless of what this memo said.
18            Q.     But for inmates for whom the basis
19    for ineligibility was a prior offense of violence,
20    sex offense or terrorism-related, do you believe
21    it would be appropriate now, in light of the May
22    8th memo, to reassess them?
23                   MR. OESTERICHER:  Objection.
24            A.     I would reassess the change of the
25    incident reports where we can now review inmates
```

**For the Exclusive Use of Covington & Burling, LLP.**
**Use by any other party voids the certification**

```
 1   who have the 300 and 400 series incident reports,
 2   and if they were denied because of that, I would
 3   definitely review them to see if they were not
 4   eligible due to that.
 5              If there is a prior -- of some type
 6   of a terrorism offense, I would have to review --
 7   if I made that initial review, I don't think
 8   anything changed.
 9        Q.   Well, isn't it a fact that the May
10   8th memo did change the Bureau's position in that
11   regard by no longer specifying prior offense?
12        A.   I don't know if that was just
13   inadvertently left out or not.
14        Q.   This is a memo from the assistant
15   director of the correctional program division;
16   correct?  Withdrawn.
17              I mean, if you look at the memo and
18   you've seen them all, it's very clear the April
19   memos talk about primary or prior offense and the
20   May 8th memo says primary offense, right?  That's
21   what the memos say, do they not?
22              MR. OESTERICHER:  Objection.
23        A.   Okay, I'm not sure.  I would have to
24   look at it.
25        Q.   That's fine.  No problem.  Take a
```

Page 127

For the Exclusive Use of Covington & Burling, LLP.
Use by any other party voids the certification

1  look at Exhibit 6 and Exhibit 9 and put them side

2  by side and let me know when you've had a chance

3  to do that.  Warden, take the time you need, I'm

4  just trying to assist and tell you on April 22nd,

5  I'm focusing on the third bullet toward the bottom

6  of the page, and on the May 8th memo, again

7  focusing you on the third bullet towards the

8  bottom of the page.  Do you see that?

9          A.    I see it on the April 22nd,

10  "Verifying the inmate's primary or prior offense

11  history does not include violence, sex offense or

12  terrorism related."

13          Q.    And now look at May 8th, the second

14  bullet on the page.

15          A.    "Verifying the inmate's primary

16  offense is not violent, a sex offense or terrorism

17  related."

18          Q.    It says nothing about "or prior";

19  correct?

20          A.    Correct.

21          Q.    That's the same memo, by the way,

22  the May 8th one, that has the change about 300 to

23  400, correct that those are no longer

24  disqualifiers; correct?

25          A.    Correct.

For the Exclusive Use of Covington & Burling, LLP.
Use by any other party voids the certification

**Marti Licon-Vitale**

```
 1              Q.     Okay.

 2              A.     However -- disregard.

 3              Q.     Would it be reasonable to view the

 4    inmates who we were told by your lawyers were

 5    ineligible because of a primary or prior offense

 6    as the reason for ineligibility, would it be

 7    reasonable to reassess those to determine whether

 8    it was solely based on a prior offense as opposed

 9    to a primary offense in light of what the May 8th

10    memo says; yes or no?

11                     MR. OESTERICHER:  Objection.

12              A.     No, because the April 22nd memo,

13    where it says "past or present," when you read the

14    May 8th memo, it has in highlights the change for

15    the 300 and 400 series incident.  However, it does

16    not highlight verifying the inmate's primary

17    offense, so that leads me to believe that that's

18    not a significant change they want us to look at,

19    because it is not bolded.

20              Q.     Is that true for other changes in

21    the May 8th memo as compare to the April 22nd

22    memo?  Because there's others.  Are you telling me

23    the only change that is worthy of consideration is

24    the one that is in bold font in the May 8th memo?

25    Warden, is that your testimony?
```

Page 129

**Marti Licon-Vitale**

```
 1                    MR. OESTERICHER:  Objection.

 2          A.    My testimony is that it stands out.

 3          Q.    My question was, is that the only

 4    change?

 5          A.    No, not the only change.

 6          Q.    It's not the only change as between

 7    the April 22nd and the May 8th memo that is worthy

 8    of consideration; am I right?

 9                    MR. OESTERICHER:  Objection.

10          Q.    Correct?

11          A.    I'm uncertain.  I'm looking.  I

12    think the May 8th memo also references pregnant

13    inmates.

14          Q.    And is that in bold font?

15          A.    It is not.

16          Q.    Does it deserve to be considered as

17    a change in policy?

18          A.    It does.

19          Q.    Going back to that chart, Exhibit 8,

20    some of the inmates for whom it states that they

21    were ineligible is for "recidivism score above

22    minimum."  For example, number 16, number 61, some

23    others, do you see that?

24          A.    "Primary or prior offense includes

25    violence, sex offense, or
```

Page 130

**Marti Licon-Vitale**

1  terrorism-related/recidivism score above minimum,"

2  yes.

3        Q.    **Recidivism score above minimum, do**

4  **you agree with me that under the relevant Bureau**

5  **of Prisons guidance, including the May 8th memo,**

6  **that a score above minimum is not a**

7  **disqualification for home confinement; is it?  I'm**

8  **referring you to the top of page 2 of the memo.**

9        A.    Which memo?

10       Q.    **The May 8th memo, which is Exhibit 9.**

11       A.    I've got the May 8th memo.  Where

12  did you want me the look?

13       Q.    **I'm looking at the second bullet,**

14  **"Inmates who have anything above a Minimum score**

15  **not receiving priority treatment"; correct?  Do**

16  **you see that?**

17       A.    "Inmates" -- I'm sorry.  I'm just

18  reading aloud.  I'll stop doing that.

19       Q.    **You can do it.  Just speak clearly**

20  **when you do it.**

21       A.    Can you tell me exactly where on

22  page 2?

23       Q.    **I'm looking at the second bullet**

24  **toward the very top of the page; right?  It says**

25  **the factors that are to be assessed to determine**

**For the Exclusive Use of Covington & Burling, LLP.**
**Use by any other party voids the certification**

1  whether an inmate is suitable for home

2  confinement, and it says, "Inmates who have

3  anything above a Minimum score not receiving

4  priority treatment."  Do you see that?

5          A.   Yes.

6          Q.    So in substance, if they have a

7  recidivism score above a minimum, they are not

8  supposed to be prioritized in terms of eligibility

9  for home confinement; correct?

10          A.   Yes.

11          Q.    But under the terms of this memo,

12  that fact, having a recidivism score above

13  minimum, is not a disqualifying feature; is it?

14          A.    I don't believe it would be.  It's

15  just something that is keeping them from being a

16  priority.

17          Q.    But it doesn't render them

18  ineligible; does it?

19          A.    I don't believe so.  Not in

20  accordance with this memo.

21          Q.    Also on that chart again, Exhibit 8,

22  some of the people for whom it's stated they were

23  ineligible, it says "percentage of time served."

24  For example, number 34.  Do you see that?

25          A.    Yes.

For the Exclusive Use of Covington & Burling, LLP.
Use by any other party voids the certification

**Marti Licon-Vitale**

Volume I                                                      5/21/2020

```
 1            Q.     Again, to be clear, the percentage
 2   of time served is not a factor that would render
 3   an inmate ineligible for home confinement
 4   referral; am it right?
 5            A.     Percentage of time served, if you
 6   look at the memo, I think it's May 8th --
 7            Q.     May 8, page 2, if I can help you,
 8   Warden.
 9            A.     I'm on page 2.  So this memo says
10   "have served 50 percent or more of their sentence,
11   or have 18 months or less remaining on their
12   sentence and they have served 25 percent or more
13   of their sentence."
14            Q.     And right above that, am I correct
15   that it says the following:  "We are currently
16   prioritizing for consideration those inmates who
17   either," and then it gives the information you
18   just testified to.  Am I right?
19            A.     Okay, yes.
20            Q.     So those features, the 50 percent
21   and the 18 months and the 25 percent, those are
22   factors that would give an inmate priority in
23   terms of reviewing them for potential home
24   confinement referral; correct?
25            A.     Yes.
```

**For the Exclusive Use of Covington & Burling, LLP.**
**Use by any other party voids the certification**

```
 1          Q.    But the inmate who does not meet
 2   those thresholds is not, under the terms of this
 3   memo, rendered ineligible for home confinement
 4   referral; are they?
 5          A.    I don't believe so.
 6          Q.    Some of the inmates listed as
 7   ineligible on that chart, Exhibit 8, it refers to
 8   gang affiliation.  So, for example, number 96, do
 9   you see that, gang affiliation?
10          A.    96, page 2?
11          Q.    Yes.
12          A.    Yes.
13          Q.    Does that mean that they had a gang
14   affiliation out on the street, had a gang
15   affiliation in jail, somewhere else?
16                MR. OESTERICHER:  Objection.
17          Q.    If you know.
18          A.    I don't know.
19          Q.    Am I correct that under the Bureau
20   of Prisons guidance, the factor with respect to
21   gang affiliation, that is included by in effect an
22   inmate having a gang affiliation in prison?
23          A.    Can you repeat that?
24          Q.    Yes.  Is gang affiliation in prison,
25   gang-related activities in prison, isn't that the
```

                                                    Page 134

```
 1    factor that is included within the May 8th memo to

 2    be considered in determining whether an inmate is

 3    eligible for home confinement?  I'm putting the

 4    emphasis on gang activity in prison as opposed to

 5    they were part of a gang outside on the street and

 6    perhaps that's what they got prosecuted for.  Am I

 7    right about that?

 8            A.    I'm not sure.

 9            Q.    Why don't you take a look at the May

10    8th memo and look at the paragraph in the middle,

11    and tell me when you're ready.  Right above where

12    that bold font type is that we spoke before --

13            A.    So "All inmates must be reviewed by

14    the SIS department --

15            Q.    -- at the referring facility to

16    determine if the inmate has engaged in violent or

17    gang-related activity in prison."  Correct?

18            A.    Yes.

19            Q.    Do you know with respect to the

20    inmates who are on that chart whether it was gang

21    activity in prison that rendered them ineligible

22    according to your lawyers?

23                  MR. OESTERICHER:  Objection.

24            A.    I do not know.

25                  MR. OESTERICHER:  Can we talk about
```

Page 135

**Marti Licon-Vitale**

Volume I                                                          5/21/2020

```
 1                    MR. OESTERICHER:   Objection.
 2           A.     I'm not aware.
 3           Q.     Have you asked anybody for authority
 4   or permission to utilize the First Step Act
 5   standard as opposed to the 5050.50 standard in
 6   determining whether to move for the release of an
 7   inmate due to compassionate release?
 8           A.     I have not.
 9           Q.     Have you recommended the filing of a
10   motion for compassionate release of any inmate in
11   the institution since you've become the warden?
12           A.     Say that one more time.  I'm sorry.
13           Q.     Since you became the warden of the
14   MCC, have you either moved or recommended the
15   filing of a motion by the Bureau of Prisons to
16   have an inmate released for compassionate release
17   reasons?
18           A.     I don't think that we have.  There
19   may have been one case where we didn't believe he
20   was eligible but because of his age, we went ahead
21   and we referred that to central office for their
22   final decision.
23           Q.     Was that COVID-19-related or simply
24   age and had nothing to do with COVID-19?
25           A.     COVID-19-related.
```

**For the Exclusive Use of Covington & Burling, LLP.**
**Use by any other party voids the certification**

```
 1            A.    Yes.
 2            Q.    You haven't delegated your authority
 3   to anybody within the MCC; have you?
 4            A.    No, I have not.
 5            Q.    On those two issues, the buck stops
 6   with you; right?
 7            A.    Yes.
 8            Q.    Again, do you know how quickly
 9   people at the MCC are, in fact, reviewing,
10   responding to, pushing up the chain their
11   recommendations with respect to compassionate
12   release requests?  Do you know?
13            A.    In the three weeks that I have been
14   back, I have seen a lot of referrals even though
15   they were declinations.  I've signed a lot of
16   those, so I can say that a lot of work has been
17   done in the last three weeks, yes.
18            Q.    Do you know what, if any, work was
19   being done before that with respect to
20   compassionate release requests?
21            A.    I wasn't here.
22            Q.    And how about in March into early
23   April?  Do you know how quickly that process was
24   working in terms of compassionate release
25   requests?
```

For the Exclusive Use of Covington & Burling, LLP.
Use by any other party voids the certification

```
 1              A.     It probably wasn't at all.

 2              Q.     Furloughs, are you familiar with the

 3      Bureau of Prisons' policies and procedures with

 4      respect to furloughs?

 5              A.     Yes.

 6              Q.     Have there been any change in the

 7      MCC's policies or practices with regard to whether

 8      to recommend the release of an inmate on a

 9      furlough?

10              A.     The process has not changed.

11              Q.     Who makes the final decision on

12      behalf of the Bureau of Prisons on a furlough

13      release?

14              A.     I do.

15              Q.     Has a furlough been considered by

16      you at all as a means of responding to COVID-19?

17              A.     I am open to reviewing furloughs as

18      a response to COVID-19.  I haven't seen any

19      referrals.

20              Q.     We've been told by your lawyers in

21      this case, again, in response to our written

22      requests for information, that there have been no

23      inmates that have been even considered for a

24      furlough since March 1st of 2020.  Do you have any

25      basis to dispute that?
```

Page 147

1   forward, regardless of if it's COVID-related or

2   not.  We've been under circumstances where it's

3   kind of held us up from doing so.

4              Certainly ideas of how we control

5   our chemicals in the units is one, and some of the

6   stuff we've actually implemented during COVID.  We

7   actually have washers and driers in the units now

8   simply because it just helps us with ensuring that

9   their clothes get washed or the cleaning rags get

10   cleaned.  Sometimes they could even put mops in

11   there to clean those.

12              Something that the nation is

13   probably looking at is more PPE.

14          Q.     What PPE?

15          A.     COVID.  You know, we've had PPE

16   before I went out and after I came back.  There

17   was never a point where oh, my goodness, we don't

18   have masks.  We've always had them, but certainly

19   I would like to have more of a -- I guess like a

20   storage of everything that you could imagine just

21   to have ready for any possible future pandemics.

22          Q.     You mentioned chemicals in the

23   units.  What were you referring to?

24          A.     I mean cleaning chemicals.

25          Q.     Got it.  Fair enough.  Anything

For the Exclusive Use of Covington & Burling, LLP.
Use by any other party voids the certification