UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CESAR FERNANDEZ-RODRIGUEZ,
ROBER GALVEZ-CHIMBO, SHARON
HATCHER, JONATHAN MEDINA, *and*
JAMES WOODSON, *individually and on
behalf of all others similarly situated*,

                              Petitioners,

                – against –

MARTI LICON-VITALE, *in her official
capacity as Warden of the Metropolitan
Correctional Center*,

                              Respondent.

**OPINION & ORDER**

20 Civ. 3315 (ER)

RAMOS, D.J.:

The World Health Organization declared the Novel Coronavirus Disease, COVID-19, a global pandemic on March 11, 2020. Two days later, on March 13, the United States declared the pandemic a national emergency. But even in the weeks and months prior to those declarations, WHO and other public health organizations were warning about the potential of the virus to infect and kill untold numbers of people around the globe. Sadly, some of the most grim predictions have come to pass as the virus has taken an unspeakable toll. The experience in the United States has been particularly dire. By all accounts, this country leads the world in both the number of infections and fatalities.

The virus started to spread particularly quickly through the City of New York in the early spring of this year. It brought life in the City to a standstill, sickening hundreds of thousands of residents. As thousands of people per day required hospitalization, the virus overwhelmed New York's healthcare system, despite drastic efforts to blunt its spread. The pandemic has ebbed in New York, but it continues to ravage the country. Indeed, as of the date of this Opinion there appears to be no end in sight, as each passing day brings a record number of new cases.

While our elected officials have debated how best to implement the recommendations of public health authorities to slow the spread of the virus, there at least exists a broad consensus as to what those appropriate measures are.  Specifically, individuals should, if at all possible, maintain an appropriate "social distance" from each other and wear a face covering when that is not possible.  Testing for the virus should be made widely available and is strongly recommended for individuals that exhibit symptoms of the disease.  Individuals who test positive should be isolated, and efforts should be made to identify those who have recently been in close contact with infected individuals, so that they may quarantine for an appropriate period of time.  Finally, all individuals should adopt a rigorous regime of personal hygiene, emphasizing frequent hand washing.

There is a common-sense recognition that jails and other correctional institutions present a particular dilemma for combating the virus because, by their nature, they make nearly impossible the imperative of social separation.  It is for that reason that the Centers for Disease Control and Prevention ("CDC") issued specific guidance for correctional institutions, and the Attorney General of the United States instructed all wardens to use the tools at their disposal to lessen the number of inmates under their stewardship.  It is also for this reason that the management of the Metropolitan Correctional Center in Manhattan (the "MCC") was included in a series of meetings convened by Chief Judge Colleen McMahon beginning in early March with other stakeholders in the criminal justice system to discuss how our work might safely be carried on.

The inmates housed at the MCC were not spared the outbreak.  As will be discussed below, while the management of the MCC was well aware of the threat posed by the virus and of the guidance that was issued to address it, it failed to implement common-sense measures to stop the spread of the virus.  In March and April, at least five percent of the MCC's inmates fell ill with COVID-19.  Although no inmate died, many were debilitated by coughs that wracked their bodies, fatigue so extreme they could not

rise from bed, and a host of other symptoms.  Even now, after the peak of the outbreak at the MCC, a handful of inmates continue to test positive for the disease.

Four inmates[1] currently held in the MCC petition this court for writs of habeas corpus on behalf of themselves and other MCC inmates, arguing that the planning and reaction to the pandemic — or lack thereof —constituted deliberate indifference to the extreme risk the novel coronavirus posed.  They argue that the conditions in which they were held shock the conscience of any civilized society and violate their rights to Due Process and to freedom from Cruel and Unusual Punishment guaranteed by the U.S. Constitution.  They now move the Court to preliminarily enjoin the MCC's warden and to order her to take certain precautions to protect all inmates from a new outbreak.

The warden, for her part, urges the Court to allow her and her team to prepare for the next outbreak without judicial oversight, providing both an analysis of where her staff fell short during the first emergency and promises for how they will improve as the situation continues to develop.  She also moves to dismiss the inmates' claims insofar as they seek release from the MCC.

The inmates are likely to show that the MCC's response to the pandemic was ad-hoc and overlooked many gaps in its scheme to identify and isolate infected inmates — creating conditions that posed a substantial risk to the health of all inmates.  As discussed in further detail below, however, the Court concludes that the inmates are not substantially likely to show that the MCC's failures were a result of deliberate indifference to their plight.  Accordingly, the inmates' motion for a preliminary injunction is DENIED.  Additionally, because the Court determines that there are no statutory or equitable bars to considering release as a remedy for inmates in its final determination of this matter, the warden's motion to partially dismiss the inmates' petition is also DENIED.

---

[1] A fifth petitioner, Jonathan Medina, terminated his participation in this lawsuit on May 18, 2020.  Doc. 41.

## I.   FACTUAL BACKGROUND[2]

### A.  COVID-19 and Initial BOP Guidance

Nearly 130,000 Americans have perished from COVID-19, and over 2.6 million have become ill as of July 1.[3]  The numbers in New York City are no less sobering:  over 20,000 have died and nearly 220,000 have gotten sick.[4]  The disease causes fever, coughing, shortness of breath, nausea, loss of smell, and a host of other symptoms.[5]  At particular risk are older adults, as well as those with certain underlying conditions, including heart disease, lung disease, and diabetes.[6]  For the most ill, trouble breathing and extreme fatigue can require hospitalization for intensive care.[7]

The CDC identified correctional facilities as a setting of particular concern in guidance dated March 23, 2020.[8]  According to the CDC, the dense nature of a crowded prison increases the risk of person-to-person transmission of the disease, especially as new inmates enter the facility from any number of distant locales.

---

[2] By agreement of the parties, the Court took evidence for this motion in the form of declarations from and depositions of MCC officials; 33 declarations submitted by current and former MCC inmates, as well as depositions of 5 of them; expert reports from Dr. Homer Venters for the inmates and Dr. Rebecca Lubelczyk for the warden; BOP guidance memoranda received by the MCC; certain documentary records produced by the MCC; and photographs taken during a May 13 court-ordered site inspection.  Although the Court does not reference every inmate declaration in its Opinion and Order, the substance of each declaration is reflected in the Court's discussion.

The evidence relied upon by the Court is contained in the following declarations of the following individuals:  Deidre D. von Dornum (Doc. 7), Arlo Devlin-Brown (Doc. 51), Ishita Kala (Doc. 54), Assistant U.S. Attorney Jean-David Barnea (Doc. 60), Dr. Robert Beaudouin (Doc. 61), Schnahider Demosthenes (Doc. 65), Associate Warden Charisma Edge (Doc. 66), and Assistant U.S. Attorney Allison Rovner (Doc. 68).  The Court additionally take's judicial notice of the latest infection statistics and symptoms as published by the CDC and BOP.  *See Basank v. Decker*, No. 20 Civ. 2518 (AT), 2020 WL 1953847, at *5 (S.D.N.Y. Apr. 23, 2020) *appeal filed* No. 20-1966 (2d Cir. June 22, 2020).

[3] *Coronavirus Disease 2019 (COVID-19): Cases in the U.S.*, Ctrs. for Disease Control & Prevention, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last updated July 1, 2020).

[4] *Id.*

[5] *Coronavirus Disease 2019 (COVID-19): Symptoms*, Ctrs. for Disease Control & Prevention, https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html (last updated May 13, 2020).

[6] *Id.*

[7] *Id.*

[8] *See* Kala Decl. ex. 20 ("CDC Correctional Facility Guidance") at 2.

The federal Bureau of Prisons (the "BOP") has not been spared the impact of the pandemic.  According to its own data, as of July 1, nearly 1,600 BOP inmates were currently ill with COVID-19, as confirmed by testing; 90 have died since the outbreak began.  Over 160 staff have tested positive and are currently sick, as well; 1 staff member has died.[9]  Some BOP facilities are experiencing large-scale outbreaks, with the Bureau identifying nearly 600 COVID-19 positive inmates in Butner, North Carolina; over 270 at the Elkton facility in Lisbon, Ohio; over 110 in Seagoville, Texas; and nearly 100 in Fairton, New Jersey.[10]

The BOP began planning for the coronavirus pandemic in January 2020 as part of its "Phase One," using its Pandemic Influenza Plan as a guide.[11]  The Bureau issued its first guidance to prison officials on January 31 and then on February 29, recommending that facilities screen staff and new inmates for exposure to persons either diagnosed with COVID-19 or who exhibited symptoms of the disease.[12]  The guidance further recommended, *inter alia*, educating staff, fitting them for N95 respirator masks, and conducting an inventory of and procuring personal protective equipment ("PPE").  It also recommended that prison executive staff "determine where persons with COVID-19 risk factors would be quarantined in the facility, if needed."[13]  Finally, the February 29 guidance included a screening tool for inmates.[14]  It directed that screeners ask whether the inmate had been to an area where COVID-19 was prevalent and whether the inmate had been in contact with someone diagnosed with COVID-19.  It listed fever, cough, and

---

[9] *See* COVID-19 Update, Bureau of Prisons, https://www.bop.gov/coronavirus/ (last updated July 1, 2020). BOP reports "the most recently available confirmed lab results involving open cases from across the agency." *Id.* (emphasis removed).

[10] *Id.*

[11] Edge Decl. ¶ 9.

[12] Beaudouin Decl. exs. 2, 16.

[13] Beaudouin Decl. ex. 2 at MCC 1727.

[14] Beaudouin Decl. ex. 16.

shortness of breath as symptoms to look for, and noted that "[f]ever may not be present in some patients." If an inmate was symptomatic, the tool directed screeners to immediately place a surgical mask on the inmate, to isolate the inmate, and to "minimize and keep a log of all persons interacting with (6ft.) or caring for, the inmate," and for staff to wear proper PPE around the inmate.

### B.  MCC and the Early Pandemic

At the time of the February 29 guidance, MCC leadership had not engaged in any planning for a potential outbreak.[15]  On February 27, a security failure unrelated to the pandemic hit the MCC:  one of its correctional officers smuggled a loaded firearm into the facility, prompting a complete lockdown as staff searched for the gun.[16]  On March 4, over 150 inmates were moved to another BOP facility in Otisville, New York to facilitate the search.

During this time, prison officials attended several meetings with stakeholders in the federal justice system as it prepared for the looming COVID-19 pandemic.  At the first such meeting, convened on March 4 by Chief Judge Colleen McMahon of this District with the U.S. Marshal's Service, the Federal Defenders, and others, MCC officials indicated that they had not yet begun planning for the pandemic due to the ongoing search for the smuggled gun.[17]  Chief Judge McMahon convened a second meeting on March 12 to specifically discuss issues surrounding COVID-19.  At that meeting, the MCC's warden indicated, *inter alia*, that the facility did not have a testing protocol or a plan for acquiring test kits and that it had not identified a location to isolate sick inmates, but that it had ordered PPE for staff.[18]

---

[15] *See* Kala Decl. ex. 7 ("Licon-Vitale Dep.") at 15:11–14 (Q:  "[H]ad anything been done as of March 1st to plan for COVID-19?"  A:  "Not that I'm aware of.").

[16] Edge Decl. ¶ 17.

[17] Von Dornum Decl. ¶ 6.

[18] *Id.* ¶ 10.

The MCC's lockdown was lifted on March 13, after the gun was found, returning the prison to normal operations.[19]  The same day, BOP officials promulgated guidance regarding "Phase Two" of the Bureau's response to COVID-19; they updated the guidance on March 18.[20]  In that guidance, BOP suspended legal and social visits, as well as non-essential inmate movement, for 30 days.  It further recommended continued symptom screening and temperature checks for staff.  It recommended that all new inmates from geographic areas suffering community spread of the virus be screened, that at-risk asymptomatic inmates be quarantined, and that "[s]ymptomatic inmates with exposure risk factors [] be isolated and tested for COVID-19 per local health authority protocols."[21]  It also recommended that wardens "implement modified operations to maximize social distancing in [BOP] facilities, as much as practicable."[22]  MCC staff held a series of town halls with inmates soon after the guidance was released to explain the new procedures, including the reasons for suspending visits and the need for social distancing.[23]

Chief Judge McMahon convened a third meeting on March 20.  At that meeting, the MCC's warden reported that the prison had identified 23 inmates as being at-risk for serious complications from COVID-19.[24]  The warden told the group that the prison had no test kits, and a total of 30 N95 masks and 100 surgical masks for an inmate population of over 650.  She also indicated that two inmates had been sent to the hospital after

---

[19] Edge Decl. ¶ 17.  About one-third of the inmates had returned from Otisville on March 9, and nearly all of the remainder returned on March 12.  *Id.*

[20] Edge Decl. ex. 1 at MCC 1390–94.  On this date, BOP promulgated guidance for Phase 3 of its action plan, as well.  Edge Decl. ¶ 11.  It related to remote work for administrative locations and is not relevant to this lawsuit.

[21] Edge Decl. ex. 1 at MCC 1393.

[22] *Id.*

[23] Edge Decl. ¶ 19.

[24] Von Dornum Decl. ¶ 15.

exhibiting symptoms of COVID-19, although they tested negative.  The warden reported that if other inmates complained of symptoms, they would be screened for elevated temperature or the presence of symptoms consistent with COVID-19.  Additionally, the MCC assigned inmate orderlies to begin cleaning common areas on a regular basis as a preventative measure.[25]

### C.  The Outbreak Begins

Inmates began complaining of COVID-19 symptoms in mid-March.  One sent an email to the "Sick Call" inbox[26] on March 15, writing, "I have been sick for the past three days.  I have been coughing as well as mild fever [*sic*].  I haven't been able to sleep because of the coughing and discomfort."[27]  Another wrote on March 18 that he or she had a cough and fever "for the past few days."[28]  A third wrote on March 20, "I've been experiencing Flu like symptoms and would like to be tested for the COVID-19 ASAP Please," following up the next day with "????????????"[29]  The first of these inmates was seen by medical staff on March 21, six days after he or she sent the email, and the latter two were seen six weeks after their messages, on May 4 and 5.[30]

In declarations, two inmates describe themselves or their cellmates falling ill in mid-March.  James Woodson, one of the named petitioners, reports that a man in his dormitory that slept nearby fell sick on March 21.[31]  The man had a high fever and was

---

[25] Edge Decl. ¶ 36.

[26] As described, inmates may request medical care of "less urgent medical needs" through this electronic Sick Call inbox or through a handwritten note given to prison staff.  Beaudouin Decl. ¶ 24.  According to the MCC, "[t]hese messages are generally reviewed within a day or two of when they are received, and inmates are scheduled for upcoming medical appointments based on the urgency of their symptoms and the availability of staff."  *Id.*

[27] Kala Decl. ex. 36 ("Inmate Sick Calls") at MCC 209 (Inmate 235).

[28] *Id.* at MCC 248 (Inmate 715).

[29] *Id.* at MCC 242 (Inmate 361).

[30] Kala Decl. ex. 37 ("Health Services Activity Rep.") at MCC 1995, 2271, 2071, respectively.

[31] Devlin-Brown Decl. ex. 5 ("Woodson Decl.") ¶ 13.

vomiting and sweating.  Woodson and other inmates "bang[ed] on the walls and doors in order to attract the attention of [a guard], but the staff did not remove him from [the] unit until the next morning."  Anthony Flynn, an inmate located in a cell on the fifth floor, declared that he experienced a fever, chills, a headache, and a loss of taste and smell starting on March 21.[32]  He reports that he did not receive any medical attention while he was sick.

On the morning of March 23, three days after the warden's third meeting with the Chief Judge and other stakeholders, MCC staff began implementing certain changes to the prison's operations.  In the morning, the warden told her staff that she was "working on a modified lock down plan."[33]  Later, the prison entered a "Modified Move Schedule," which limited inmates to their cells or dormitories except for a two-hour time period per day to access common areas.[34]  The policy indicated that the common areas would be sanitized after each use.  Also on this day, the CDC released guidance specifically related to managing COVID-19 in prison facilities, with much of the guidance focused on implementing screening, hygiene protocols, isolation, and social distancing.[35]

That afternoon, the first inmate at MCC tested positive for COVID-19.  He had been sent to the hospital two days prior, complaining of chills, body aches, fever, dry cough, and a headache.[36]  After test results came in at approximately 3:00 p.m., the inmate was returned to the MCC and isolated.

---

[32] Devlin-Brown Decl. ex. 18 ("Flynn Decl.") ¶ 10.

[33] Edge Decl. ex. 2.

[34] Edge Decl. ex. 3.  This period was reduced to one hour the next day.  Edge Decl. ex. 5.

[35] *See generally* CDC Correctional Facility Guidance.

[36] Edge Decl. ex. 4 at MCC 111.  This inmate was not the first isolated.  One was isolated on March 23 but tested negative for the disease on March 24.  Kala Decl. ex. 32 ("Quarantine Isolation Flowsheet") (Inmate 519).

The warden issued a memorandum informing the staff that the inmate had tested positive and instructing them that his dormitory unit, Unit 11-South, be quarantined.[37] She instructed that all inmates in the unit should be medically assessed daily. She further indicated that the prison would conduct a contact investigation to determine what staff had been in contact with the inmate during the previous two weeks. In an email sent about 90 minutes after the inmate tested positive, a prison official restricted inmates in Unit 11-South to their dorms except to pick up food during meal periods, and he included guidance that identified "fever, congestion, muscle aches [and] other flu-like symptoms" as symptoms meriting an inmate being placed in isolation.[38] Prison guards met with inmates on Unit 11-South to inform them of the new restrictions that evening.[39]

### D. The Outbreak Spreads

Over the next week, the MCC isolated ten more inmates exhibiting symptoms of COVID-19.[40] Those inmates with difficulty breathing were given a chest x-ray to detect pneumonia and antibiotics to treat any such pneumonia.[41] Inmates with fever were given Tylenol, and a few of the most serious cases were sent to the hospital. According to the MCC, isolated inmates were visited once or twice daily by medical staff for checkups and were returned to their units 72 hours after symptoms subsided.[42]

Several of these inmates (along with the inmate isolated on March 23) were housed in the Special Housing Unit (the "SHU") until March 29.[43] The SHU is normally

---

[37] Edge Decl. ex. 4 at MCC 111.

[38] *Id.* at MCC 13.

[39] Edge Decl. ¶ 20.

[40] Quarantine Isolation Flowsheet. One inmate was isolated on March 24, two were isolated on March 26, three were isolated on March 27, two were isolated on March 28, and two were isolated on March 29. *Id.* Due to a shortage of tests, the majority of these inmates were isolated based on symptoms they exhibited, rather than a positive test result at a hospital. Beaudouin Decl. ¶ 11.

[41] Beaudouin Decl. ¶ 11.

[42] *Id.* ¶ 12.

[43] *Id.* ¶ 10.

used to house inmates being disciplined or who are being protected for some reason,[44] and many inmates expressed trepidation about being sent there for medical isolation, referring to it as "the box."[45]  According to photographs taken during discovery, SHU cells contain a single concrete slab that functions as a bed, a concrete stool, and a combination sink and toilet.[46]  As MCC's warden acknowledges, "the conditions for the inmates in the SHU are not as favorable as conditions in an ordinary cell . . . ."[47]

Vinicius Andrade was one of the inmates isolated in the SHU with COVID-19 symptoms.  He had fallen ill on March 24, shaking, experiencing chills, and feeling feverish.[48]  According to his declaration, staff checked his temperature but initially sent him back to his cell because he did not register a fever.  Andrade took Tylenol the next night but woke up on the morning of March 26 with chills.  Medical staff took his temperature again, finding it was over 100.4 degrees — BOP's threshold for a fever[49]; MCC staff took Andrade to the hospital two hours later.[50]

When he returned the next day, March 27, Andrade was placed in the SHU.[51]  Although he had not been there before, he knew of it as a place "where they put the inmates who are in really big trouble."  MCC staff did not give him a mattress, blanket, or pillow the first night he was in the SHU.  To sleep more comfortably, he tried to use his

---

[44] *See* Licon-Vitale Dep. 64:4–7.

[45] *See, e.g.*, Devlin-Brown Decl. ex. 8 ("Beniquez Decl.") ¶ 11 ("The word around was, if you get sick or complain you're going to the box, so a lot of people didn't want to get out that they were sick.").

[46] *See* Kala Dec. exs. 14, 15; Devlin-Brown Decl. ex. 1 ("Venters Rep.") ¶ 18.

[47] Licon-Vitale Dep. 64:14–8.

[48] Devlin-Brown Decl. ex. 6 ("Andrade Decl.") ¶ 4.

[49] Beaudouin Decl. ¶ 14.

[50] Andrade Decl. ¶ 5.

[51] *Id.* ¶ 6.

jumpsuit as a pillow, but he was forced to put it back on when sleeping in only underwear and a t-shirt proved too cold.  He was given a mattress and blankets the next day.[52]

He was kept isolated in the SHU for 15 days.[53]  He reports that he was coughing for five days, experienced muscle aches, and was unable to smell.  Although he was given Tylenol three times a day and was told he had no fever, he reports that medical staff never checked his chest or lungs and that he drank water exclusively from the cell's sink.  He reports that when he returned to his tier, "[t]he inmates in [his] tier gave [him] a plastic bag that they had put [his] blanket and sheet in so they did not spread the infection.  But everything else was just the same, and the guys in [his] tier said no one had come to clean or given them any extra cleaning supplies."[54]

In addition to Unit 11-South, which was quarantined on March 23, the prison quarantined Unit 11-North on March 27, and Units 5-South, 7-North, and 7-South on March 28.[55]  Inmates in quarantine reported delays between when they notified MCC staff about symptoms consistent with COVID-19 and when they were isolated.  For example, Armand Beniquez declares that his bunkmate, Dwayne, fell ill on March 23.[56]  Although Dwayne was seen by medical staff that day, he did not improve.  Beniquez attempted to get more help, but it did not arrive until March 25, when Dwayne allegedly showed a temperature of 102.9 degrees and was removed from the cell.  As Dwayne was removed, a doctor said to Beniquez, "[I]f your bunkie is sick, we will send you to the box [*i.e.*, the SHU] tomorrow, and then take you to the hospital."  Beniquez was left alone in the cell until Dwayne returned, although Dwayne's belongings were never removed and

---

[52] *Id.* ¶ 7.

[53] *Id.* ¶ 8.

[54] *Id.* ¶ 11.

[55] Edge Decl. ex. 9 at MCC 22–28.  In this email, the warden wrote, "We have a total of three inmates who have tested positive. . . . We can hold the line by following and maintaining the safety precautions."

[56] Beniquez Decl. ¶ 5.

washed, with Beniquez claiming he never received supplies to clean up after Dwayne.[57] Beniquez declares that he eventually developed a bad fever, chest pains, coughing, loss of taste, and fatigue.[58]  Despite talking to medical staff during medical checks and guards during the day and emailing the warden, Beniquez claims that he never saw a doctor, with the warden telling him, "I've seen your temperature and it's fine."[59]

Some inmates continued to seek medical attention through the sick-call system. On March 26, Carlos Garcia began to feel ill while working in the kitchen.[60]  He declares that he woke up the next day with a severe headache and covered in sweat.  He told a guard that he was too sick to perform his kitchen duty and then told a doctor his symptoms.[61]  The doctor told him to submit a sick call via email; he did so that day, March 27.[62]  Garcia felt worse over the next week, "constantly coughing," sweating, and experiencing chest pains.[63]  He was eventually seen by medical staff and placed in isolation on April 2, after speaking directly to a nurse.[64]

As the MCC dealt with the first set of inmates to fall ill, the BOP and the Attorney General each released new guidance related to the pandemic.  First, the BOP announced Phase Four of its response on March 26, updating it on March 28.[65]  This guidance

---

[57] Beniquez Decl. ¶ 9.

[58] Id. ¶ 7.

[59] Id. ¶ 8.  Similarly, named petitioner Rober Galvez-Chimbo and his cellmate began to feel sick on March 25, reporting bloody nose, fever, loss of smell, coughing, aches, and chills.  He and his cellmate asked for medical care, but guards did not respond.  Galvez-Chimbo did not see a doctor until April 7 and was not isolated until April 8.  Devlin-Brown Decl. ex. 3 ("Galvez-Chimbo Decl.") ¶¶ 4, 5, 8.

[60] Devlin-Brown Decl. ex. 19 ("Garcia Decl.") ¶ 9.

[61] Garcia Decl. ¶¶ 9, 10.

[62] Id. ¶¶ 10, 11.  Several other inmates submitted sick calls via email complaining of COVID-19- like symptoms during this period but waited some time before being seen by medical staff, if they were seen at all.  See, e.g., Inmate Sick Calls at MCC 239 (Inmate 569; Sent: Mar. 27; Never Seen), Inmate Sick Calls at MCC 237 & Health Services Activity Rep. at MCC 2007 (Inmate 254; Sent: Mar. 28; Seen: Apr. 2).

[63] Garcia Decl. ¶ 12.

[64] Id. ¶ 14–17.

[65] Edge Decl. ex. 1 at MCC 1625–27.

mandated that all incoming inmates be screened for fever and symptoms, that asymptomatic inmates be quarantined for 14 days, and that symptomatic inmates be placed in isolation. The guidance further mandated screening of all staff, contractors, and visitors, and that staff be fitted and trained on the use of N95 masks. Also on March 26, the Attorney General directed the Director of the BOP to "prioritize the use of [] various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing COVID-19 pandemic."[66] In that memorandum, the Attorney General listed a number of discretionary factors for the consideration of inmates for home confinement, including:

- The age and vulnerability of the inmate to COVID-19, in accordance with [CDC] guidelines;

- The security level of the facility currently holding the inmate . . . ;

- The inmate's conduct in prison . . . ;

- The inmate's score under [the Prisoner Assessment Tool Targeting Estimated Risk and Need], with inmates who have anything above a minimum score not receiving priority treatment under this Memorandum;

- Whether the inmate has a demonstrated and verifiable re-entry plan that will prevent recidivism and maximize public safety, including verification that the conditions under which the inmate would be confined upon release would present a lower risk of contracting COVID-19 than the inmate would face in his or her BOP facility;

- The inmate's crime of conviction, and assessment of the danger posed by the inmate to the community. . . .[67]

---

[66] Demosthenes Decl. ex. 3 at 1. These authorities can include *furloughs*, authorized by 18 U.S.C. § 3622, which allows prison wardens to authorize an inmate to spend up to 30 days outside the prison; *home confinement*, authorized by 18 U.S.C. § 3624(c)(2), which allows certain inmates to serve the remainder of their imprisonment at home; and *compassionate release*, authorized by 18 U.S.C. § 3582(c)(1)(A), which allows a sentencing court to modify a term of imprisonment on the motion of the Director of BOP upon a finding of "extraordinary or compelling reasons" to do so.

[67] Demosthenes Decl. ex. 3 at 1–2.

### E.  Continued Infection & Staff Reassignment

Over the next ten days, the MCC isolated an additional 18 inmates,[68] and quarantined three more units:  Unit 5-North on March 30,[69] Unit 2 (which contained the prison's female inmates) on April 4,[70] and Unit 9-North on April 8.[71]  The MCC also transitioned its isolation ward from the SHU to Unit 3 on March 30.[72]  In addition, Phase Five of the BOP's response started on March 31, directing prompt contact tracing for all persons who exhibited COVID-19 symptoms and dictating hygiene and social distancing protocols.[73]  The guidance also directed prison staff to conduct daily rounds of all departments, health staff to conduct twice-daily rounds, and unit guards to conduct rounds every thirty minutes.

The first woman isolated, Tiffany Days, began to feel unwell on March 29, feeling fatigued and lightheaded.[74]  When medical staff came to her unit to distribute medication and take the inmates' temperatures, Days told them of her symptoms.  They told her to request medical attention via a sick-call email.  By April 3, Days' fatigue had intensified, and she began to cough.[75]  When medical staff came to check on about ten women feeling ill, Days recorded a fever.  She was isolated in Unit 2's suicide watch room and, like Andrade in the SHU, reported not being provided sheets or a blanket and being too

---

[68] Quarantine Isolation Flowsheet.  Three inmates were isolated on March 30, one on April 1, two on April 2, one on April 3, two on April 5, three on April 6, one on April 7, and four on April 8.  One inmate was isolated on March 31, but tested negative for the disease on April 15.

[69] Edge Decl. ex. 8 at MCC 29.

[70] *Id.* at MCC 38.

[71] Beaudouin Decl. ¶ 15.  Prison officials held a town hall with inmates on Unit 9-North to discuss the disease and proper responses to it on March 31.  Edge Decl. ¶ 28.

[72] Edge Decl. ¶ 24.  The move was made in part due to lack of space in the SHU, which only contained four cells.  Beaudouin Decl. ¶ 10.  The warden indicated that the SHU was initially chosen because it was "the easiest place to make . . . available" for isolation.  Licon-Vitale Dep. at 63:18–21.

[73] Edge Decl. ex. 1 at MCC 130–31.

[74] Devlin-Brown Decl. ex. 15 ("Days Decl.") ¶ 4.

[75] *Id.* ¶ 5.

cold.[76]  She indicates that she asked guards for water and was told to drink from the sink in the cell; she reports becoming so dehydrated her lips began to bleed.[77]

Around this time, Adrienne Roberts, a woman located in Unit 2, was given a new cellmate, Loren Piquant.[78]  Roberts declares that medical staff saw Piquant in the cell with Roberts and asked Piquant, "[W]hy are you in here?"  The next evening, medical staff visited again and, seeing Piquant, said "[Y]ou are not supposed to be in here, you have a fever."  Roberts' temperature was taken, and she registered a fever.  In a panic, Roberts acted as if she were going to hang herself in order to remove herself from the cell she shared with Piquant.[79]  Guards rushed in and placed Roberts in isolation.

On April 3, the Attorney General issued additional guidance expanding the category of inmates eligible for home confinement:

> I am therefore directing you to immediately review all inmates who have COVID-19 risk factors, as established by the CDC, starting with the inmates incarcerated at FCI Oakdale, FCI Danbury, FCI Elkton, and similarly situated facilities where you determine that COVID-19 is materially affecting operations.  You should begin implementing this directive immediately at the facilities I have specifically identified and any other facilities facing similarly serious problems. . . . [Y]our review should include all at-risk inmates — not only those who were previously eligible for transfer.[80]

Two days later, however, the warden reassigned all MCC staff — including case managers, who would ordinarily review inmates for early release — to corrections posts to remedy staff shortages.[81]  Recognizing that this shift would prevent case management staff from implementing the Attorney General's guidance,[82] the associate warden

---

[76] *Id.* ¶ 8.

[77] *Id.* ¶ 9.

[78] Devlin-Brown Decl. ex. 27 ("Roberts Decl.") ¶ 13.

[79] *Id.* ¶ 14.

[80] Demosthenes Decl. ex. 4.

[81] Demosthenes Decl. ¶ 38.

[82] Edge Dep. at 156:13–16.

approached the warden, who refused to provide additional staff for the evaluation of home confinement packages.[83]  As a result, while staff were reassigned, the team did not evaluate any of the more than 50 compassionate release applications submitted by inmates; nor did it evaluate any inmates for home confinement or furlough.[84]

Soon after case managers were reassigned to corrections posts, two more inmates sent emails complaining of long-lasting symptoms, both on April 8.  One inmate living on Unit 11-North explained that he had been experiencing chills, aches, fatigue, and heavy coughing for ten days.[85]  He said he was having trouble breathing and that 13 of the 16 inmates in his dormitory were sick.  His temperature was checked the next day, April 9, and he had a clinical encounter on April 16.[86]  The second inmate complained of experiencing fever, aches, and severe coughing for at least a month.[87]  He wrote that many people in his unit were experiencing symptoms, and that he had reported this to a guard.

### F.  Reaching the End of the Outbreak

The MCC isolated five additional victims of the initial outbreak between April 9 and April 16.[88]  During this time, the prison began procuring additional protective equipment.  On April 9, the prison began providing its staff with one new surgical mask daily and additional PPE for those staff working in isolation wards.[89]  On April 10, the

---

[83] Edge Dep. at 157.  The associate warden repeated this request to an acting warden when the regular warden of MCC was out sick.  *Id.* at 159:10–25.  In her deposition, the associate warden suggested that the reassignment of case management staff was not necessary.  *Id.* at 162:2–18.

[84] Demosthenes Decl. ¶¶ 39, 40.

[85] Inmate Sick Calls at MCC 227 (Inmate 344).

[86] Health Services Activity Rep. at MCC 2063.

[87] Inmate Sick Calls at MCC 228 (Inmate 677) (written in Spanish).

[88] Quarantine Isolation Flowsheet.  Two inmates were isolated on April 9, one on April 10, one on April 11, and one on April 16.  Two additional inmates were isolated, although they eventually tested negative:  one was isolated on April 24 but tested negative on April 24 and April 27 and the other was isolated on May 5 but tested negative on May 5 and May 7.

[89] Edge Decl. ¶ 50.

MCC was able to order a limited number of COVID-19 test kits from its suppliers,[90] and on April 11 it began to provide its staff with one N95 respirator mask each week.[91]  The MCC did not begin to distribute masks and mandate their use among inmates until mid-April and early May.  Beginning on or about April 16, inmates were given one disposable surgical mask per week and were told that mask-wearing was mandatory while outside of their cells.[92]  On or about May 2, each inmate received two reusable cloth masks and was told that failing to wear one could have disciplinary consequences.[93]

As the prison was distributing PPE, there was evidence that symptomatic inmates were not being immediately quarantined.  For example, Antonio Smith, an inmate who was placed in the SHU for disciplinary reasons, began to feel sick on or about April 8, reporting fatigue, congestion, and coughing.[94]  Although he was diagnosed with pneumonia two days later, he was returned to his cell, which he shared with Terrell Brown.[95]  On April 16, over a week after Smith first fell ill, medical staff saw Smith and Brown working as orderlies in the SHU.[96]  The staff member looked surprised to see the two men and said he had ordered their quarantine after Smith was diagnosed with pneumonia.[97]  They were isolated in individual cells the next day.[98]  While they were

---

[90] Beaudouin Decl. ¶ 19.

[91] Edge Decl. ¶ 50.  In addition, BOP began Phase Six of its COVID-19 response, extending Phase Five through May 18.  Edge Decl. ex. 1 at MCC 149–54.

[92] Edge Decl. ¶¶ 43, 44; *see also* Devlin-Brown Decl. ex. 11 ("Brown Decl.") ¶ 19 (inmate confirming that masks were provided during this time).

[93] Edge Decl. ¶¶ 45, 48.  Some inmates declare that the masks are too small and that it is very difficult to properly wash them.  *See, e.g.*, Roberts Decl. ¶ 11.

[94] Brown Decl. ¶ 11; Devlin-Brown Decl. ex. 29 ("Smith Decl.") ¶ 8.

[95] Brown Decl. ¶ 11; Smith Decl. ¶ 9–10.

[96] Brown Decl. ¶ 14; Smith Decl. ¶ 13.

[97] Brown Decl. ¶ 14; Smith Decl. ¶ 14.

[98] Brown Decl. ¶ 15; Smith Decl. ¶ 15.

isolated, both men indicated that they only received temperature checks and were not otherwise screened for other symptoms of COVID-19.[99]

By April 16, the MCC had aggregated a number of checklists and guidelines into a full infection control plan.[100]  This plan mandated the screening of all new inmates and staff each day upon arrival for fever and symptoms associated with COVID-19.  It also mandated isolation of any entering inmate with a temperature over 100.4 degrees or having respiratory symptoms, and the quarantine of all asymptomatic inmates for 14 days.  Inmates in quarantine were to have temperature and symptom checks performed once daily, and isolated inmates were to be checked twice per day.  The plan directed that isolation of symptomatic inmates should happen "immediately when symptoms occur."  On April 25, MCC staff implemented a new schedule for quarantined inmates:  they would be allowed out of their cells to shower only three times per week, and a sealed plastic screen would be placed over cell-block doors, "to minimize [the] possibility of spreading the virus . . . when an infected person coughs, sneezes or talks."[101]

During this time, some emails that inmates sent to the sick-call inbox were not immediately answered.  For example, one inmate sent an email on April 17 reporting shortness of breath, wheezing, and chest pain, and said that he had reported his symptoms directly to medical staff.[102]  His first clinical appointment after this email was on May 12, nearly one month later.[103]  Another inmate reported chest pain and difficulty breathing on April 22 — he did not get a clinical appointment until six days later, on April 28.[104]

---

[99] Brown Decl. ¶ 16; Smith Decl. ¶ 16.

[100] Beaudouin Decl. ex. 6 (as updated April 20); *see also* Beaudouin Decl. exs. 3 ("Isolation Checklist") (updated Mar. 27, 2020), 4 ("Quarantine Checklist") (updated May 7, 2020).

[101] Edge Decl. ex. 8 at MCC 161.

[102] Sick Call Requests at MCC 219 (Inmate 343).

[103] Health Services Activity Rep. at MCC 2062–61.

[104] Inmate Sick Calls at MCC 210 (Inmate 131); Health Services Activity Rep. at MCC 2028.

From late April into early May, inmates began sending sick-call emails that suggested they had suffered from symptoms linked to COVID-19 weeks earlier. One inmate asked for attention on April 30 because he was still coughing after recovering from what he believed was COVID-19[105]—the prison's records do not indicate this inmate was ever isolated.[106] He was seen in the clinic approximately two weeks later, on May 13.[107] Another inmate emailed on May 7, indicating that he had experienced symptoms associated with the disease a month before, including loss of taste and smell[108]— he, too, was never isolated.[109] This inmate was seen by medical staff on May 11.[110]

BOP released additional guidance regarding the use of furloughs and home confinement on April 15, while case management staff were still on emergency corrections duty. In that guidance, the Bureau provided criteria for home confinement tailored to the pandemic and authorized the use of emergency furloughs for inmates nearing their release date.[111] One week later, on April 22, BOP issued additional guidance to prisons, directing them to prioritize inmates who had served more than 50 percent of their sentences or had less than 18 months remaining in their sentences for home confinement.[112] A little less than a week after this second memorandum, case management staff returned to their duties.[113] They began to work through the backlog of home confinement applications and to review inmates for home confinement and

---

[105] Inmate Sick Calls at MCC 215 (Inmate 344).

[106] *See* Quarantine Isolation Flowsheet.

[107] Health Services Activity Rep. at MCC 2063.

[108] Inmate Sick Calls at MCC 203 (Inmate 360). The inmate indicated his sense of taste and smell had returned somewhat since he was ill but that he was still weak.

[109] *See* Quarantine Isolation Flowsheet.

[110] Health Services Activity Rep. at MCC 2071.

[111] Demosthenes Decl. ex. 5.

[112] Demosthenes Decl. ex. 6.

[113] Demosthenes Decl. ¶ 41.

furlough.[114]  Finally, on May 8, BOP released additional guidance further altering eligibility criteria and priority for inmates to be considered for home confinement.[115]

By the end of May, the MCC had received a rapid-testing kit and hundreds of nasal swab test kits.[116]  The prison is currently following a policy of testing all new inmates, all departing inmates, all symptomatic inmates, and all inmates that had close contact with symptomatic inmates.[117]  Based on BOP guidance, the prison only uses the rapid-testing machine on symptomatic inmates; for all others, it uses the nasal swab kits, which take more than a day to return.[118]

Although several inmates displayed symptoms of COVID-19, none tested positive or were fully isolated by the prison until early June.[119]  On June 19, the MCC's warden informed the Court that one inmate had tested positive for COVID-19 — the first positive test result since April 16.[120]  On June 29, the Court learned that a pretrial detainee in one of its cases also tested positive for the disease, and the BOP's data indicates two total inmates are sick with COVID-19 as of July 1.[121]

---

[114] Demosthenes Decl. ¶ 41.  Over the next two weeks, the team worked through a backlog of 67 compassionate release applications, denying them all for not meeting the necessary criteria.  *Id.* ¶ 42.  As of May 28, the staff had reviewed 117 sentenced inmates for home confinement, of which it has referred 24 to central BOP staff for release.  *Id.* ¶ 45.  Nine remained under review at that time.  *Id.* ¶ 46.  The others have either been denied or released due to a successful compassionate release motion or the end of their sentences.  *Id.* ¶ 48.  Case management staff had only begun to evaluate inmates for furlough as of May 28.  *Id.* ¶ 56.

[115] Demosthenes Decl. ex. 7.

[116] Beaudouin Decl. ¶¶ 20, 21.

[117] *Id.* ¶ 20.

[118] *Id.*

[119] *Id.* ¶ 19.

[120] Letter from Marti Licon-Vitale to U.S. District Judge Edgardo Ramos (June 19, 2020), Doc. 86.

[121] COVID-19 Update, Bureau of Prisons, https://www.bop.gov/coronavirus/ (last updated July 1, 2020). On July 2, the warden confirmed that two inmates have tested positive for the coronavirus.  Letter from Marti Licon-Vitale to U.S. District Judge Edgardo Ramos (July 2, 2020), Doc. 88.

## II.     THIS LITIGATION

### A.  Procedural History

The petitioners commenced this action on April 28, 2020, seeking writs of habeas corpus pursuant to 28 U.S.C. § 2241 on behalf of themselves and "all current and future detainees in custody at the MCC during the course of the COVID-19 pandemic."[122]  The inmates allege that the warden and her staff were deliberately indifferent to "conditions that pose an excessive risk to their health and safety," in violation of the Fifth and Eighth Amendments of the U.S. Constitution.[123]  The petition seeks the following relief:

- "increased inmate health monitoring, expanded testing of inmates and staff, and implementation of contact tracing";

- treatment measures for those who have either tested positive for or are experiencing symptoms consistent with COVID-19, and for those who have come into contact with someone infected with COVID-19, including medically appropriate quarantine and isolation;

- professional cleaning of the facility on a regular basis;

- distribution of basic hygiene necessities, without cost to the inmates;

- release from confinement "with such conditions as may be appropriate, of Petitioners and Class members (i) who are eligible for release pursuant to BOP's statutory authority or directives issued by Attorney General Barr; or (ii) for whom release (either temporary or permanent) is otherwise reasonable under the extraordinary circumstances of the COVID-19 pandemic"; and

- for those who are ineligible for release but who meet the CDC criteria for enhanced vulnerability to the virus, "prompt transfer from the MCC to another BOP facility where appropriate preventive measures may be taken and adequate health care provided until such time as the MCC can improve conditions sufficiently to take such measures and provide such care itself."[124]

Additionally, the inmates request that the Court appoint an independent monitor to oversee compliance with the above.[125]  The class they purport to represent consists of the

---

[122] Class Action Petition Seeking Writs of Habeas Corpus ("Petition") ¶ 87, Doc. 1.

[123] Petition at 25–26.  Jonathan Medina terminated his participation in this lawsuit on May 18, 2020.  Doc. 41.

[124] Petition at 27–28.

[125] *Id.* at 28.

nearly 700 inmates at MCC who were allegedly unnecessarily exposed to a substantial risk of serious harm by the warden's policies, procedures, and practices regarding the COVID-19 crisis.[126]

On the same day that the petition was filed, the inmates also filed an emergency motion for an order to show cause and a temporary restraining order.[127]  The Court held a telephonic conference to discuss the motion on April 29, 2020.[128]  At the conference, the Court reserved its ruling regarding the inmates' application and scheduled a hearing for May 4, 2020.[129]  On May 4, 2020, the Court denied the inmates' application for a temporary restraining order.  However, it directed the parties to submit a discovery plan, including a plan for inspection of the MCC, and scheduled a preliminary injunction hearing.[130]  That inspection was held on May 13, 2020.[131]

## B.  Expert Reports

During the preparation for this motion, both the inmates and the warden engaged experts to opine on the conditions of the MCC and on the suitability of its efforts to fight the outbreak.  Dr. Homer Venters, for the inmates, is a physician and epidemiologist that previously served as Chief Medical Officer of the Correctional Health Services of New York City.[132]  Dr. Rebecca A. Lubelczyk, for the warden, is a physician and previously served as Medical Director of the Massachusetts Correctional Institute at Norfolk.[133]  Dr. Venters, in his critique of the MCC, identified four sets of omissions by MCC staff:  (1)

---

[126] *Id.* ¶¶ 86–91.

[127] Doc. 4.

[128] Minute Entry for Apr. 29, 2020.

[129] *Id.*

[130] Tr. of proceedings re: conference held on 5/4/2020 at 54:22–55:5, 64:10, Doc. 36.

[131] Inspection Order, Doc. 32

[132] Venters Rep. ¶¶ 5, 6.

[133] Lubelczyk Rep. at 2–3.

an inadequate sick-call systems; (2) deficient COVID-19 screening and contact tracing; (3) inadequate access to soap and cleaning supplies; and (4) deficient isolation and quarantine procedures.[134]

### 1. Sick-Call Systems

According to Dr. Venters, a functioning sick-call system is necessary to ensuring proper medical care in correctional facilities, especially during the outbreak of an infectious disease.[135]  An ideal sick-call system involves the review of any submitted written or electronic requests within 24 hours and proper retention of the documentation of those requests.  During an outbreak, Dr. Venters recommends that medical staff cross-reference sick-call requests with a list of symptoms associated with the ongoing outbreak.[136]  This methodology, along with proper record-keeping, can help track the disease's spread through a prison.  Both the acting clinical director of the MCC, Dr. Robert Beaudouin, and Dr. Lubelczyk largely agree with these principles.[137]

Based on his review of the record, Dr. Venters characterizes the sick-call system at the MCC as "broken or grossly deficient."[138]  He notes the delays between the submission of an email sick-call request and medical care, specifically describing one inmate who sent a sick call on April 16, but only received an email response on May 5 and had yet to be seen by medical staff at the time of his report.[139]  Based on testimony

---

[134] Venters Rep. ¶ 2.

[135] *Id.* ¶¶ 34, 35.

[136] *Id.* ¶ 36.

[137] *See* Beaudouin Dep. at 228:12–18; Rovner Decl. ex. 2 ("Lubelczyk Rebuttal") at 8 (clarifying that the applicable standard is that requests be triaged within 24 hours, rather than that an appointment occur within that time).

[138] Venters Rep. ¶ 39.

[139] *Id.* ¶ 41 (referring to Inmate 324 on Inmate Sick Calls at MCC 208).

from Dr. Beaudouin, he notes that paper requests for medical attention were shredded after a medical appointment was scheduled.[140]

In Dr. Venters' review of the record, he observes that several inmates reported that they did not receive medical care even after they reported symptoms to guards.  Each of the inmates he describes verbally informed guards of symptoms associated with COVID-19 but did not receive medical care for days or weeks.[141]  Other inmates submitting declarations described similar experiences.  For example, one woman in Unit 2 declared that the other inmates in her unit would tell correctional officers if they were experiencing symptoms of COVID-19, but "9 out of 10 times the officer does not call up to medical right away."[142]  The same woman reported that medical staff took several days to see two women who reported symptoms "multiple times a day" — both of those women were eventually isolated with suspected COVID-19.[143]  As one inmate living in 11-South declared:

> Many of the guys on my unit experienced symptoms.  They called out for medical help and were ignored by officers and told to lay down.  Many coughed through the night and complained of difficulty breathing but no medical help came.  Those experiencing symptoms were extremely weak, [and] could barely eat or get out of bed.[144]

The warden largely does not deny the significant deficiencies of the sick-call system.  As she now admits, the delays were caused in part by the absence of the staff

---

[140] *Id.* ¶ 43; *see also* Kala Decl. ex. 1 ("Beaudouin Dep.") at 220:14–17 ("Q:  Before that date [two weeks before May 20] to your knowledge were all paper sick call requests shredded?  A:  That's what I think, yes.").

[141] *See* Venters Rep. ¶ 42 (describing Devlin-Brown Decl. ex. 17 ("Falu Decl.") ¶ 5, ex. 22 ("Luna Decl.") ¶ 10, ex. 14 ("Davis Decl.") ¶ 6, and Garcia Decl. ¶¶ 10–12).

[142] Devlin-Brown Decl. ex. 26 ("Richardson Decl.") ¶ 8.

[143] *Id.*

[144] Devlin-Brown Decl. ex. 20 ("Griffin Decl.") ¶ 12.

with primary responsibility for monitoring the inbox.[145]  Dr. Beaudouin believes that this oversight did not lead to unidentified COVID-19 infections due to the existence of independent temperature and symptom screening.[146]  Dr. Lubelczyk similarly opines that overlapping screening and infection control protocols prevented the failure to monitor the email inbox from meaningfully worsening the outbreak.[147]  She also notes that inmates appeared to know that they could verbally report a medical issue to guards in an emergency and generally regarded the email sick-call system as "a waste of time."[148]

As a general response to Dr. Venters' critiques of the sick-call system, Dr. Lubelczyk also notes that, in her experience, inmates sometimes exaggerate the severity of their symptoms, and that Dr. Venters' opinion relies too heavily on their declarations.[149]  In support, she points out several internal inconsistencies in the testimonies of named petitioner Fernandez-Rodriguez and declarants Woodson and Sucich.[150]

### 2. Screening & Contact Tracing

Dr. Venters also found that the procedures for screening inmates were deficient. He notes that the CDC recommends that new arrivals to a prison be screened and that screening be extended to current inmates when there is a risk of infection within the facility.[151]  Based on Dr. Venters' review of the record, screening was neither consistent

---

[145] See Beaudouin Dep. at 258–59; Beaudouin Decl. ¶ 24 ("Due to recent staff shortages and absences, I learned that some of these [email] messages had not received timely responses or been timely scheduled for medical appointments.").  The warden also admits that handwritten sick-calls were shredded after an appointment was scheduled; those sick-calls are now added to inmates' medical records.

[146] Beaudouin Decl. ¶ 24.

[147] See Lubelczyk Rebuttal at 11.

[148] Lubelczyk Rebuttal at 10 (quoting an interview with an inmate taken during the May 13 inspection).

[149] Id. at 14.

[150] Id. at 9, 14–16.

[151] Venters Rep. ¶ 22.

nor rigorous.[152]  Several inmates declared that medical screening consisted only of a temperature check and did not include questioning regarding other symptoms of COVID-19.[153]  In addition to inadequate screening, Dr. Venters views efforts to trace the contacts of infected staff as insufficient and the efforts to conduct contact tracing for inmates as non-existent.[154]  He concludes that the MCC's omissions "not only increase[] the likelihood that individual patients with COVID-19 will develop serious illness, but also increase[] the likelihood that they will transmit infection to others."[155]

Dr. Beaudouin indicated that screening should include a check for fever, as well as a check for whether the inmate had "cough, chest pains, shortness of breath, fever, nausea, vomiting, diarrhea, loss of taste, loss of smell, muscle aches and pains."[156]  He admits, however, that medical staff may have reverted to "shorthand" over time in their screening process — going from a detailed inquiry into symptoms known to be associated with COVID-19 to a less rigorous, "How are you feeling?"[157]  Dr. Lubelczyk agrees that screening largely consisted of temperature checks in non-quarantined units and should have been more rigorous.[158]  She does not, however, believe that this failure increased the risk of a broader outbreak because "the basic symptoms of COVID-19 are relatively well known, including to MCC inmates [and] inmates were being seen on a

---

[152] *See* Venters Rep. ¶ 24.

[153] *See* Kala Decl. ex. 5 ("Hatcher Dep.") at 39:10–15; Devlin-Brown Decl. ex. 9 ("Bourgoin Decl.") ¶ 7 ("Multiple guys reported symptoms when they were coming around to take our temperatures every day. But they would just say temperature in response."); Devlin-Brown Decl. ex. 13 ("Dansowah Decl.") ¶ 9 ("When the medical staff started coming around taking temperatures, they did not care if people had other symptoms — cough, chills, diarrhea.  They just left them in bed unless they had a fever.").

[154] Venters Rep. ¶¶ 31, 32.

[155] *Id.* ¶ 46.  Dr. Lubelczyk does not address omissions related to contact tracing in her report or in her rebuttal to Dr. Venters' report.

[156] Beaudouin Dep. at 146:9–14.

[157] Beaudouin Decl. ¶ 14 n.5.

[158] Lubelczyk Rebuttal at 7.

regular basis by medical staff . . . ."[159]  Dr. Beaudouin additionally admits that staff absences limited the number of contact tracing investigations that could be conducted for staff, and the acting warden admitted that no inmate contact tracing investigations were ever conducted.[160]

### 3.  Soap & Cleaning Supplies

Dr. Venters and Dr. Lubelczyk came to very different conclusions when evaluating the prison's level of cleanliness and the availability of hygiene supplies for inmates.[161] According to the MCC, inmates bore some responsibility for keeping cells and common areas clean during the outbreak.  The MCC assigned inmate orderlies to clean common areas and other high-traffic areas on a daily basis.[162]  Individual inmates were responsible for regularly cleaning their own cells.[163]  Prison officials indicated that cleaning supplies were available on request from staff, including disinfectant rated by the CDC for use against the novel coronavirus.[164]  Some inmates suggest, however, that these supplies were not refilled frequently enough, especially during the early days of the outbreak.[165] In addition, they report infestations of rodents and cockroaches, as well as the growth of mold.[166]

---

[159] *Id.* at 8.

[160] Venters Rep. ¶ 32 (referring to Beaudouin Dep. at 117:14–25 and Kala Decl. ex. 6 ("Hazlewood Dep.") 1:19–42:9).

[161] *See* Venters Rep. ¶ 56; Lubelczyk Rep. at 11–13.

[162] Edge Decl. ¶ 36.

[163] *Id.* ¶ 34.

[164] *Id.* ¶¶ 34, 35.

[165] *See, e.g.*, Devlin-Brown Decl. ex. 25 ("Naqvi Decl.") ¶ 18.

[166] *See, e.g.*, Devlin-Brown Decl. ex. 33 ("Turner Decl.") ¶ 5.  One of the photographs taken during the May 13 inspection shows a cockroach caught on a trap in Unit 11-South.  Kala Decl. ex. 10.  Dr. Venters also describes the inspection group having "to step over a large cockroach to inspect the single toilet shared by 26 men in one tier of unit 11 South."  Notice of Filing ex. 1 ("Venters Rebuttal") ¶ 26, Doc. 72.

The MCC issued each inmate one bar of soap and one roll of toilet-tissue each week.[167]  By the time of the prison inspection ordered by the Court in May, officials had posted signs informing inmates they could request additional supplies from unit staff.[168]  Some inmates, though, suggest that soap was scarce during the initial outbreak.  One inmate housed in the SHU declared, "We asked for soap but there are always so many officers running around that they don't remember to give it to us.  We have to wait until officers give out soap."[169]  Another suggested that he had to ask others for soap, declaring, "I had to beg guys who have been a the MCC for a while to give me a little sliver of soap so that I could clean my clothes."[170]  Some of those same inmates suggest, however, that the provision of supplies had improved by mid-April.[171]

Based on these declarations and his own observations during the May 13 inspection, Dr. Venters concludes that the MCC lacked "basic infection control."[172]  Dr. Lubelczyk differs in her evaluation of this evidence, finding that any issues with vermin are limited and more associated with food left in dorms than with a lack of extermination services.[173]  She further found that the MCC had appropriate signage informing inmates of the availability of cleaning supplies, and she personally observed inmates cleaning telephones after use.[174]  On the whole, Dr. Lubelczyk opined that she "was very

---

[167] Edge Decl. ¶ 30.

[168] *Id.* ¶ 31.

[169] Brown Decl. ¶ 20.

[170] Schiliro Decl. ¶ 11.

[171] *Id.* ¶ 12.

[172] Venters Rep. ¶ 61.

[173] Lubelczyk Rebuttal at 4.

[174] *Id.*

impressed with the level of sanitation and cleaning resources [she] saw throughout the facility."[175]

### 4. Isolation & Quarantine Procedures

When examining the living arrangements of prisoners at different stages of isolation, Dr. Venters opines that the social distancing of inmates prior to quarantine and the care of inmates under isolation were deficient.

In critiquing the prison's social distancing efforts, Dr. Venters focuses specifically on Unit 11-South, which contains six dormitory tiers.[176]  Each tier in Unit 11-South is tightly packed, with up to 26 men sleeping within arm's reach and sharing a single sink, shower, urinal, and toilet.[177]  There are two tables in the dormitory with four chairs attached to each table.[178]  He characterizes the dormitory as the primary example of how the MCC "appears to have given little effort to implementing any social distancing."[179]

Unit 11-South houses many of the MCC inmates that have medical issues, both those serving sentences and those on pretrial detention.[180]  Dr. Venters notes that the most recent BOP guidance recommends against having medically vulnerable persons live together.[181]  In light of this guidance and the fact that he views social distancing as "impossible" in these circumstances, Dr. Venters concludes that "nothing" could alleviate the concerns of a spreading infection.[182]  Indeed, he believes that these conditions "likely increase[d] the spread of COVID-19 among the high risk patients placed onto this unit"

---

[175] Lubelczyk Rep. at 14.

[176] Edge Decl. ¶ 7.

[177] *See* Venters Rep. ¶ 17, Kala Decl. exs. 10, 11 (photographs).

[178] Venters Rep. ¶ 61.

[179] *Id.* ¶ 62.

[180] *Id.* ¶ 69;  Edge Decl. ¶ 7; Devlin-Brown Decl. ex. 32 ("Toro Decl.") ¶¶ 12, 14.

[181] Venters Rebuttal ¶ 19 (referring to guidance from May 7, 2020).

[182] *Id.* ¶ 19.

and outweighed the benefit of efficiency gains in the regular care of medically vulnerable inmates.[183]

Dr. Lubelczyk views the "cohorting" of inmates, as a general rule, as essential in preventing virus transmission.[184]  As she puts it, "the practice of cohorting reduces opportunities for transmission because only that cohort is at risk of exposure if the virus is introduced, instead of the entire dorm/tier/unit."[185]  Based on her observations, the MCC properly executed its cohorting plan, where only one cohort was to be released for recreation at a time.  She concludes that "MCC's implementation of cohorting [] has been timely, comprehensive and effective."[186]

Dr. Venters also takes issue with the use of the SHU as an isolation ward in late March, as the outbreak began.  Focusing on the experiences of Andrade, described above, Dr. Venters opines that the MCC's practices in caring for inmates in the SHU "flies in the face of elemental correctional health practices and even the BOP's own pandemic influenza plan."[187]  He further criticizes the use of the SHU because he believes that the use of the unit — normally reserved for discipline — could discourage inmates from reporting their symptoms.[188]

Dr. Lubelczyk, in response, posits that guidance from BOP came too late and the outbreak came too quickly for the MCC to properly plan for an isolation ward, hence the use of the SHU.[189]  She notes that the MCC quickly switched to Unit 3, a more

---

[183] Venters Rep. ¶¶ 68, 71.

[184] Lubelczyk Rep. at 10.  Cohorting is "the practice of separating inmates into relatively small groups, which only interact among themselves."  Beaudouin Decl. ¶ 9.  At the MCC, cohorts were no larger than ten inmates, although inmates on Unit 11-South were exposed to the up to 26 men living in their dormitories, as well.  *Id.*

[185] Lubelczyk Rep. at 11.

[186] *Id.* at 11.

[187] Venters Rep. ¶ 51.

[188] *Id.* ¶ 52.

[189] Lubelczyk Rebuttal at 11.

comfortable set of cells, and therefore there is currently little disincentive to report symptoms for fear of being sent to the SHU.[190]

* * *

At the conclusion of his report,[191] Dr. Venters recommends, *inter alia*, a number of interventions:

- Twice-daily screening of all inmates in quarantine or isolation, and screening of others on a twice-weekly basis;

- Evaluation of all inmates reporting symptoms of COVID-19 within 24 hours;

- Broad administration of COVID-19 testing of all new inmates, those who possess certain risk factors, those who have been in contact with someone suspected of having COVID-19, and those who are released from quarantine, as well as similar testing of staff and contacts of staff suspected of having COVID-19;

- A standardized screening procedure and individual isolation protocol;

- Creating a contact tracing procedure and taking needed steps to quarantine those exposed to a person suspected of having COVID-19;

- Ensuring the proper sanitation of the prison and the proper use of PPE; and

- Decreasing the population of 11-South and similar areas where high-risk inmates reside by 50 percent.

Dr. Lubelczyk takes particular issue with the necessity of the testing protocols Dr. Venters recommends. She notes that neither BOP nor CDC policy currently recommends the testing of medically vulnerable individuals who are asymptomatic.[192] She concludes by noting that the current testing protocol is "eminently reasonable," and is likely to be responsive to future recommendations and guidance.[193]

---

[190] *Id.* at 13.

[191] Venters Rep. ¶ 75.

[192] Lubelczyk Rebuttal at 13.

[193] *Id.* at 14.

Dr. Venters opines that a second outbreak at the MCC is likely sometime this year.[194]  He bases this opinion on the consensus of a number of epidemiological experts and a continuing increase in MCC staff who have tested positive for COVID-19.[195]

### C. The Licon-Vitale Letter

As part of her briefing for this motion, the MCC's warden submitted a letter, dated May 29, that provided her assessment of how the prison handled the outbreak and detailed a number of procedures the prison would undertake going forward.[196]  The warden begins by offering her overall assessment of the MCC's response:

> I am proud of how MCC has weathered this crisis to date.  While there have certainly been some hiccups and disruptions to expected operations, and some things have not gone according to plan as I discuss below, overall the MCC community has been spared a serious problem.  Although some 40 members of our staff have experienced some COVID-19 symptoms since March, and approximately 34 inmates have been isolated with confirmed or suspected COVID-19 infection, no one has become seriously ill-and critically, no one has died.  This is due, in large part, to the resilience of the staff and the inmates who have mostly followed the precautions we have put in place to protect them.

She then identifies several shortcomings in the prison's response and proposes remedial measures:

- *The failure to "consistently perform[]" contact tracing for infected staff.*  The warden states that "clear lines of responsibility" have been created for contact tracing investigations, and that such investigations are now occurring.

- *The failure to "consistently ask[] inmates about all potential COVID-19 symptoms."*  The warden indicates that medical staff "have been explicitly directed to ask inmates about all possible symptoms."

- *The failure to monitor the sick-call email inbox and promptly schedule inmates for medical care.*  The warden reports that MCC medical staff has assigned an employee to review all requests each morning and to promptly schedule follow-up.

---

[194] Venters Rebuttal ¶ 32.

[195] *Id.* ¶ 31 (reviewing a number of reports the MCC has made to Chief Judge Mauskopf of the Eastern District of New York)

[196] Barnea Decl. ex. 1.

- ▪ *The accessibility of soap and cleaning supplies.*  Although the warden believes that "soap and hygiene products have always been in adequate supply," she has directed her staff to ensure the provision of adequate supplies and has seen that related signage be posted throughout the facility.

- ▪ *The failure to promptly process applications for early release.*  The warden has committed to reviewing early release applications related to COVID-19, including through compassionate release, home confinement, and furlough, normally within 14 days and in no more than 30 days.

In addition to these policy changes, the warden pledges to report to this Court every two weeks with information on the number of inmates and staff suspected of having COVID-19, confirmation that the above policies are in effect, and the status of evaluations for early release.[197]

The warden concluded her letter by noting a number of operational objections to Dr. Venters' proposals.[198]  She notes that the prison is limited in the medical care and testing it can provide its staff, and that resources are too limited to expand the frequency of symptom screening.  She indicates that the prison does not intend on using the SHU again for isolation unless absolutely necessary and that she is exploring solutions for reducing the density of Unit 11-South.

## III.   PRELIMINARY INJUNCTION

In the Second Circuit, a district court "may grant a preliminary injunction where a [movant] demonstrates irreparable harm and meets either of two standards:  (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation, and a balance of hardships tipping decidedly in the movant's favor."  *Trump v. Deutsche Bank AG*, 943 F.3d 627, 635 (2d Cir. 2019), *cert. granted*, 140 S. Ct. 660 (2019) (quotation marks and internal citation

---

[197] The warden voluntarily submitted her first report on June 19.  *See* Letter from Warden Licon-Vitale to the Hon. Edgardo Ramos (June 19, 2020), Doc. 86.  In that letter, she reports that the prison tested 34 inmates for COVID-19 and 1 tested positive between May 29 and June 19.  *Id.*  No staff reported being infected.  The warden submitted a second report on July 2.  *See* Letter from Marti Licon-Vitale to U.S. District Judge Edgardo Ramos (July 2, 2020), Doc. 88.  In the two weeks between the letters, the MCC had tested 57 inmates and returned 2 positive results, although 12 tests were outstanding as of the time the letter was submitted.

[198] Barnea Decl. ex. 1 at 6.

34

omitted).  The warden argues that the likelihood of success standard applies here because the inmates seek to enjoin "governmental action taken in the public interest pursuant to a statutory or regulatory scheme."  *Plaza Health Labs., Inc. v. Perales*, 878 F.2d 577, 580 (2d Cir. 1989).  As the inmates have not argued that the "serious questions" standard applies, the Court will apply the more rigorous "likelihood of success" standard to this motion.  *But see Time Warner Cable of New York City v. Bloomberg L.P.*, 118 F.3d 917, 923 (2d Cir. 1997) (applying "serious questions" standard in a case with "public interest concerns on both sides").  Further, given that the inmates move the Court to enter a mandatory preliminary injunction, *i.e.*, one altering the status quo, they "*must* demonstrate a substantial likelihood of success on the merits."  *New York Progress and Protection PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2013) (quotation marks and internal citation omitted) (emphasis added).

\* \* \*

The inmates bring a petition for writs of habeas corpus under 28 U.S.C. § 2241, which, in the Second Circuit, allows for injunctive relief for unconstitutional prison conditions.  *See Thompson v. Choinski*, 525 F.3d 205, 209 (2d Cir. 2008); *see also Ilina v. Zickefoose*, 591 F. Supp. 2d 145, 146–49 (D. Conn. 2008) (describing § 2241 as a "broad remedy available to federal prisoners challenging the conditions of their confinement").  The Eighth Amendment — for convicted prisoners — and the Fifth Amendment — for pretrial detainees — govern the inmates' claims of unconstitutionality and therefore guide the Court's analysis in determining their likelihood of success on the merits.  *See Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017) (analyzing unconstitutional conditions of confinement claims under the Eighth and Fourteenth Amendments); *Cuoco v. Moritsugu*, 222 F.3d 99, 106 (2d Cir. 2000) (establishing that claims by federal pretrial detainees under the Fifth Amendment are analyzed in the same manner as claims by state pretrial detainees under the Fourteenth Amendment).  In either case, there is both an "objective"

and a "subjective" prong to the analysis of whether an inmate's conditions of confinement are unconstitutional.  *See Darnell*, 849 F.3d at 29.

The objective prong asks whether the conditions of which the inmates complain, "either alone or in combination, pose an unreasonable risk of serious damage to [their] health, which includes the risk of serious damage to physical and mental soundness." *Darnell*, 849 F.3d at 30 (quotation and internal citation omitted).  In a case where inmates complain of an elevated risk of being harmed by the allegedly unconstitutional conditions, the Court must determine "whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk.  In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate." *Helling v. McKinney*, 509 U.S. 25, 36 (1993) (emphasis in original).  This prong is identically analyzed for convicted and pretrial inmates.  *See Darnell*, 849 F.3d at 30.

The subjective prong, however, differs slightly between the two Amendments. Under the Eighth Amendment, the inmates must show that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Darnell*, 849 F.3d at 32 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).  The Fifth Amendment requires a less stringent showing — only that the official "knew, *or should have known*, that the condition posed an excessive risk to health or safety." *Id.* at 35 (emphasis added).  In this context, "disregard" means "failing to take reasonable measures to abate" the unconstitutional condition.  *Farmer*, 511 U.S. at 847.

### A.  The Existence of an Unreasonable Risk of Serious Damage to the Inmates' Health

Four months after the pandemic first began in this country, it is beyond debate that COVID-19 is a disease that can seriously sicken and even kill those who suffer from it.

The novel coronavirus has indiscriminately infected hundreds of thousands throughout the United States, with New York City in particular experiencing an outsized number of deaths as a result of the virus.  Put simply, COVID-19 stands with the roster of infectious diseases from which "correctional officials have an affirmative obligation to protect inmates."  *Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996) (examining duty to protect inmates from tuberculosis).  This Court is far from the only one to identify COVID-19 as a serious risk to inmates.  *See, e.g.*, *Martinez-Brooks v. Easter*, No. 20 Civ. 569 (MPS), --- F. Supp. 3d ----, 2020 WL 2405350, at *27 (D. Conn. May 12, 2020); *Coronel v. Decker*, No. 20 Civ. 2472 (AJN), --- F. Supp. 3d ----, 2020 WL 1487274, at *3 (S.D.N.Y. Mar. 27, 2020); *Basank v. Decke*r, No. 20 Civ. 2518 (AT), --- F. Supp. 3d ----, 2020 WL 1481503, at *4 (S.D.N.Y. Mar. 26, 2020).

Inmates are particularly vulnerable to this disease.  The CDC identifies social distancing as "a cornerstone of reducing transmission of respiratory diseases such as COVID-19."  CDC Correctional Facility Guidance at 4.  But inmates "live, work, eat, study, and recreate within congregate environments, heightening the potential of COVID-19 to spread once introduced."  *Id.* at 2.  These factors, among others, create "unique challenges for control of COVID-19 transmission" within a correctional facility.  *Id.*

As the CDC pithily notes, "[i]n most cases, [inmates] are not permitted to leave the facility."  CDC Correctional Facility Guidance at 2.  It is this point that can raise the risk associated with living in a prison during an outbreak of COVID-19 from merely elevated to "so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk."  *Helling v. McKinney*, 509 U.S. 25, 36 (1993).  Unlike those on the outside, who have some choice with whom they associate, of when they leave their homes, of how closely to walk by other people, or of when to move from one end of a train to another at the cough of a stranger, prisoners have none. "[W]hen the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs

. . . it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause." *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989). Indeed, "[a]n inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976).

In this case, inmates need distance and protection from those who may be infected with COVID-19, but they are not free to take those precautions themselves; they rely on the warden to take the precautions for them. *See Jolly*, 76 F.3d at 477. The CDC, in its recommendations, implicitly recognizes this view. It advises that corrections facilities reassign sleeping quarters so that individuals have six feet or more of space in all directions. CDC Correctional Facility Guidance at 11. For those inmates identified as having symptoms of COVID-19, the CDC recommends that prison officials "*immediately* place[] [them] under medical isolation." *Id.* at 15 (emphasis added). Prison staff should close off and disinfect the area used by isolated individuals. *Id.* at 17. The CDC further recommends that "[f]acilities should make every possible effort to quarantine close contacts of COVID-19 cases individually" and that facilities should closely monitor them, placing those displaying symptoms into medical isolation "immediately." *Id.* at 19. When quarantined individuals must be housed together, the CDC recommends that prison officials ensure the space is well-ventilated and that social distancing strategies are employed. *Id.* at 20.

"The *isolation* of symptomatic inmates," however, "is only useful if those symptomatic inmates are actually *identified*." Venters Rebuttal ¶ 23 (emphasis in original). In his report, Dr. Venters lays out the necessity for both a functioning sick-call system and for effective screening of individuals potentially infected by the coronavirus. Venters Rep. ¶¶ 26 ("It is essential that . . . active screening be part of any response to a viral outbreak."); 35 ("This basic approach to sick calls becomes even more critical during an outbreak of communicable disease . . . ."). Dr. Lubelczyk does not disagree

with these principles, and, indeed, the MCC's policies incorporated them into its quarantine plans throughout the outbreak.

Of course, this is a case about prison conditions at the MCC, not about policies or the abstract threat of COVID-19 to inmates.  In other words, "determining whether prison conditions pose a substantial risk of serious harm from COVID-19, or any other risk, must be determined 'after accounting for the protective measures [the MCC] has taken.'" *Chunn v. Edge*, --- F. Supp. 3d ----, No. 20 Civ. 1590 (RPK) (RLM), 2020 WL 3055669, at *24 (E.D.N.Y. June 9, 2020) (quoting *Valentine v. Collier*, 956 F.3d 797, 801 (5th Cir. 2020)).

The record shows, with the above guidelines in mind, that the conditions in the MCC — despite the MCC's attempts at protective measures — posed a substantial risk to the health of its inmates.  Rather than having a functioning sick-call system, the MCC admits it entirely failed to review inmates' electronically submitted complaints due to neglect in staffing of the sick-call inbox.  Rather than rigorously and regularly screening inmates in quarantine or those who had been exposed to the coronavirus, the MCC admits its staff came to rely on temperature checks and generalized inquiries — ignoring half of the screening protocol recommended by both MCC's own policy and the CDC.  Rather than trace the contacts of infected staff, the MCC admits that it failed to conduct the majority of these investigations.  And, rather than attempt to use home confinement, furloughs, and compassionate release as tools to reduce the density among the most vulnerable inmates, the prison chose to not pursue that path at all until well after the initial outbreak had subsided.  Furthermore, the MCC does not provide serious rebuttal to the declarations of the many inmates who testified that a broad spectrum of their neighbors developed symptoms of COVID-19 but never received care or isolation — sometimes despite informing guards and medical staff of their symptoms.

Many courts have found that prisons exposed to the novel coronavirus present conditions that meet the objective prong of the constitutional analysis.  For example, the

Sixth Circuit found the objective prong "easily satisfied" when examining the situation at the Elkton BOP facility in Ohio. *See Wilson v. Williams*, 961 F.3d 829, 2020 WL 3056217, at *7 (6th Cir. 2020); *see also Wragg v. Ortiz*, No. 20 Civ. 5496 (RMB), --- F. Supp. 3d ----, 2020 WL 2745247 (D. N.J. May 27, 2020) ("COVID-19 is an indiscriminate and cruel disease that poses a risk to anyone and everyone, including prison inmates."). In so deciding, the *Wilson* panel pointed to the impossibility of social distancing and the inherent dangerousness of developing COVID-19 as indicative of the substantial risk that faces the inmates at Elkton. *See Wilson*, 2020 WL 3056217, at *7; *see also Martinez-Brooks v. Easter*, No. 20 Civ. 569 (MPS), --- F. Supp. 3d ----, 2020 WL 2405350, at *21 (D. Conn. May 12, 2020) (observing that the "structure of the three facilities at FCI Danbury—even assuming that all reasonable precautions and safety measures are being fastidiously observed . . . — heightens the risk of transmission" due to the impossibility of social distancing); *Banks v. Booth*, No. 20 Civ. 849 (CKK), 2020 WL 1914896, at *7 (D.D.C. Apr. 19, 2020) (same). Other courts have specifically pointed to a lack of effective screening as a factor in finding that inmates face a substantial risk from COVID-19 in prison. *See, e.g.*, *Valenzuela Arias v. Decker*, No. 20 Civ. 2802 (AT), --- F. Supp. 3d. ----, 2020 WL 1847986, at *7 (S.D.N.Y. Apr. 10, 2020) (suggesting that even daily monitoring of inmates for infection is no substitute for prevention).

The conditions facing the MCC are worse than several of the cases described above because MCC's failure to identify infected inmates causes the cohorting system to lose effectiveness as a substitute for social distancing. If one inmate in a cohort falls ill and the MCC does not have the systems in place to identify him, then the rest of the cohort can fall ill quickly thereafter. One need only look at the tightly-packed dormitories of Unit 11-South — containing medically vulnerable inmates — to see how quickly the virus can spread in the absence of an effective isolation protocol.

The warden is quick to point out that the MCC has been spared deaths among its inmate population and staff, that no inmates had to be hospitalized for intensive care, and that the inmates have presented no evidence that the outbreak in the prison was any worse than the outbreak affecting New York City as a whole.  She notes the actions taken by MCC staff in March and April:  implementing a cohorting scheme that reduced the exposure of inmates to each other, assigning and supplying orderlies to clean common areas, and educating inmates on practices necessary to reduce transmission risk.  Dr. Lubelczyk and Dr. Beaudouin further argue that it is unlikely that any of the failings to which the warden admits actually led to increased infections, given other precautions taken by the prison.

Judge Rachel P. Kovner of the Eastern District of New York faced a similar fact pattern regarding an outbreak of COVID-19 at the Metropolitan Detention Center ("MDC") in Brooklyn.  *See Chunn*, 2020 WL 3055669.  In denying inmates preliminary injunctive relief similar to that asked for here, Judge Kovner found that the MDC's response to COVID-19 — which included, among other steps, "massively restricting movement within the facility, enhancing sanitation protocols, and creating quarantine and isolation units"— had proven to be effective because it had resulted in no deaths and only one hospitalization.  *Id.* at *25.  Indeed, in cases that have granted injunctive relief, like *Banks v. Booth* in the District of Columbia, courts have often found an existing outbreak within the facility with the same or greater severity than that of the surrounding area.  *See* 2020 WL 3303006, at *6 (noting that 13.5 percent of inmates in the relevant facilities were infected one month before the order granting a preliminary injunction); *see also*, *e.g.*, *Martinez-Brooks*, 2020 WL 2405350, at *20 (finding that that there was indisputably "an active and serious outbreak of COVID-19 at FCI Danbury"); *Mays v. Dart*, No. 20 Civ. 2134 (MFK), --- F. Supp. 3d ----, 2020 WL 1812381, at *2 (N.D. Ill. Apr. 9, 2020) (noting the infection of 251 detainees and 150 staff).

But the warden has presented this Court with no authority that the situation in the MCC must deteriorate before the Court can find that conditions pose a substantial risk to inmates' health.  To the contrary, the Supreme Court has been quite clear that a risk of future harm can provide a basis for a violation of the Constitution.  *See Helling*, 509 U.S. at 33 ("That the Eighth Amendment protects against future harm to inmates is not a novel proposition.").  And, as described above, the risk to inmates is primarily qualitative and based on the warden's obligation to protect those in her custody; the unreasonableness of the risk is not only measured in percentage points of a morbidity or mortality rate, but also by the injustice of letting men and women live in conditions that leaves them helpless to protect themselves from the infection.  Given the material failings in the MCC's system for identifying infected inmates and ensuring their prompt isolation during the March and April outbreak — especially those medically vulnerable inmates placed in tight quarters in Unit 11-South — the inmates have made a substantial showing that the MCC's inmates faced a substantial danger to their health when the novel coronavirus circulated through the facility.

## B.  Deliberate Indifference to the Risks Facing the Inmates

But were MCC officials aware of (or should they have been aware of) the risk posed by the above conditions?[199]  *See Darnell v. Pineiro*, 849 F.3d 17, 32, 35 (2d Cir. 2017).  And, if so, did they disregard that risk by failing to take reasonable measures to abate it?  *See Farmer v. Brennan*, 511 U.S. 825, 847 (1994).  Although MCC officials should have at least known about these risks, the Court finds that the answer to the latter question is no.  The inmates are therefore not substantially likely to succeed in showing that the MCC's steps to adapt to the pandemic were unreasonable.

---

[199] The parties have not discussed whether and how the putative inmate class having persons governed by the Eighth Amendment and persons governed by the Fifth Amendment should affect the Court's analysis. Because the Court finds below that the inmates are unlikely to show that prison officials knew of or should have known of the risk faced by inmates and failed to take reasonable steps to abate the risk, its findings are the same for both pretrial and convicted inmates.

Officials certainly knew of the risk COVID-19 posed in a prison setting early on. Starting in January, more than a month *before* the WHO declared COVID-19 a pandemic, BOP distributed guidance to its prisons recommending, *inter alia*, that prisons identify areas for quarantining inmates at risk of contracting COVID-19.  In March, the MCC's warden attended two different meetings with stakeholders in the Southern District where the threat of COVID-19 and plans to continue essential criminal justice procedural requirements were discussed.  On March 23, the CDC released its interim guidance for prisons, as summarized above.  In late March and early April, the Attorney General sent additional memoranda that stressed the need to proactively use release authorities to remove the most vulnerable inmates from prisons.  All of these documents and meetings stressed both the risk created by the novel coronavirus and the need to implement social distancing or a substitute to reduce that risk.  Furthermore, the risk came to pass when dozens of prisoners and staff fell ill.

The warden herself acknowledged how delicate the situation was by writing on March 27, "We have a total of three inmates who have tested positive. . . .  We can hold the line by following and maintaining the safety precautions."  Edge Decl. ex. 9 at MCC 22.  That email message attached an operations guide, which quarantined five units and enforced the importance of sanitation and of identifying inmates who exhibited symptoms.  *Id.* at MCC 23.  Indeed, the record is full of internal MCC emails and memoranda that stress the importance of isolating symptomatic inmates and quarantining those with whom those inmates had contact.  *See generally* Edge Decl. Ex. 9 (collecting emails related to quarantine operations).  In light of this focus on finding and isolating sick inmates, the warden and her senior staff at least should have known that several of its tools for identifying those inmates were non-functional.  It is undisputed that the warden now knows of these shortfalls based on the admissions she makes in her May 29 letter to the Court.

The warden makes her stand on the final aspect of the merits analysis:  whether, in light of this knowledge, the MCC made reasonable efforts to abate the risk facing the inmates.  The MCC points to the substantial changes in operations it has put into effect in a short period of time.  Inmates are rarely let out of their cells to congregate with others, and, when they are, the cohorts remain static and limited to ten people.  The provision of PPE and sanitation supplies has been vastly expanded since March.  The MCC has acquired testing capabilities that will allow for more thorough screening of inmates entering the population.  The case management team has eliminated the backlog of inmates seeking compassionate release or home confinement.  Furthermore, the warden has implemented a number of policy changes that aim to rectify the failures in processing sick calls, properly conducting symptom screening, and executing contact tracing investigations.

Courts that have denied injunctive relief have pointed to similar efforts by other prisons and found them to be reasonable.  Most notably, three Circuit Courts of Appeals have vacated preliminary injunctions after determining that the petitioners had failed to establish deliberate indifference to the risks to their health.  For example, in *Wilson v. Williams*, the Sixth Circuit found that the prison "was aware of and understood the potential risk" but ultimately acted reasonably.  961 F.3d 829, 2020 WL 3056217, at *7 (6th Cir. 2020).  In making this finding, the panel noted that the prison's efforts to expand testing and improve its response during the determination of the preliminary injunction "demonstrate the opposite of a disregard of a serious health risk."  *Id.*; *see also Chunn v. Edge*, No. 20 Civ. 1590 (RPK) (RLM), --- F. Supp. 3d ----, 2020 WL 3055669, at *26 (E.D.N.Y. June 9, 2020).  Similarly, the Eleventh Circuit examined efforts to overcome the impossibility of social distancing and found that when prison officials "do[] their best balancing social distancing and regulation applicable to the facility" they do not exhibit deliberate indifference, especially when the CDC's own guidance "presupposes that some modification of its social-distancing recommendations will be necessary in institutional

settings." *Swain v. Junior*, No. 20-11622, --- F.3d ----, 2020 WL 3167628, at *8 (11th

Cir. June 15, 2020); *see also Mays v. Dart*, No. 20 Civ. 2134 (MFK), 2020 WL 1812381,

at *10 (N.D. Ill. Apr. 9, 2020) (same).  And in staying a preliminary injunction order, the

Fifth Circuit observed that that the prison "has taken and continues to take measures—

informed by guidance from the CDC and medical professionals—to abate and control the

spread of the virus.  Although the district court might do things differently, "mere

'disagreement' with [the facility]'s medical decisions does not establish deliberate

indifference." *Valentine v. Collier*, 956 F.3d 797, 803 (5th Cir. 2020) (internal citation

removed); *see also Wragg v. Ortiz*, 20 Civ. 5496 (RMB), 2020 WL 2745247, at *22

(D.N.J. May 27, 2020) (noting the present use of PPE and masks, as well as screening of

newly admitted inmates, as evidence against deliberate indifference).  Each of these cases

show that the prison's good faith efforts to improve its response — even if it was initially

deficient, as was the case at the MCC — is enough to demonstrate that a petitioner is

unlikely to succeed in showing deliberate indifference.

Many of the plans and practices detailed by the warden largely match the

preliminary relief requested by the inmates, suggesting consensus on what is necessary to

make the risk posed by COVID-19 in the MCC more reasonable.  The inmates urge the

Court to order the warden to go further, however, by ordering the testing of all vulnerable

inmates, all staff who report symptoms, and all staff who are exposed to the novel

coronavirus; as well as ordering the warden to detail the frequency of symptom

screening, inmate hygiene and mask provision, and the extent to which the MCC will use

release authorities to reduce the inmate population.  *See* Doc. 74 app. A.  But the inmates

have failed to show that the additional protections they seek are necessary to bring the

conditions in the MCC above the constitutional minimum.  In a rebuttal report entered

after the warden's submission, Dr. Venters does not engage with the differences between

the warden's proposed policies and those he suggests.  Indeed, Dr. Venters writes, "I

agree that aspects of some of these policies, if carried out in practice, would help the

MCC address COVID-19."  Venters Rebuttal ¶ 2 (emphasis removed).  Without expert testimony disputing the reasonableness of the MCC's plan, the Court is unable to find that the inmates are likely to succeed on this point.

Inmates' counsel likewise show little objection to the policies the warden has proposed, instead focusing on the risk that the MCC will never implement them.  The Court is sensitive to this concern.  The record shows that the MCC performed almost no planning for the pandemic until almost the day the first inmate tested positive.  It further shows that, as the outbreak progressed, the MCC had difficulty properly operating the existing sick-call system and implementing the response plans it had created.  This record renders reasonable the inmates' doubts on the MCC's ability to follow through on its promises.

But, given that they are seeking an order from this Court directing the action of MCC officials, the inmates have the burden of showing a *substantial* likelihood of success on the merits.  *See New York Progress and Protection PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2013).  The level of judicial oversight inherent in the warden's decision to voluntarily report to the Court every two weeks with data on infections among inmates and staff and to certify the implementation of her identified polices provides some assurance that she is genuine in her willingness to fix the MCC's initially ineffective response.  *Cf. E.E.O.C. v. KarenKim, Inc.*, 689 F.3d 92, 100 (2d Cir. 2012) (per curiam) (analyzing the "bona fides of the expressed intent to comply," "the effectiveness of discontinuance," and "the character of the past violations" in determining the propriety of a permanent injunction).

Accordingly, the Court finds that the inmates have failed to show a substantial likelihood that they will succeed in proving that the MCC is deliberately indifferent to the serious risks posed by COVID-19.  Of course, the MCC may fall short in its efforts to improve its pandemic response.  Should the Court be in a position to issue a final ruling

on the propriety of a permanent injunction, it will consider these factors and a further developed factual record in its deliberation.

With the inmates having failed to make their showing of a substantial likelihood of success on the merits, the Court concludes its analysis and DENIES the inmates' request for a preliminary injunction. *See N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 45 (2d Cir. 2018) (not considering other preliminary injunction factors when movant failed to demonstrate substantial likelihood of success in mandatory injunction case); *see also Chunn*, 2020 WL 3055669, at *28 (same). Additionally, because the Court does not issue relief at this time, it does not analyze the parties' arguments concerning whether relief may be granted to the entirety of the putative class. *See Chunn*, 2020 WL 3055669, at *28.

## IV.   MOTION TO DISMISS

Having denied preliminary relief, the Court turns to the warden's motion to partially dismiss the inmates' petition. In that motion, the warden seeks to dismiss any parts of the petition that seek a release order from this Court. For the following reasons, that motion is DENIED.

Federal Rule of Civil Procedure 12(b)(1) requires that an action be dismissed for lack of subject matter jurisdiction when the district court lacks the statutory or constitutional power to adjudicate the case. Fed. R. Civ. P. 12(b)(1). The party asserting subject matter jurisdiction carries the burden of establishing, by a preponderance of the evidence, that jurisdiction exists. *Morrison v. Nat'l Australia Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)). "On a Rule 12(b)(1) motion challenging the district court's subject matter jurisdiction, the court may resolve the disputed jurisdictional fact issues by referring to evidence outside of the pleadings . . . ." *Zappia Middle E. Constr. Co. Ltd. v. Emirate of Abu Dhabi*, 215 F.3d 247, 253 (2d Cir. 2000). When evaluating a motion to dismiss for lack of subject matter jurisdiction, the court accepts all material factual allegations in the complaint as

true, but does not draw inferences from the complaint favorable to the plaintiff. *J.S. ex rel. N.S. v. Attica Cent. Sch.*, 386 F.3d 107, 110 (2d Cir. 2004) (citing *Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998)).

Federal Rule of Civil Procedure 12(b)(6) governs motions to dismiss for failure to state a claim. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556). However, this "flexible 'plausibility standard'" is not a heightened pleading standard, *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 n.3 (2d Cir. 2007) (quotation marks and citation omitted), and "a complaint . . . does not need detailed factual allegations" to survive a motion to dismiss, *Twombly*, 550 U.S. at 555.

The question on a motion to dismiss "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y. 2012) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995)). "[T]he purpose of Federal Rule of Civil Procedure 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits" or "weigh[ing] the evidence that might be offered to support it." *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (internal quotation marks and citations omitted). Accordingly, when ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor. *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d

Cir. 2014); *see also Twombly*, 550 U.S. at 556 ("[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable . . . ."). "For purposes of this rule, the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (internal quotation marks and citations omitted).

The warden brings this motion to dismiss the inmates' claims only insofar as they seek release from custody. She argues that there are three reasons for doing so: (1) the requested relief is precluded by the Prison Litigation Reform Act (the "PLRA") because the inmates have not met the requirements for obtaining a "prisoner release order," as defined by that statute; (2) 18 U.S.C. § 3621 also prohibits the Court from granting the requested relief because it leaves decisions regarding inmate placement in the BOP's sole discretion; and (3) granting the requested relief is barred by collateral estoppel and would violate well-established principles of "comity" by infringing on the authority of the district court judges presiding over the inmates' criminal cases. The Court considers each of these arguments in turn and finds that the PLRA does not apply to the instant action; that nothing in 18 U.S.C. § 3621 prohibits the Court from remedying constitutional violations; that collateral estoppel does not preclude review of these claims; and that, to the extent any principles of comity are implicated by the instant action, these are not an adequate basis for dismissal at this early stage. As such, the warden's motion to partially dismiss is DENIED.

### A. The PLRA

The PLRA provides that "[p]rospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs." 18 U.S.C. § 3626(a)(1)(A). The statute further provides that such relief must be "narrowly drawn, extend[] no further than necessary to correct the violation of the Federal right, and [be] the least intrusive means

necessary to correct the violation of the Federal right." *Id.* As is relevant to this litigation, the PLRA also severely curtails courts' authority to issue so-called "prisoner release orders." The statute defines a "prisoner release order" as "any order, including a temporary restraining order or preliminary injunctive relief, that has the purpose or effect of reducing or limiting the prison population, or that directs the release from or nonadmission of prisoners to a prison." *Id.* § 3626(g)(4). Courts may only issue such orders if at least two conditions are met. First, a court must have "previously entered an order for less intrusive relief that has failed to remedy the deprivation of the Federal right sought to be remedied through the prisoner release order," with which the defendant has had "a reasonable amount of time to comply." *Id.* § 3626(a)(3)(A). Second, such an order must be entered by an appropriate three-judge court and only after finding, by clear and convincing evidence, that "crowding is the primary cause of the violation of a Federal right," and that "no other relief will remedy the violation of the Federal right." *Id.* § 3626(a)(3)(E).

While the warden contends that release is precluded in this action because the inmates have indisputably failed to meet the prerequisites for a prisoner release order as set out by the PLRA, the inmates argue that the PLRA does not apply to this action and that, even if it did, they are not seeking a "prisoner release order." The term "any civil action with respect to prison conditions" — to which the PLRA only applies — is defined as:

> [A]ny civil proceeding arising under Federal law with respect to the conditions of confinement or the effects of actions by government officials on the lives of persons confined in prison, but does not include habeas corpus proceedings challenging the fact or duration of confinement in prison[.]

*Id.* § 3626(g)(2). Both parties agree that the statute plainly excludes "habeas corpus proceedings challenging the fact or duration of confinement in prison." The question before the Court is whether the inmates' action challenges "the conditions of

confinement," or "the fact or duration of confinement."  Given the unique nature of

COVID-19, its transmission, and the measures required for its prevention, the Court finds

that it does both, and that such a hybrid action is not covered by the PLRA.  Having

arrived at this conclusion, the Court does not need to reach the question of whether the

inmates seek a "prisoner release order" at this juncture.

### 1.  *The Nature of the Relief Sought*

The Second Circuit has "assume[d] without deciding" that habeas petitions "that

challenge criminal convictions and sentences," are "not civil actions covered by the

PLRA."  *Jones v. Smith*, 720 F.3d 142, 145 n.3d (2d Cir. 2013).  This is in contrast to

"petitions, sometimes brought under 28 U.S.C. § 2241, that complain of conditions of

confinement."  *Id.*[200]  Here, the inmates clearly seek to improve the conditions at MCC

so as to mitigate the spread of COVID-19.[201]  For example, they seek greater access to

hygienic supplies and improved cleaning of the facility.  They also seek increased access

to health monitoring and testing for both inmates and staff, as well as adequate treatment

for those who have COVID-19 symptoms or are suspected of having or are known to

---

[200] The Court notes that not all circuits recognize § 2241 habeas petitions as a vehicle for challenging prison conditions.  *See, e.g.*, *Aamer v. Obama*, 742 F.3d 1023, 1034–38 (D.C. Cir. 2014) (describing split).  The Supreme Court has yet to address this question.  *See, e.g.*, *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1862–63 (2017) ("[W]e have left open the question of whether [detainees] might be able to challenge their confinement conditions via a petition for writ of habeas corpus.").

[201]  In their petition, the inmates repeatedly make reference to the phrase "conditions of confinement."  Petition ¶¶ 86, 89, 93, 94, 95, 96, 101, 102.  Indeed, 28 U.S.C. § 2241, under which the inmates assert their claims, is generally recognized in the Second Circuit as a vehicle to "challenge[] the *execution* of a federal prisoner's sentence, including such matters as the administration of parole, computation of a prisoner's sentence by prison officials, prison disciplinary actions, prison transfers, type of detention and prison conditions."  *Jiminian*, 245 F.3d at 146.  This is in contrast to habeas claims brought pursuant to § 2255, which are "generally the proper vehicle for a federal prisoner's challenge to his conviction and sentence."  *Id.* at 147.  Courts have therefore sometimes characterized § 2241 petitions as "analogous to suits under 42 U.S.C. § 1983 complaining of conditions of confinement."  *Jones*, 720 F.3d at 145 n.3.  However, the classic distinction between claims targeting "conditions of confinement" and claims targeting "the fact or duration of confinement" begins to break down when the conditions complained of cannot be ameliorated without also addressing the fact or duration of confinement.  Such is the case presented by the novel coronavirus.

have COVID-19.  However, the inmates' request for relief goes further.  It seeks an order

directing the warden to:

> d.  [R]elease from MCC confinement, with such conditions as may
> be appropriate, of Petitioners and Class members (i) who are eligible
> for release pursuant to the BOP's statutory authority or directives
> issued by Attorney General Barr; or (ii) for whom release (either
> temporary or permanent) is otherwise reasonable under the extraor-
> dinary circumstances of the COVID-19 pandemic; and
>
> e.  for those inmates who cannot be released under (d) above and
> who are vulnerable to COVID-19 based on CDC criteria, prompt
> transfer from the MCC to another BOP facility where appropriate
> preventive measures may be taken and adequate health care can be
> provided, until such time as the MCC can improve conditions suffi-
> ciently to take such measures and provide such care itself.

Petition at 27–28.  The inmates allege that "[r]elease protects the inmates with the

greatest vulnerability to COVID-19 from transmission of the virus," as well as makes

social distancing possible for the remaining inmates.  *Id.* ¶ 33; *see also id.* ¶¶ 47–50

(alleging that "[t]he MCC's failure to release or transfer inmates has resulted in continued

overcrowding," which has, in turn, created conditions making it "effectively impossible

for inmates to maintain a six-foot distance from others").  As the inmates further allege,

"social distancing [is] required to mitigate the risk of transmission." *Id.* ¶ 25.  Without

the requested relief, such social distancing is allegedly impossible.  Because release is

therefore required to remedy the warden's alleged deliberate indifference, the Court finds

that the inmates are challenging not just the conditions of their confinement, but the very

*fact* of their confinement as well.

   In analyzing similar claims, courts in the District of Connecticut, the District of

Massachusetts, and the Northern District of Ohio[202] have come to the same conclusion.

---

[202] Though the Sixth Circuit recently overturned the preliminary injunction issued in this case, it affirmed the district court's finding that the PLRA did not apply.  *Wilson v. Williams*, No. 20-3447, --- F.3d ----, 2020 WL 3056217, at *5–6 (6th Cir. June 9, 2020).  In doing so, however, it also noted "that the district court's order requiring transfer from Elkton to another BOP facility was not proper under § 2241." *Id.* at *6. Despite apprising the Court of the Sixth Circuit's holding in *Wilson*, neither party has addressed what effect, if any, its decision to circumscribe relief might have on this case.

In *Martinez-Brooks v. Easter*, No. 20 Civ. 569 (MPS), --- F. Supp. 3d ----, 2020 WL 2405350 (D. Conn. May 12, 2020), the Court also considered whether the PLRA precluded review of a § 2241 habeas petition brought by inmates who had increased COVID-19 risk factors.  The petitioners there alleged that,

> [T]heir medical histories and the outbreak at FCI Danbury combine to place them in grave danger from COVID-19; that at current facility population levels, they and other FCI Danbury inmates cannot comply with CDC guidelines for physical distancing; and that as long as prisoners are unable to practice physical distancing, any other mitigating steps will fail to decrease meaningfully the risk of COVID-19 infections at FCI Danbury.

*Id.*, at *16 (internal quotation marks and citation omitted).  That petition sought an order "either releasing them from custody altogether or releasing them to home confinement because, absent significant de-densifying, people who are confined in prisons, jails, and detention centers, as well as staff, will find it impossible to engage in the necessary social distancing and hygiene required to mitigate the risk of transmission." *Id.*  The court interpreted these claims as alleging that "nothing short of an order ending [petitioners'] confinement at FCI Danbury [would] alleviate that violation." *Id.*  It therefore construed the petition as one challenging, at least in part, the fact, not just the conditions, of their confinement.

Similarly, in *Baez v. Moniz*, No. 20 Civ. 10753 (LTS), --- F. Supp. 3d ----, 2020 WL 2527865 (D. Mass. May 18, 2020), the petitioners alleged that "[u]nder the current conditions at PCCF, Respondents have not and cannot protect Petitioners and the class from this risk of serious harm.  In these circumstances, release is the only means of protecting the inmates and the class they seek to represent from unconstitutional treatment." *Id.*, at *2 (internal quotation marks and citation omitted).  Based on these allegations, the court concluded that "this action arises under § 2241 and is properly viewed, at least in part, as a challenge to the fact or duration of the petitioners' confinement," and, therefore, the PLRA did not limit the court's jurisdiction. *Id.*

Finally, in *Wilson v. Williams*, No. 20 Civ. 794 (JSG), --- F. Supp. 3d ----, 2020

WL 1940882 (N.D. Ohio Apr. 22, 2020), *vacated on other grounds*, 961 F.3d 829 (6th

Cir. 2020), the court considered the request of a medically vulnerable subclass that sought

immediate release to home confinement, parole, or half-way houses "at least until the risk

of the virus has abated." *Id.* at *6. The court found that this claim — as opposed to the

larger class's claims, which included the oversight of a public health expert to mitigate

the risk of COVID-19 — was not merely a challenge to prison conditions, but rather was

"closer to a challenge to the manner in which the sentence is served." [203] *Id.* Therefore,

the district court in *Wilson* found that the subclass's claims were not subject to the

PLRA's requirements. *Id.* at *10.

At least one court, however, has found that the PLRA does apply to claims like

those of the inmates. In *Alvarez v. Larose*, the district court for the Southern District of

California found that that "unlike a claim concerning the fact of confinement, Plaintiffs'

claims would not exist *but for* their current conditions of confinement at Otay Mesa."

*Alvarez v. Larose*, No. 20 Civ. 782 (DMS) (AHG), --- F. Supp. 3d ----, 2020 WL

2315807, at *3 (S.D. Cal. May 9, 2020). Therefore, the court concluded, the habeas

claim was based on confinement conditions, and was subject to the purview of the PLRA.

*Id.* In arriving at its conclusion, the Court considered that the plaintiffs "[had] not

challenge[d] the reason for their confinement, their conviction or charge, the length of

their sentence, or a release determination based on good time credits—claims that are

often characterized as 'the core of habeas corpus.'" *Id.* (quoting *Preiser v. Rodriguez*,

411 U.S. 475, 487 (1973)). Instead, it found that "their claims [were] based solely on the

conditions inside the OMDC given the COVID-19 pandemic." *Id.*

---

[203] As a result, the Court found that the claim was cognizable under 28 U.S.C. § 2241. *Wilson*, 2020 WL 1940882, at *6. Notably, the Sixth Circuit, unlike the Second Circuit, does not recognize § 2241 as "the proper vehicle for a prisoner to challenge conditions of confinement." *Id.*, at *5 (internal quotation marks and citation omitted). "However, the Sixth Circuit has also held § 2241 is appropriate for claims challenging the execution or manner in which the sentence is served." *Id.* (internal quotation marks and citation omitted).

The warden argues that this case is more like *Alvarez* than *Martinez-Brooks*, *Baez*, and *Wilson* because the inmates invoke other types of relief — for example, improved cleaning of the facility, increased testing and health monitoring, appropriate quarantine and treatment measures, and so forth — that could potentially cure their constitutional violation. *Compare Alvarez*, 2020 WL 2315807, at *3 ("[U]nlike the inmates in *Wilson*, Plaintiffs fail to argue that there are no set of conditions of confinement that would be constitutionally sufficient."), *with Martinez-Brooks*, 2020 WL 2405350, at *16 (finding that petitioners had alleged that "nothing short of an order ending their confinement[] . . . [would] alleviate th[e] [constitutional] violation"), *Baez*, 2020 WL 2527865, at *2 (finding that petitioners had alleged that "release is the only means of protecting Petitioner"), and *Wilson*, 2020 WL 3056217, at *5 ("[W]here a petitioner claims that no set of conditions would be constitutionally sufficient, the claim should be construed as challenging the fact or extent, rather than the conditions, of the confinement." (citations omitted)).[204]  The Court is unpersuaded by this argument for several reasons.  *First*, as the inmates in this case well note, "a combination of release and non-release measures is plainly needed in the extraordinary circumstances of the COVID-19 pandemic, where social distancing is a critical public health measure that is difficult to achieve in prisons or jails."  Doc. 57 at 7.  It would be unreasonable for the inmates to ask for one form of relief without the other.  *Second*, the fact that other relief has been sought does not mean that release is not essential.  In other words, none of the additional relief the inmates seek would allow them to more effectively practice social distancing, which, according to the petition, is necessary to remedying the warden's alleged deliberate indifference.  *See, e.g.*, Petition ¶ 24 ("Social distancing, wearing a face mask, *and* vigilant hygiene . . . are the only known effective measures for protection from COVID-10." (emphasis added)); *id.* ¶ 25 ("Individuals who are confined in prisons, jails, and other detention centers are

---

[204] Indeed, this is one of the key distinctions *Martinez-Brooks* drew on as it declined to adopt the reasoning in *Alvarez*.  *Martinez-Brooks*, 2020 WL 2405350, at *16 n.16.

generally unable to engage in the social distancing *required* to mitigate the risk of transmission." (emphasis added)).

The Court therefore concludes that the inmates challenge, at least in part, the "fact of confinement."

   *2.   Application of the PLRA*

With this understanding the Court next turns to whether actions that challenge both the conditions of confinement and the fact of confinement, like this one, are included in the definition of "a civil action with respect to prison conditions." The Court finds that this definition does not extend to these types of claims.

To the Court's knowledge, only one court has conducted an in-depth textual analysis of the PLRA's definition of "a civil action with respect to prison conditions," as found in 18 U.S.C. § 3626(g)(2). In *Martinez-Brooks*, Judge Shea of the District of Connecticut sought to give effect to all parts of the definition — both the first clause, "any civil proceeding arising under Federal law with respect to the conditions of confinement or the effects of actions by government officials on the lives of persons confined in prison," and its qualifying clause, "but does not include habeas corpus proceedings challenging the fact or duration of confinement in prison." He found that the first clause, by its very terms, already exempts from the PLRA "habeas petitions unrelated to conditions of confinement—such as challenges to the validity of a conviction or the length of the sentence imposed by the court." No. 20 Civ. 569 (MPS), --- F. Supp. 3d ----, 2020 WL 2405350, at *17 (D. Conn. May 12, 2020). In other words, if the qualifying phrase were to relate exclusively to these kinds of habeas proceedings, it would be "superfluous." *Id.* "By contrast, interpreting the clause to refer to a subset of habeas petitions 'with respect to the conditions of confinement . . .' — namely, those that challenge the 'fact or duration of confinement' by claiming, for example, that no constitutional conditions of confinement are possible under the circumstances — gives effect to all parts of the definition." *Id.* After conducting this analysis, Judge Shea

concluded that actions challenging the fact of confinement as well as the conditions of confinement were excluded from the PLRA.  The Court finds this analysis persuasive.

The warden argues that this conclusion is based on an incorrect reading of the Second Circuit's statement in *Jones v. Smith*, 720 F.3d 142 (2d Cir. 2013).  In a footnote in that case, the Second Circuit expanded upon its previous holding in *Reyes v. Keane*, 90 F.3d 676, 678 (2d Cir. 1996), *overruled on other grounds by Lindh v. Murphy*, 521 U.S. 320 (1997), which held that "Congress did not intend the PLRA to apply to petitions for a writ of habeas corpus."  The Second Circuit wrote:

> We recognize that *Reyes* spoke in general terms to the effect that 'habeas corpus petitions' are not civil actions covered by the PLRA. We nonetheless assume without deciding that, in so saying, the court meant habeas corpus petitions that challenge criminal convictions and sentences, and not petitions, sometimes brought under 28 U.S.C. § 2241, that complain of conditions of confinement, which are analogous to suits under 42 U.S.C. § 1983 complaining of conditions of confinement.

720 F.3d at 145 n.3.  The warden argues that "[c]ontrary to petitioners' suggestion, this statement—that challenges to criminal convictions and sentences are not covered by the PLRA—does not support their construction of Section 3626(g)(2), and thus their release claims are governed by Section 3626."  Doc. 73 at 4.

The warden's argument appears to invite the Court to equate the phrase "habeas corpus petitions that challenge criminal convictions and sentences" with "habeas corpus proceedings challenging the fact or duration of confinement in prison."  The Court rejects this invitation for several reasons.  First, as discussed in *Martinez-Brooks*, the plain text of the statute is clear.  *See United States v. Gayle*, 342 F.3d 89, 92 (2d Cir. 2003) ("Statutory construction begins with the plain text and, if that text is unambiguous, it usually ends there as well." (citations omitted)).  Second, had Congress intended the PLRA to exclude only "habeas corpus petitions that challenge criminal convictions and sentences," surely a common enough phrase, this is the phrase it would have used.  It did not do so.  As the court in *Martinez-Brook*s found, "the *Jones* dicta does not clearly

57

address whether the PLRA applies to habeas petitions that challenge *both* conditions of confinement *and* the fact or duration of confinement."  2020 WL 2405350, at 17 n.17. Finally, to the extent any doubt remains, the very next sentence of the *Jones* footnote goes on to state that "[t]he logic of our opinion in *Reyes* was to distinguish between civil actions covered by the PLRA and others based on the type of relief sought, rather that the statute under which relief was sought."  720 F.3d at 145 n.3.  That is exactly the kind of distinction the Court makes here.

For all of these reasons, the Court concludes that the PLRA does not apply to the instant action.

**B.  18 U.S.C. § 3621**

Next, the warden argues that "Section 3621 precludes the Court from ordering the transfer of MCC inmates to other BOP facilities or community-based placements even if it finds that petitioners' constitutional claims have merit."  Doc. 73 at 8.  Section 3621 provides that the BOP "shall designate the place of the prisoner's imprisonment," and that this designation "is not reviewable by any court," though it does not define the "place of imprisonment."  18 U.S.C. § 3621(b).  As the Second Circuit has held, "[t]he BOP is the sole agency charged with discretion to place a convicted defendant within a particular treatment program or a particular facility."  *Levine v. Apker*, 455 F.3d 71, 83 (2d Cir. 2006) (citing *United States v. Williams*, 65 F.3d 301, 307 (2d Cir. 1995)).

This law is well-established.  However, it does not apply to the type of relief at issue here.  As the inmates rightly note, their petition does not ask the Court to review individual home confinement requests or to challenge *any* of the individual decisions made by BOP.  Doc. 57 at 14.  It also does not, as the warden claims, "seek a court order overturning BOP's decision not to release [the inmates] to home confinement or halfway houses."  Doc. 73 at 9.  Indeed, the thrust of the inmates' allegations appears to be that BOP has failed to make these decisions at all.  Rather, the petition seeks an order mandating the BOP to act pursuant to its authority under a different statutory provision,

18 U.S.C. § 3624, as expanded by the CARES Act, so as to avoid a constitutional

violation. The Court does not read this as an invitation to review BOP's ultimate

individual decisions, but rather as one to ensure that BOP is not acting with deliberate

indifference in the face of the coronavirus pandemic and its call for adequate preventative

measures. As the court in *Martinez-Brooks* held, "[w]hile subsection 3621(b) gives the

BOP broad, general authority over designations of and transfers to 'places of

imprisonment,' a term that some courts have construed to cover halfway houses as well as

prisons, subsection 3624(c)(2) provides specific, independent authority to place inmates

in home confinement." 2020 WL 2405350, at *15 (internal citation omitted). A finding

that the warden has failed to constitutionally exercise her authority under subsection

3624(c)(2), is therefore "not [a] review[] [of] the BOP's designation of a place of

imprisonment under subsection 3621(b)." *Id.* (internal quotation marks and citation

omitted). In other words, "the Court is not reviewing the merits of BOP's decision as to

*where* [the inmates] [are] housed, but the constitutionality of the conditions of

confinement it places on [them] regardless of where [they] are housed." *Royer v. Fed.*

*Bureau of Prisons*, 933 F. Supp. 2d 170, 180 (D.D.C. 2013).

Moreover, if there remains any ambiguity as to whether § 3621 precludes the

Court's review of the inmates' claims, the statute must be read otherwise. "[W]here

Congress intends to preclude judicial review of constitutional claims its intent to do so

must be clear." *Webster v. Doe*, 486 U.S. 592, 603 (1988). Neither § 3621 nor § 3624

mention any restriction on judicial review of constitutional claims. Indeed, as at least one

court in this district has found, "[w]hile it is true that prison officials generally have

discretion to transfer an inmate from one correctional facility to another, the transfer is

reviewable if it is otherwise in violation of an individual's constitutional rights." *Fermin-*

*Rodriguez v. Westchester Cty. Jail Med Pers.*, 191 F. Supp. 2d 358, 362 n.3 (S.D.N.Y.

2002) (internal citation omitted). Such a reading properly "avoid[s] the constitutional

question that would arise from a wholesale bar on judicial review in the circumstances of

this case." *Martinez-Brooks*, 2020 WL 2405350, at *15 (citations omitted); *see also Webster*, 486 U.S. at 603 (noting that a "serious constitutional question . . . would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim") (internal citation omitted)).

The Court therefore finds that 18 U.S.C. § 3621 does not provide a basis for dismissal.

### C.  Improper Collateral Attacks and Risk of Inconsistent Rulings

Finally, the warden argues that the Court should dismiss the inmates' release claims "to avoid inconsistent rulings and prevent inmates from inappropriately collaterally challenging the decisions of other courts."  Doc. 47 at 17.  She argues that "[p]etitioners and the putative class members may pursue release through a motion for bail or compassionate release addressed to the district court before which their criminal case is pending" — indeed three of the four named petitioners already have, albeit unsuccessfully.[205]  *Id.* at 18.  In light of these opportunities, she argues that entertaining release claims is both barred by collateral estoppel and inappropriate because of general principles of comity.  The Court addresses each of these arguments in turn.

#### 1.  Collateral Estoppel

The warden argues that "entertaining release in this case runs the risk of creating inconsistent rulings."  Doc. 47 at 18.  Specifically, she posits that inmates like Fernandez-Rodriguez, Hatcher, and Woodson, who have already brought claims either for compassionate release and bail and whose claims have already been denied, have "raised in motions in their criminal cases the same arguments regarding risks to their health, the

---

[205] Petitioner Fernandez-Rodriguez's motion for release on bail in light of concerns relating to MCC's management of the coronavirus pandemic was denied by Judge Daniels on April 7, 2020, *see United States v. Fernandez Rodriguez*, 20 Crim. 43 (GBD) (ECF No. 27) (S.D.N.Y. Apr. 7, 2020); Petitioner Hatcher's emergency motion for compassionate release requesting either home confinement or release on bail due to the COVID-19 pandemic was denied by Judge Failla on April 16, 2020, *see United States v. Hatcher*, 18 Crim. 454 (KPF) (ECF No. 233) (S.D.N.Y. Apr. 16, 2020); and Petitioner Woodson's motion for compassionate release in light of COVID-19 and the MCC's inadequate response was denied by Judge Castel on May 4, 2020, *see United States v. Woodson*, 18 Crim. 845 (PKC), 2020 WL 2114770 (S.D.N.Y. May 4, 2020).

alleged conditions within the MCC, and why the potential dangers outweighed the flight and security concerns posed by their release," and that these claims are therefore barred by collateral estoppel. Doc. 73 at 11. She points to Woodson as an example of someone who "repeatedly raised the same arguments he makes now" in support of his motion for compassionate release or, in the alternative, for transfer to a halfway house or home confinement. Doc. 47 at 18–19. In that case, Judge Castel, Woodson's sentencing judge, denied the motion in part because "[s]upervising Woodson on home confinement with location monitoring would greatly tax the resources of the Office of Probation." *United States v. Woodson*, 18 Crim. 845 (PKC), 2020 WL 2114770, at \*4 (S.D.N.Y. May 4, 2020). The warden maintains that "a decision of this Court directing BOP to release inmates to home confinement would be inconsistent with such decisions." Doc. 73 at 10.

The Court finds that collateral estoppel does not bar review of the inmates' release claims. The doctrine of collateral estoppel, or issue preclusion, applies when:

> (1) [T]he issues in both proceedings are identical, (2) the issue in the prior proceeding was actually litigated and actually decided, (3) there was full and fair opportunity to litigate in the prior proceeding, and (4) the issue previously litigated was necessary to support a valid and final judgment on the merits.

*United States v. Hussein*, 178 F.3d 125, 129 (2d Cir. 1999) (internal quotation marks and citation omitted). However, as the Second Circuit has held, "[i]ssues that may bear the same label are nonetheless not identical if the standards governing them are significantly different." *Jim Bean Brands Co. v. Beamish & Crawford Ltd.*, 937 F.2d 729, 734 (2d Cir. 1991). The warden herself has aptly summarized the difference in standards between either a motion for compassionate release or bail pending sentencing and a motion for habeas corpus alleging deliberate indifference: "[F]or either a motion for compassionate release or a motion for bail pending sentencing, the court's inquiry focuses on the defendant's individual circumstances, and not [as in a habeas petition for deliberate indifference claims] on the state of mind or actions of prison officials." Nor does the

warden suggest that the inmates could have raised their constitutional claims in their motions for compassionate release.  As noted by the court in *Martinez-Brooks v. Easter*, the question of whether constitutional violations can be raised in compassionate release hearings presents a novel question.  No. 20 Civ. 569 (MPS), --- F. Supp. 3d ----, 2020 WL 2405350, at *18 (D. Conn. May 12, 2020).  However, as the judge in Hatcher's criminal proceeding observed, an inmate's Eighth Amendment claims "would have to be presented in the procedural vehicle of a habeas petition under 2241 . . . and couldn't just be intuited from a compassionate release motion."  *United States v. Hatcher*, 18 Crim. 454–10 (KPF), Doc. 234 at 14:1–24 (S.D.N.Y. Apr. 16, 2020); *see also United States v. Haney*, No. 19 Crim. 541 (JSR), 2020 WL 1821988, at *8 (S.D.N.Y. Apr. 13, 2020) (declining to interpret compassionate release motion as a habeas petition because "the Court will not, and cannot, construe what is not a habeas petition as a habeas petition").  The warden does not argue to the contrary.[206]

### 2.  Comity

The warden also appeals to general "principles of comity," as a basis for dismissing the inmates' claims, urging the Court to exercise its "equitable restraint."  Doc. 47 at 18.  At the outset, the Court notes that the warden does not point the Court to any relevant doctrine of abstention or otherwise.  As the Supreme Court has cautioned, "[j]urisdiction existing, . . . a federal court's 'obligation' to hear and decide a case is 'virtually unflagging.'"  *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 77 (2013)

---

[206] This also distinguishes *Zambrana v. Califano*, 651 F.3d 842, 844 (2d Cir. 1981), on which the warden relies for support.  In *Zambrana*, Social Security applicants, whose claims had been remanded for further proceedings, sought to form a nationwide class for due process violations based on processing delays without first seeking relief from remanding courts.  The Second Circuit affirmed the district court's dismissal, finding in part that a remanding court "may adjust its relief to the exigencies of the case in accordance with the equitable principles governing judicial action."  *Id.* at 844 (internal quotation marks and citation omitted).  Because "there [was] a clear remedy available to plaintiffs . . . in the district courts that remanded their individual cases to SSA," the Second Circuit found that it would affirm on that ground alone, "rather than have the district judge supervise the prompt disposition of remands from scores of other judges."  *Id.* at 845.  Here, no such "clear remedy" — beyond habeas — is available to the inmates.

(quoting *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)).  More importantly, as the inmates aptly note, nothing in the petition asks the Court "to order the district judges in their criminal cases to grant them compassionate release, or anything else for that matter."  Doc. 57 at 15.

As to the sentenced petitioners, the warden cites to no authority that prevents the BOP from reviewing the inmates for furlough or home confinement, even if the sentencing judge has denied an application for compassionate release.  Indeed, several judges considering compassionate release applications have noted that the BOP's tools for de-densifying prisons in light of the pandemic are far more extensive than those of the judiciary.  *See, e.g.*, *United States v. Roberts*, 18 Crim. 528–5 (JMF), --- F. Supp. 3d ----, 2020 WL 1700032, at *3–4 (S.D.N.Y. Apr. 8, 2020) (discussing prisoner furloughs pursuant to 18 U.S.C. § 3622 and "recommending that BOP exercise its discretion to grant [an inmate] temporary release" (internal quotation marks and citation omitted)).  In this action, the inmates seek an order directing the BOP to make use of these tools.  There is nothing that prevents this Court, upon a finding of a constitutional violation, from doing so.

With regard to pretrial detainees, the warden does note that several circuits have held that a § 2241 petition cannot seek release of a pretrial detainee, "as the authority to order such release lies exclusively through the bail authority of the criminal court."  Doc. 43 at 18 (citing *Reese v. Warden*, 904 F.3d 244, 247 (3d Cir. 2018); *Medina v. Choate*, 875 F.3d 1025, 1029 (10th Cir. 2017); *Williams v. Hackman*, 364 F. App'x 268 (7th Cir. 2010).  However, even these cases — which are not binding on this Court — recognize that there are "exceptional circumstances" under which pretrial detainees may seek release through a § 2241 petition.  *See Reese*, 904 F.3d at 246; *Medina*, 875 F.3d at 1028. The inmates argue that such "exceptional circumstances" are present here, where, unlike in bail hearings, "inmates can gather evidence in support of their common allegations of systemic constitutional violations—violations that require urgent redress in order to

protect their health and safety." Doc. 57 at 16.  Though the warden takes issue with the inmates' reference to the opportunity for discovery, Doc. 73 at 11–12, she does not contest that the circumstances alleged may, indeed, be "exceptional."  Because the inmates may still well meet this standard, the Court declines to dismiss these claims on this basis at this stage of the litigation.

Moreover, to the extent any conflict remains, "to what extent any relief should be tailored to avoid conflict with orders of detention issued by other District Judges (*e.g.*, ordering transfer to a different facility instead of release on bail), are questions properly considered when considering the merits and tailoring relief on a complete factual record." *Baez v. Moniz*, No. 20 Civ. 10753 (LTS), --- F. Supp. 3d ----, 2020 WL 2527865, at *3 (D. Mass. May 18, 2020).  These "are not issues justifying dismissal." *Id.*  The Court therefore declines to partially dismiss the petition on these bases.

## V.    CONCLUSION

For the foregoing reasons, the Court DENIES the inmates' motion for a preliminary injunction and DENIES the warden's motion to partially dismiss.  The Court notes its receipt of the first two reports from the MCC's warden and looks to receiving additional reports every two weeks through the end of modified operations, as detailed in the warden's letter of May 29.  As suggested in the parties' letter of June 16, the parties are directed to appear at a status teleconference on July 17, 2020 at 10:15 a.m.  They may dial (877) 411–9748 and enter access code 302 9857# at that time.  The Clerk of Court is respectfully directed to terminate the motions, Docs. 46 and 50.

It is SO ORDERED.

Dated:    July 2, 2020
          New York, New York

EDGARDO RAMOS, U.S.D.J.