UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CESAR FERNANDEZ-RODRIGUEZ,
REDHWAN ALZANAM, ROBERT BARNES,
MICHAEL FALU, GREGORY FERRER, CHRIS
KARIMBUX, WILLIAM PASCAL, and JORGE
SOTO, individually and on behalf of all others
similarly situated,

                    Petitioners,


                    -v.-

MARTI LICON-VITALE, in her official capacity
as Warden of the Metropolitan Correctional Center,

                    Respondent.

No. 20 Civ. 3315 (ER)

**FIRST AMENDED[1] CLASS
ACTION PETITION SEEKING
WRITS OF HABEAS CORPUS**

---

Petitioners Cesar Fernandez-Rodriguez, Redhwan Alzanam, Robert Barnes, Michael Falu,

Gregory Ferrer, Chris Karimbux, William Pascal, and Jorge Soto (collectively, "Petitioners"), on

behalf of themselves and a class of similarly situated detained people in the custody of the

Metropolitan Correctional Center ("MCC"), by and through their attorneys, Covington & Burling

LLP, allege, based on personal knowledge as to themselves and their own circumstances and on

information and belief as to all other matters, as follows:

## PRELIMINARY STATEMENT

1.      An unprecedented public health crisis continues to unfold at the MCC, a result of

the jail's long delayed and consistently inadequate response to the COVID-19 pandemic.  To date,

at least 53 staff members and 80 inmates have tested positive for the virus.  In the early months of

---

[1] Attached as Exhibit A is the Court's signed order granting the Petitioners' request to file an
amended petition.

the crisis, COVID-19 spread through the MCC, an overcrowded jail serving an inmate population nearly 50 percent greater than the number of inmates it was designed to serve. Nine months later, the MCC still fails to take the steps it should to protect the health and safety of its population. The MCC's delayed response to the spread of COVID-19 within its walls has been a mixture of ineptitude and indifference that threatens the safety of inmates, staff, and the community at large.

2.      Despite knowing about the potential risks posed by the COVID-19 pandemic for months, the MCC, by its own admission, did almost nothing to prepare for it.  Among other failures to ready itself for the first wave of the pandemic, the MCC took virtually no steps to reduce overcrowding, did not develop a testing protocol or obtain test kits, had insufficient PPE on hand, and had no plan to isolate those suffering from COVID-19.  Some steps the MCC did take were as inexplicable as their numerous failures to act.  In particular, the MCC decided to house the MCC inmates most vulnerable to COVID-19 in the cramped open dormitories of 11 South, together with the "cadre" inmates who work throughout the facility.

3.      When, as was foreseeable, COVID-19 entered the facility in March, the MCC's response was as ill-conceived as it was inhumane. In dozens of instances, the MCC simply left symptomatic inmates in crowded open dormitories in which as many as two dozen men bunked closely together, sharing a single toilet and one or two sinks.  Unsurprisingly, the virus spread rapidly through at least one of the units that contain these open dormitories and from there, throughout the facility.  Other inmates with COVID-19 symptoms were confined to cells with concrete "beds" that were used to hold 9/11 terrorist defendants. Inmates suspected of infection often received, at best, only cursory medical attention.

4.      Even after witnessing the impact of overcrowding in the first outbreak, the MCC failed to reduce the extreme overcrowding of its facility—which operated at nearly 50 percent

more than capacity for months—in a manner reflecting the urgency of the pandemic, despite ample tools to do so. Despite multiple directives from U.S. Attorney General William Barr to reduce prison populations through the use of home confinement, and related BOP guidance to address overcrowding by evaluating inmates for transfer or furlough, the MCC reassigned the critical personnel responsible for handling such matters for nearly a month at the height of the initial outbreak.  The reassignment significantly delayed implementation of the Attorney General's guidance, and compassionate release requests piled up into a significant backlog.

5.      The true impact of that first wave is unknown because, in the early months of the crisis, the MCC tested only a tiny fraction of the inmate population, and failed to test many symptomatic inmates who were almost certainly suffering from the virus.  As of April 28, only *seven* tests had been conducted, representing just one percent of the inmate population at that time. Five of those seven tests—71 percent—came back positive, strong evidence that the virus had been spreading unmonitored and undetected throughout the jail.  Increased testing in the months following the start of this litigation revealed greater numbers of positive cases.

6.      By the end of the summer, a second wave had struck the facility with an  additional 31 inmates testing positive.  And, more recently, the MCC has experienced yet another wave of COVID-19 infections, with 38 additional inmates and six more staff members testing positive since mid-November. Many of the same failings that punctuated the MCC's initial mismanagement, which allowed the virus to spread through the facility in the first instance, continued during the more recent waves.

7.      Throughout the pandemic, the MCC has failed to trace and properly quarantine those who have had contact with infected inmates and staff, despite written guidance from the

Federal Bureau of Prisons' ("BOP") sister federal agency, the Centers for Disease Control and Prevention ("CDC"), that such measures are essential.

8.      The MCC's isolation practices have also fallen short of guidelines for correctional institutions and the standards set or agreed to by the MCC itself.  Inmates isolated due to positive COVID-19 tests have been returned to regular housing locations without a negative test, medical screening, or even the expiration of the 14-day quarantine period.  And the practice of isolating inmates in punitive housing, which the Respondent claimed to use only as a "last resort," continued through at least the late summer and has still not been repudiated.

9.      The MCC's medical screening used to identify potential COVID-19-positive inmates has oscillated between lackluster and non-existent.  Dozens of inmates have waited weeks and sometimes even months for responses to sick call requests or doctor-ordered medical tests, and in some cases have received no response at all.  The MCC itself has acknowledged this failing on multiple occasions.

10.     The MCC has also failed at times to take obvious, common-sense health and hygiene measures crucial to reducing the spread of the virus.  Soap has often been lacking, or has been obtainable only through purchase at the commissary.  Toilets, showers, phones, and computer keyboards have not consistently been sanitized between uses.  Inmates initially received only paper or thin cloth masks, when they received them at all, and were told to reuse them for a week or more.  MCC staff members have circulated from unit to unit, including between quarantined units with infected inmates and non-quarantined units, often without the proper personal protective equipment, which certain staff members fail to wear consistently or properly.

11.     Ultimately, the MCC's many failings have jeopardized the health and safety of the entire population under its care, including the inmates who the MCC determined are or were

especially vulnerable to COVID-19 based on CDC criteria.  This confined population is at a particularly high risk of contracting a disease which, even in the country's general population, has required the hospitalization of at least hundreds of thousands of people and resulted in the deaths of over 375,000 Americans.

12.     Judicial intervention is required to compel the MCC to improve conditions of incarceration and take other steps to comply with the requirements of the U.S. Constitution and lessen the risk of serious illness or the death of individuals in its care.  Inmates nearing the end of their sentences, and other inmates for whom release is reasonable under the extraordinary circumstances of the COVID-19 pandemic, should be released promptly to home confinement. Others should be transferred to alternate facilities where adequate preventive and treatment measures can be provided.  Improvements to the MCC's tracing, treatment, sanitation, isolation, and other health-related conditions of confinement must be put into effect for all who remain.

### THE PARTIES

13.     Each of the eight petitioners is in the custody of the BOP at the MCC.

14.     Petitioner Cesar Fernandez-Rodriguez is a 38-year-old man currently in pre-trial custody.  Mr. Fernandez-Rodriguez suffers from chronic asthma, among other conditions, that potentially put him at increased risk of severe illness or death from the virus that causes COVID-19.  During his incarceration, he and past cellmates, one of whom tested positive this summer, have suffered from COVID-19 symptoms.  In addition, at various points, Mr. Fernandez-Rodriguez has not received medical care, his asthma medication, or hygiene products (including soap and tissues).

15.     Petitioner Redhwan Alzanam is a 22-year-old man who has been sentenced and is scheduled to be released in 2021.  After Mr. Alzanam tested positive for COVID-19 in July 2020, he spent part of his isolation in Tier G of the punitive Special Housing Unit ("SHU"), which was

built to contain 9/11 terrorists.  Mr. Alzanam was ultimately released from isolation without a test confirming his negative status and without even undergoing a medical examination.

16.     Petitioner Robert Barnes is a 74-year-old man who has pleaded guilty and is awaiting sentencing.  Mr. Barnes suffers from numerous medical conditions, including coronary heart disease, high blood pressure, and deteriorated kidney function, which make him at increased risk for severe illness or death from the virus that causes COVID-19.

17.     Petitioner Michael Falu is a 33-year-old man who has been sentenced and is scheduled to be released in late 2022.  In April 2020, Mr. Falu experienced COVID-19 symptoms, including cold chills, sweats, headache, a pronounced cough, and loss of taste and smell.  Despite those symptoms, and requests for medical attention, Mr. Falu received only belated and perfunctory treatment and he was not tested at that time.

18.     Petitioner Gregory Ferrer is a 34-year-old man currently in pre-trial custody.  Mr. Ferrer suffers from asthma, which potentially places him at increased risk of severe illness or death from the virus that causes COVID-19.  Mr. Ferrer has been in quarantine since he arrived at the facility in October 2020.  Since his arrival, over ten inmates in his tier have tested positive for COVID-19.

19.     Petitioner Chris Karimbux is a 39-year-old man who has been sentenced and is scheduled for release on July 6, 2021.  In late March and early April of 2020, Mr. Karimbux experienced COVID-19 symptoms, including a fever as high as 105 degrees, body aches, labored breathing, and a loss of smell.  In July 2020, Mr. Karimbux tested positive for COVID-19.  Mr. Karimbux was not tested to confirm his negative status before being released from isolation.

20.     Petitioner William Pascal is a 46-year-old man who has been sentenced and is scheduled for release on April 17, 2021.  Mr. Pascal suffers from diabetes, asthma, and myoclonic

seizures, among other conditions, which put him at increased risk of severe illness or death from the virus that causes COVID-19. Mr. Pascal has been quarantined since his arrival at the MCC in mid-October. Several inmates in Mr. Pascal's tier have tested positive for COVID-19. Mr. Pascal has not received cleaning supplies or medical care, despite repeated requests.

21. Petitioner Jorge Soto is a 53-year old man who has pleaded guilty and is awaiting sentencing. Mr. Soto suffers from asthma and chronic obstructive pulmonary disease (COPD), which puts him at increased risk for severe illness or death from the virus that causes COVID-19, and has been hospitalized multiple times for shortness of breath. During his incarceration, both Mr. Soto and past cellmates have suffered from COVID-19 symptoms.

22. Respondent Marti Licon-Vitale is the Warden at the MCC and is being sued in her official capacity. As Warden, Respondent Licon-Vitale oversees all day-to-day activity at the MCC and is responsible for ensuring the health and safety of all in the institution, including providing adequate medical care to them. Respondent Licon-Vitale has failed to adopt and enforce policies, procedures, and practices that adequately protect the Petitioners and other inmates under her care from actual or potential infection, illness, and death due to COVID-19.

## JURISDICTION AND VENUE

23. Petitioners bring this action pursuant to 28 U.S.C. § 2241.

24. The Court has subject matter jurisdiction over this action pursuant to Article I, § 9, cl. 2 of the U.S. Constitution (Suspension Clause), the Fifth and the Eighth Amendments to the U.S. Constitution, 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 2241 (habeas corpus), and 28 U.S.C. § 1651 (All Writs Act). In addition, the Court has authority to grant injunctive relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201.

25.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to these claims occurred in this district.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

26.     Petitioners are excused from Section 2241's prudential exhaustion requirements. While a petitioner is generally required to exhaust all administrative remedies before bringing a habeas petition, the exhaustion requirement does not apply where available remedies provide no genuine opportunity for adequate relief or where the administrative remedies would be futile. Here, both exceptions are met because the BOP's Administrative Remedy Program does not provide for all measures of relief sought by Petitioners on behalf of themselves and other proposed Class members.

## STATEMENT OF FACTS

### I.     The COVID-19 Pandemic

27.     The novel coronavirus that causes COVID-19 has led to an ongoing global pandemic.  As of April 26, 2020, there were more than 2.9 million reported COVID-19 cases throughout the world, with more than 950,000 cases resulting in over 55,000 deaths in the United States.  By August 1, 2020, global cases had risen to more than 17.4 million, U.S. cases to over 4.6 million, and U.S. deaths to over 154,000.  As of January 11, 2021, global cases rose to more than 90.4 million, U.S. cases reached over 22.6 million, and U.S. deaths surpassed 375,000.

28.     In April 2020, New York City was at the epicenter of the COVID-19 pandemic.  As of April 26, 2020, there were more than 158,000 positive cases and more than 12,000 reported deaths from COVID-19 in New York City alone.  Recent data show the virus is now spreading in New York City again.  As of January 11, 2021, there had been almost 488,000 positive cases and over 25,000 confirmed deaths in New York City, while the percentage of positive tests hovers

around rates not seen since May.  While vaccines have begun to be distributed to essential workers, even under the most optimistic projections approved vaccines are months away from widespread distribution.  The BOP has stated that initial allotments of the vaccine will be reserved for staff. No timetable has been provided for vaccination of inmates. There remains no cure for COVID-19.

29.     Even when not fatal, the COVID-19 virus can cause severe damage to lung tissue, sometimes leading to a permanent loss of respiratory capacity, and can damage tissues in other vital organs, including the heart, liver, and kidneys.[2]

30.     Certain categories of people are more likely to face illness or death as a result of COVID-19.  This includes people over the age of 65 and people of any age who suffer from certain underlying medical conditions, including asthma, obesity, diabetes, lung disease, heart disease, chronic liver or kidney disease, and compromised immune systems (such as from cancer, HIV, or autoimmune disease).[3]  Treatment in these cases may require advanced medical support, including highly specialized equipment or treatments that are in limited supply, as well as care providers, respiratory therapists, and intensive care physicians.

31.     Even for individuals who are not medically vulnerable, COVID-19 presents a serious risk to their health and lives and can require advanced medical support that the MCC does

---

[2] Matt Stieb, *There's More Bad News on the Long-Term Effects of the Coronavirus*, N.Y. Mag. (Apr. 16, 2020), https://nymag.com/intelligencer/2020/04/more-bad-news-on-the-long-term-effects-of-the-coronavirus.html; *see also* Jennifer Couzin-Frankel, *From 'brain fod' to heart damage, COVID-19's lingering problems alarm scientists*, Science Mag. (July 31, 2020), https://www.sciencemag.org/news/2020/07/brain-fog-heart-damage-covid-19-s-lingering-problems-alarm-scientists.

[3] *People at Increased Risk: People with Certain Medical Conditions*, CDC (Dec. 29, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.

not provide.  For example, 22 percent of individuals requiring admission to a hospital intensive care unit due to COVID-19 do not have any underlying health conditions.[4]

32.     COVID-19 spreads from person to person through respiratory droplets, close personal contact, and from contact with contaminated surfaces and objects.  Social distancing, wearing a face mask, and vigilant hygiene, including frequent hand washing and sanitizing surfaces, are the only known effective measures for protection from COVID-19.  Widespread testing, contact tracing, and quarantining can reduce the spread of the virus.

## II.     COVID-19 Spreads Rapidly In Detention Facilities

33.     Individuals who are confined in prisons, jails, and other detention centers are generally unable to engage in the social distancing required to mitigate the risk of COVID-19 transmission.  Correctional facilities house large groups of people in close proximity, and move them in groups to eat, engage in recreation, receive medication, and shower.  Inmates share toilets, sinks, showers, telephones, and computer terminals, almost always without the ability to disinfect between each use.  A recent study by researchers at Stanford University found that because of these factors, among others, COVID-19 is spreading faster in U.S. jails and prisons than it did on the Princess Diamond cruise ship or at the pandemic's outbreak in Wuhan, China.[5]

34.     Epidemiological research shows that conditions of mass incarceration increase contagion rates of infectious disease, such as COVID-19, not only among inmates but also among

---

[4] *Preliminary Estimates of the Prevalence of Selected Underlying Health Conditions Among Patients with Coronavirus Disease 2019 — United States, February 12-March 28, 2020*, CDC (Apr. 3, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6913e2.htm.

[5] Edmund L. Andrews, *Stanford researchers find COVID-19 spreads faster in American jails than on cruise ships* (Sept. 24, 2020), https://news.stanford.edu/2020/09/24/covid-19-spread-american-prisons/.

correctional staff and the community at large.[6]  Transmission in prisons and jails endangers the broader community because correctional facilities are not closed systems—as staff enter and leave the facility each day, they can carry the virus with them and risk spreading the disease to everyone they encounter on the outside.  Like the inmates in the facilities where they work, correctional officers face an increased risk of COVID-19 exposure because they are less able to engage in social distancing.  Indeed, as of April 25, 2020, the BOP had reported confirmed positive COVID-19 tests for 441 staff.  By January 11, 2021, this number had ballooned to 5,530 federal inmates and 2,013 staff with confirmed positive tests, and an additional 36,602 inmates and 3,262 staff who had recovered from confirmed cases.[7]

     35.    Incarcerated people in New York City have tested positive for COVID-19 in large numbers.  For example, as of April 25, 2020, of the nearly 4,000 people incarcerated by the New York City Department of Correction ("NYDOC"), 377 had confirmed cases of COVID-19.  In addition, 956 NYDOC staff members had confirmed cases of COVID-19.[8]  As of January 1, 2021, there were still hundreds of *current* confirmed cases of COVID-19 in New York City's correctional facilities, and hundreds more correctional staff members who had tested positive in the intervening months.[9]

---

[6] Sandhya Kajeepeta & Seth J. Prins, *Why Coronavirus in Jails Should Concern All of Us*, THE APPEAL (Mar. 24, 2020), https://theappeal.org/coronavirus-jails-public-health/.

[7] *COVID-19 Cases*, BOP, https://www.bop.gov/coronavirus (January 11, 2021).

[8] *New York City Board of Correction Daily Covid-19 Update*, N.Y. Board of Corr. (Apr. 25, 2020), https://www1.nyc.gov/assets/boc/downloads/pdf/News/covid-19/Public_Reports/Board%20of%20Correction%20Daily%20Public%20Report_4_25_2020.pdf.

[9] *New York City Board of Correction Weekly COVID-19 Update, Week of December 26 - January 1, 2021*, N.Y. Board of Corr. (January 1, 2021), https://www1.nyc.gov/assets/boc/downloads/pdf/covid-19/BOC-Weekly-Report-12-26-20-01-01-21.pdf

III.     **Correctional Institutions Have Ample Tools To Protect Incarcerated Persons From Outbreaks Of COVID-19 Within Their Facilities**

36.     Incarcerated people must rely on detention facilities and the people who run them to minimize risks from this potentially fatal virus.  Those who operate these facilities thus are entrusted with a special responsibility and legal obligation to provide for the health, safety, and well-being of the detainees in their charge.

37.     There is established guidance on how correctional institutions should address and mitigate the risks of COVID-19.  By March 2020, the CDC had issued "Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities," which was last updated in December 2020.  This Guidance has emphasized the need for (a) enhanced cleaning and disinfecting practices of shared areas and equipment several times daily; (b) provision of free hygiene products such as soap and tissues, as well as alcohol-based hand sanitizer, if possible; (c) social distancing; (d) consistent use of personal protective equipment by staff and inmates; (e) creation and execution of a plan to ensure COVID-19 evaluation and testing; (f) medical isolation of confirmed and suspected cases; (g) identifying and quarantining of persons in contact with those confirmed and suspected cases; and (h) special protection for at-risk individuals.[10]

38.     A World Health Organization report on COVID-19 prevention in prisons and other places of detention recommended that "physical distancing should be observed"; "wall-mounted liquid soap dispensers, paper towels and foot-operated pedal bins should be made available";

_____

[10] *See Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities,* CDC, 2 (last updated Dec. 31, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

medical masks should be provided and not be reused; surfaces should be regularly disinfected; and appropriate action should be taken for confirmed cases, "including transfer to specialist facilities for respiratory isolation."[11]

39.     Correctional health experts have also recommended the release from custody of inmates most vulnerable to COVID-19.   Release protects the inmates with the greatest vulnerability to COVID-19 from transmission of the virus.   Reducing the inmate population also allows for greater risk mitigation for all people held or working in a prison, jail, or detention center.

40.     Both the U.S. Congress and the U.S. Department of Justice have recognized that release of vulnerable inmates and reduction of inmate populations is essential to protecting against COVID-19.   The Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") permits the Director of the BOP to increase the amount of time an inmate can serve a prison sentence through home confinement if the Attorney General finds that emergency conditions will materially affect the functioning of the BOP.   In an April 3, 2020 memorandum, Attorney General Barr made that finding and directed the BOP to "immediately review" for home confinement "all inmates who have COVID-19 risk factors, as established by the CDC."[12]   In a prior, March 26, 2020 memorandum, Attorney General Barr also directed the BOP to "prioritize the use of your various

---

[11] *Preparedness, Prevention, and Control of COVID-19 in Prisons and Other Places of Detention*, WHO    Regional    Office    for    Europe,    1,    9,    19-23    (Mar.    15,    2020), http://www.euro.who.int/__data/assets/pdf_file/0019/434026/Preparedness-prevention-and-control-of-COVID-19-in-prisons.pdf.

[12] Memorandum For Director of Bureau of Prisons re Increasing Use of Home Confinement at Institutions Most Affected by COVID-19, Office of the Attorney General, Washington, D.C. (Apr. 3, 2020), https://www.justice.gov/file/1266661/download.

statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing COVID-19 pandemic."[13]

41.     The BOP itself has emphasized the need for testing to combat the COVID-19 virus. On April 23, 2020, the BOP announced the importance of expanded testing *beyond* symptomatic inmates to identify asymptomatic inmates in order to control the spread of COVID-19.[14]

42.     Other state and federal correctional facilities have taken steps towards reducing inmate populations through release of vulnerable inmates and improving health and safety conditions for those incarcerated.  For example, on March 17, 2020, the New York City Board of Correction issued a statement calling on the City to release certain people from criminal custody, prioritizing people over 50, with underlying health conditions, detained for administrative reasons, and/or with sentences of one year or less.  In response, as of April 21, 2020, New York City had released over 1,500 inmates.  By September, the number of state and county prison inmates in New York state was roughly 37,000, the lowest level since 1986.[15]  Similarly, by late April 2020, Cook County Jail in Chicago had released 1,300 inmates, reducing its inmate population by almost 25 percent.  Additionally, according to the BOP, since Attorney General Barr's March 26, 2020 directive, approximately 8,000 inmates in the custody of the BOP have been placed in home confinement.  The BOP has twice emptied (for periods of over 30 days) the minimum security

---

[13] Memorandum For Director of Bureau of Prisons re Prioritization of Home Confinement As Appropriate in Response to COVID-19 Pandemic, Office of the Attorney General, Washington, D.C. (Mar. 26, 2020), https://www.bop.gov/coronavirus/docs/bop_memo_home_confinement.pdf.

[14] Kevin Johnson, *Federal Prison System Expands Virus Testing to Find Hidden Asymptomatic Infections*, USA TODAY (Apr. 23, 2020), https://www.usatoday.com/story/news/politics/2020/04/23/coronavirus-federal-prisons-expand-testing-asymptomatic-inmates/3015287001/.

[15] *NY Urged to Make Fixes To Avoid Another COVID Surge in Prisons and Jails*, NBC (Sept. 22, 2020), https://www.nbcnewyork.com/news/coronavirus/ny-urged-to-make-fixes-to-avoid-another-covid-surge-in-prisons-and-jails/2631126/.

facility at FCI Otisville, New York of *all* inmates through a combination of furlough, release to home confinement, or transfer to other facilities.

IV.    **The MCC Has Failed to Take Appropriate Measures to Protect Inmates from COVID-19**

43.    The MCC is a detention facility in lower Manhattan where a significant portion of the inmate population, most of whom are awaiting trial, is at high risk of contracting COVID-19. Designed for a maximum population of 474, the MCC has at times during the pandemic housed over 700 inmates, or nearly 50 percent more than its intended capacity, since the outbreak of the pandemic.  With 587 inmates as of January 11, 2021, the MCC is still operating at more than roughly 25 percent of its intended capacity. At one point, the MCC itself designated as many as 205 of its inmates, or 29 percent of the inmate population at the time, as particularly vulnerable to COVID-19 based on CDC criteria.

44.    The MCC has failed to adequately provide for the health and safety of its inmate population, even before the COVID-19 crisis.

45.    For example, on April 12, 2019, feces and urine flooded the women's unit at the MCC from pipes overhead, and toilets began to overflow into cells.  Women were locked in with raw sewage up to their ankles and feces in their hair.  Correctional officers present in the unit instructed the women to clean up the sewage themselves.  No effort was made to remove the women from the unit during the clean-up, to provide sufficient safety equipment, or to identify women for whom the raw sewage might pose an increased health concern.  Immediately before a scheduled inspection on May 23, 2019, women were made to clean the unit, with threats of punishment if they refused.  Women were told to scrub the unit with bleach to remove mold, sweep up rodent droppings and remove rat traps from sight, clean all the air vents, and remove all buckets that had been placed under leaks from the ceiling and light fixtures.

46.     The MCC has also struggled to protect even its highest profile inmates.  On August 10, 2019, inmate Jeffrey Epstein, who had been removed from suicide watch just two weeks before, was found dead in his cell.  In response, Attorney General Barr decried the MCC's "failure" to adequately secure its facility, stating there were "serious irregularities at this facility that are deeply concerning" and describing it as a "perfect storm of screw-ups."  The failure of the MCC was so serious that two correctional officers assigned to the MCC's SHU were indicted for their role in the affair, with Geoffrey Berman, the U.S. Attorney for the Southern District of New York, stating that the officers had failed in their "duty to ensure the safety and security of federal inmates in their care."

47.     Additionally, from February 27 to March 6, 2020, the MCC was on total lockdown, with no social or legal visitors permitted and all inmates locked in their cells, as staff searched for a loaded weapon that a correctional officer allegedly brought into the MCC.  During this time, as the spread of COVID-19 was making global headlines, staff were throwing away or withholding personal items, including prescription medications; inmates with acute medical conditions were being given little or no care; menstruating women were not being provided a change of underwear or any sanitary pads; and inmates were going without toilet paper for over a week while locked in two-person cells with open toilets.  Inmates remained locked in their cells until at least March 10, 2020, when the facility fully re-opened.

48.     These underlying and systemic institutional failings have been on full display during the spread of COVID-19 within the MCC.  As described in detail below, the MCC failed to promptly reduce the inmate population even when directed by the head of the Department of Justice to do so, and has failed to implement adequate health care measures to protect individuals at the facility from COVID-19.

A.      **Failure to Reduce Overcrowding Through Release or Transfer of Vulnerable Inmates**

49.      The MCC has failed to act quickly or robustly on existing statutory authority and the express direction of Attorney General Barr to release inmates who are particularly vulnerable to COVID-19.  The MCC is required, pursuant to Attorney General Barr's directives of March 26 and April 3, 2020, to immediately review all inmates with COVID-19 risk factors and authorize the release of inmates at any stage of their sentence if they are particularly medically vulnerable, pose a low security risk, and have a safe residence to be released to.

50.      Despite these directives, and the overcrowded conditions at the facility at the time, Petitioners are unaware of a single MCC inmate released under this authority for nearly a month following Attorney General Barr's *second* directive on the issue.  Indeed, as of May 1, 2020, the MCC had not even reviewed for home confinement eligibility the 20 sentenced inmates designated to the facility that it deemed at-risk to COVID-19.  Similarly, as of late April, only two of the 16 vulnerable individuals who were identified by the Federal Defenders to the MCC as eligible for home confinement under *pre-existing* statutory authority because they were nearing the end of their sentences, had been released due to MCC action.

51.      Instead of quickly implementing Attorney General Barr's directives in early April, when the virus was spreading throughout the packed facility, the MCC reassigned the personnel responsible for evaluating inmates for home confinement.  Predictably, a significant backlog resulted with respect to both evaluating inmates for home confinement and responding to compassionate release requests, which took weeks to resolve.

52.      The MCC has likewise not acted promptly to transfer inmates serving longer sentences to less crowded facilities capable of providing adequate medical care.  For example, former inmate Sharon Hatcher was in poor health and suffering from multiple conditions that put

her at high risk for COVID-19 complications, including a compromised immune system and chronic respiratory issues.  Although she was sentenced to 52 months' imprisonment on March 4, 2020, the MCC did not act to transfer her to a long-term correctional facility capable of meeting her medical needs.  Instead, she was transferred, along with all other female inmates, to the Metropolitan Detention Center (MDC) in Brooklyn in October.

53.     Finally, the MCC has failed to use its furlough authority to address COVID-19.  As of late May 2020, months after the onset of the crisis, relevant personnel at the MCC could not recall having considered even a single furlough request, despite the BOP's central office making clear that the COVID-19 pandemic was an urgent situation justifying the MCC's use of its emergency furlough authority.

### B.     Failure to Allow for Social Distancing

54.     For months after the onset of the COVID-19 pandemic, the MCC's failure to release or transfer inmates resulted in continued overcrowding.

55.     At a time when social distancing was imperative for public health (as it remains today), as many as 150 inmates were confined in dormitory style settings with about 26 people sharing a sleeping space where beds are spaced only 3 to 5 feet apart.  These inmates have shared toilets, sinks, and showers, without disinfection between each use.

56.     The remainder of inmates at the MCC, aside from a small number in solitary confinement in the SHU or in cells on the third floor, share small two-person cells originally designed for one person, with a shared open toilet and sink.  When they have been allowed out of their cells for brief periods to use the telephones, computers, and showers in groups, they have necessarily been in close proximity to each other and to unit staff (who come and go from the facility each day).

57.     These conditions have made it effectively impossible for inmates to maintain a six-foot distance from others.

58.     The MCC's failure to promptly address overcrowded conditions, especially in the open dormitories of 11 South, all but ensured that the virus would spread rapidly.  Predictably, it ultimately did, starting in 11 South and then proliferating throughout the facility.  Of the five inmates who had tested positive for COVID-19 at the MCC by April 28, 2020, three were housed in open dormitories and two were housed in shared cells while they were symptomatic.  Many more inmates from the jam-packed open dormitories of 11 South, who went untested and by-and-large untreated, experienced severe symptoms characteristic of COVID-19.

**C.     Failure to Maintain Hygiene**

59.     The MCC has not provided inmates with the basic necessities required to follow recommended hygiene practices designed to minimize the risk of contracting COVID-19.

60.     Since the beginning of the COVID-19 pandemic, many inmates have lacked regular access to soap and tissues, or have been charged for these medically necessary supplies through their commissary accounts.  This is despite CDC guidance that hygiene products, such as soap and tissues, should be provided to inmates free of charge.  Some inmates have been given paper or thin cloth masks and have been told to reuse them for extended periods. Hand sanitizer and gloves have not been available to inmates. According to some inmates, disinfectant continues to be in short supply and distributed sparingly.

61.     Toilets, sinks, showers, phones, and computer terminals have been and continue to be shared by many inmates, without consistent disinfection between each use.

62.     Cadre inmates (inmates who work throughout the building) have at various times continued to perform responsibilities, including cleaning the facility and preparing and serving food, even if they had COVID-19 symptoms.

63.     Even as COVID-19 spreads though the facility, inmates, rather than professional cleaners, have been and remain responsible for cleaning MCC facilities and often have not been given appropriate supplies.  Inmate orderlies have continued to clean the open dormitories and common areas, including infected quarantined units.  After cleaning these units, inmate orderlies have returned to their own housing tiers without first being provided a change of clothes or an opportunity to disinfect themselves.

64.     For some time after the onset of the pandemic, staff, some of whom worked with inmates in quarantine or medical isolation, were not provided sufficient, adequate masks, such as N-95 masks.  Still today, some staff members do not wear masks when moving throughout the facility, or wear them improperly, so they cover only their mouths.

**D.     Failure to Provide Adequate Screening, Testing, and Tracing**

65.     As of April 28, 2020, the MCC, a facility that then housed approximately 700 inmates, had tested only seven inmates for COVID-19, five of whom were positive.  This paltry number of tests almost certainly resulted in a dangerous undercount, leaving the MCC with no reliable indication of the actual prevalence of COVID-19 within the facility.

66.     Data from other correctional facilities further suggests that the MCC's testing for COVID-19 was shockingly inadequate and that its reported data on inmates with COVID-19 was significantly understated.  For example, as of April 28, 2020, the NYDOC and the privately-run Queens Detention Facility ("QDF") had tested far more inmates than the MCC, on both an absolute and percentage basis.  Unsurprisingly, this additional testing revealed that a significant number of

QDF and NYDOC inmates had COVID-19—38 out of about 222 at QDF, and 377 out of approximately 4,000 at NYDOC.[16]   There is no reason to believe that these facilities, which generally house and are staffed by individuals from the same geographic community as the MCC, would have had significantly different rates of COVID-19 infection than the MCC.

67.     In addition, the MCC reported seven staff with positive test results on April 3, 2020, 17 staff positives on April 14, and 33 staff positives on April 23.  This further suggests that as of April 28, 2020, the prevalence of COVID-19 among the MCC's inmate population was increasing in a similar fashion and was far larger than what the MCC had reported.

68.     As of April 23, 2020, one month after the MCC's first inmate tested positive for COVID-19, the MCC did not have *any* COVID-19 test kits available, making widespread testing an impossibility.  Six out of the seven tests conducted as of April 28, 2020, required transporting the inmate to a hospital.

69.     Predictably, as the MCC began to conduct increased testing over the summer, it discovered that more inmates were positive for COVID-19.  By August 31, 2020, 31 additional inmates had tested positive.  Recently, the MCC has experienced another wave of infections, with 38 inmates and six staff members testing positive since mid-November.

70.     Since the beginning of the COVID-19 pandemic, the MCC also has failed to adequately screen staff entering the facility on a daily basis.  While staff have been checked for elevated temperatures, they have not been asked if they have come into contact with a person who has tested positive for COVID-19 within the last 14 days.  Staff who are exposed to inmates or

---

[16] Letter from QDF Facility Administrator William Zerillo to Chief Judge Roslynn R. Mauskopf (Apr. 23, 2020), https://www.nyed.uscourts.gov/pub/bop/QDF_20200423_043331.pdf; *Board of Correction Daily Covid-19 Update*, N.Y. Dep't. of Corr. (Apr. 25, 2020), https://www1.nyc.gov/assets/boc/downloads/pdf/News/covid-19/Public_Reports/Board%20of%20Correction%20Daily%20Public%20Report_4_25_2020.pdf.

other staff who have tested positive for COVID-19 have been asked to return to work at the facility after only 48 hours.

71.    The MCC staff themselves recognized these dangers, joining an OSHA complaint alleging "imminent danger" to the staff based on, among other things, the requirement that staff report to work 48 hours following probable COVID-19 exposure and the failure to provide N-95 masks to the staff.

72.    In addition, the MCC has failed to adequately screen inmates for COVID-19.  The MCC has acknowledged that at the outset of the pandemic, its COVID-19 screenings for inmates were insufficient, as they consisted only of temperature checks and failed to include symptom screening.  This deficiency continues, as inmates, including several Petitioners, report that they are not questioned about COVID-19 symptoms during screenings—if screenings occur at all. Inmates report going weeks, or even months, without a temperature check or screening, and that they have not received screenings at the frequency required by MCC policies—twice a day for isolated inmates and once a day for quarantined inmates.

73.    The MCC has not conducted systematic contact tracing of staff members or inmates who have tested positive for COVID-19 to identify and isolate inmates with whom they have come into contact.  At present, contact tracing after an inmate tests positive seems to consist only of sending all MCC staff a memorandum advising them of the positive test and posting this memorandum on an internal electronic system to which all inmates have access.  The MCC does not alert inmates when staff members test positive.

74.    The MCC's response to inmates seeking medical care has remained inadequate since the outset of the COVID-19 pandemic.  On August 5, 2020, the MCC itself acknowledged that inmates' electronic requests for medical care were not diligently reviewed by medical staff.

22

This resulted in inmates, including those reporting symptoms consistent with COVID-19, going weeks or even months without receiving medical care in response to a sick call request. This remains the case today, as inmates, including some Petitioners, report months-long waits for responses to sick call requests or doctor-ordered medical tests.

### E.    Failure to Adequately Isolate and Treat Those Suffering from COVID-19

75.    As of April 28, 2020, the MCC had identified 205 inmates as particularly vulnerable to COVID-19 based on CDC criteria, but had not adequately provided for their medical needs. The MCC reported on March 20, 2020 that it was keeping many of these at-risk inmates in open dormitory units, comprised of a number of dormitories where 26 inmates sleep in one room in densely packed bunk beds and share a single toilet and one or two sinks. In September 2020, the Respondent admitted that, although the BOP provides it with a list of potentially vulnerable inmates, the MCC refuses to rely on that list to aid its response to COVID-19, including with regard to these inmates' housing, medical treatment, or evaluation for potential release.

76.    The MCC's first COVID-19 positive inmate, whose test result was reported by the MCC on March 23, 2020, was being housed on 11 South, an open dormitory unit for individuals vulnerable to COVID-19. Further, this inmate was a member of the cadre and therefore moved throughout the building, with exposure to many other inmates, prior to testing positive.

77.    Rather than adopting an isolation or social distancing protocol for the unit, the MCC placed the entire unit in "quarantine," thereby keeping inmates from leaving the unit but offering no protection from the spread of COVID-19 within the group or to the staff working on that unit. The MCC failed to sanitize the unit after the inmate tested positive, and instead gave the inmates cleaning supplies—but not masks—to clean the unit themselves.

78.     During this quarantine, many inmates in 11 South had COVID-19 symptoms, including coughing, fever, chills, body aches, and loss of sense of taste and smell.   Medical treatment primarily consisted of temperature checks and Tylenol.   For the vast majority of these individuals, COVID-19 tests were not administered.

79.     James Woodson was an inmate in 11 South.   In March 2020, an inmate in his dormitory developed COVID-19 symptoms, including a high fever, vomiting, and sweating. Despite inmates alerting the staff, this individual was not removed until the next morning, and subsequently tested positive for COVID-19.   At least two other individuals were subsequently removed from Mr. Woodson's dormitory and placed into medical isolation.   The unit was not sanitized after these inmates became sick.

80.     As inmates in 11 South and throughout the MCC experienced symptoms associated with COVID-19 in March and April 2020, the MCC implemented a flawed testing and isolation protocol.   As of April 28, 2020, staff removed only those individuals who had an elevated temperature from their open dormitories and shared cells.   However, as health experts had noted at the time, temperature checks are insufficient for identifying people who are suffering from COVID-19.   In one unit, rather than adopting appropriate testing, tracing, and isolation practices, correctional staff covered certain tiers of cells housing a number of symptomatic inmates with plastic.

81.     Petitioner Fernandez-Rodriguez, who was housed on the seventh floor, shared his cell with another inmate and did not receive a COVID-19 test in April, despite having a fever and a cough.   Mr. Fernandez-Rodriguez did not receive any medical care (aside from temperature checks) or his prescribed asthma medication at that time.

24

82.     In some cases, the MCC's failure to provide proper medical care has also harmed the treatment of inmates' underlying health conditions.  For example, in March and April 2020, James Woodson's asthma was not adequately treated by the rescue inhalers he was provided by the MCC.  After he suffered a serious asthma attack and endured persistent breathing difficulties, Mr. Woodson repeatedly reported his condition to the staff.  The staff's only response was that Mr. Woodson should place a sick call; however, despite numerous sick call requests, he was not seen by a doctor.  Instead, the staff continued to give him rescue inhalers that were insufficient to manage his condition.

83.     In addition to failing to adequately identify symptomatic inmates, the MCC has failed to provide adequate medical resources to care for them.  Inmates who do contract COVID-19 thus are at higher risk of serious illness or death than if they were in the community.

84.     Unlike many other federal prisons and Rikers Island, the MCC has no separate medical unit or facility for inmates.  Instead, some individuals who develop high fevers, and those who are in such distress that they must be taken to the hospital, where they test positive for COVID-19, have been placed in solitary confinement and have received, at most, limited medical treatment.  Those inmates that are symptomatic but do not develop high fevers have been left in their units, with little or no medical care.

85.     Medically-isolated inmates have been placed in solitary confinement in cells on the third floor or in the SHU, including in Tier G, which previously housed defendants charged with participating in the 9/11 terrorist attacks.  Each of the cells in this tier has a single concrete "bed," an open toilet, and a sink.  Despite being months into the COVID-19 crisis, the MCC continues to place symptomatic or positive inmates such as Petitioner Redhwan Alzanam into the SHU, including Tier G.

86.     Others, like Rober Galvez-Chimbo, have been placed in "isolation" with a cellmate. Despite repeated requests for medical attention, it took two weeks for Mr. Galvez-Chimbo to be seen by a doctor after he began experiencing symptoms of fever, loss of sense of smell and taste, severe coughing, loss of appetite, body aches, and chills.  His cellmate was also experiencing similar symptoms.  On or about April 8, 2020, Mr. Galvez-Chimbo and his cellmate were moved to medical isolation on the third floor, where they continued to share a cell.  Mr. Galvez-Chimbo received antibiotics (which do not treat this viral disease) and Tylenol, and was never tested for COVID-19.  Mr. Galvez-Chimbo and his cellmate were subsequently released back to the general population on 7 North.

87.     The MCC's grossly inadequate treatment of its inmate population exacerbates the spread of COVID-19 at the MCC both because it impedes recovery and because it makes symptomatic individuals reluctant to speak up.  By placing inmates in need of medical isolation in units normally designed for punishment, the MCC has disincentivized inmates from reporting symptoms, because such reporting could result in placement in solitary confinement with even less access to staff and limited ability to call their families or lawyers.

88.     The MCC has been unable to provide the level of medical care that people who contract COVID-19 often require.  As of April 28, 2020, only two doctors were available at the MCC to care for its approximately 700 inmates.  Treatment provided by the MCC to symptomatic and COVID-19 positive individuals has generally been limited to twice-daily temperature readings and Tylenol.  In certain cases, the MCC has also failed to provide vulnerable inmates with necessary prescription medications.

89.     The MCC's isolation practices have continued to be grossly inadequate.  These deficiencies include, but are not limited to, the following failures:  (i) inmates have been removed

from isolation before the time required by the CDC as well as BOP and MCC policy; (ii) despite acquiring the capability to perform rapid tests, the MCC has failed to consistently test inmates before their release from isolation; (iii) instead of the regular and substantive symptom checks required by CDC, MCC, and BOP policy, isolated inmates have received only cursory and sporadic evaluations; and (iv) correctional officers have regularly traveled between isolation/quarantine units and other units, defeating the core purpose of quarantine and isolation, a failure that is exacerbated by the correctional staff's inconsistent use of PPE.

## V.   The MCC's Failure To Respond To The COVID-19 Pandemic Occurred Despite Ample Warning and Opportunity to Mitigate

90.     As early as March 4, 2020, the Federal Defenders attempted to address, with Respondent and other MCC staff, the serious health risks posed by COVID-19 to individuals confined in the facility.  At that time, the MCC had not yet prepared any COVID-19 response plan.

91.     In the following days, the Federal Defenders continued to communicate to the MCC the importance of procedures to curb the spread of COVID-19, including implementing screening and testing protocols, ensuring thorough sanitization of the facility, providing all staff and inmates with 24-hour access to hot water and soap, and developing a plan for isolation and medical care for medically vulnerable inmates as well as any individuals displaying COVID-19 symptoms.

92.     On March 12, 2020, Respondent stated that the MCC did not anticipate having a COVID-19 testing protocol, that the facility was housing medically at-risk inmates together in open dormitory units, that it did not know how many at-risk inmates it had, and that it did not know where within the facility it would be able to isolate symptomatic or COVID-19 positive inmates.

93.     On March 20, 2020, the Second Circuit Court of Appeals acknowledged the "grave and enduring" risk posed by COVID-19 in the correctional context. *Fed. Defs. of New York Inc.*

*v. Fed. Bureau of Prisons*, 954 F.3d 118, 135 (2d Cir. 2020).  As of that same date, the MCC still had not determined how many at-risk inmates it had, had not procured tests for COVID-19, had only 30 N95 and 100 surgical masks for all staff and over 700 inmates, had no alcohol-based sanitizer, and had conducted doctors' visits to each unit only once a week.

94.     As of April 24, 2020, the week before the original petition was filed in this case, the MCC had still not procured tests for COVID-19; had not consistently provided inmates with basic necessities, such as soap, gloves, and masks; had not undertaken contact tracing of staff and inmates who have tested positive; and had not addressed its serious shortage of medical staff and equipment necessary to prevent or address a more serious COVID-19 outbreak.

## VI.     The MCC Continued To Mishandle Its COVID-19 Response Even After This Action Was Filed

95.     Throughout the pendency of this litigation, the MCC has not adequately implemented many basic health and safety measures.

96.     Even after the original petition was filed on April 28, 2020, the MCC failed to act promptly to remedy its grossly inadequate initial response to the pandemic.  Despite claims that it had corrected its past failings, the MCC instead continued to fall short in myriad ways.  For example, the MCC still lacked a functioning sick-call system.  Similarly, even after the MCC received the ability to perform rapid tests in the late spring, it was slow to implement any systematic testing protocol or to ramp up testing rapidly.  The MCC also continued to perform irregular and superficial symptom screening, and seemingly failed to conduct any contact tracing at all, problems that still seem to exist.  In addition, the MCC neglected to isolate obviously symptomatic inmates and failed to distribute adequate supplies of soap and PPE.

97.     The MCC continued to mishandle its COVID-19 response throughout the summer as a second wave of infections roiled the facility.  Over the summer, the number of positive inmates

within the facility increased by over 600 percent—from five to 36.  During this time, responses to sick calls continued to be inexcusably slow, with the Respondent herself admitting that "electronic cop outs have not been diligently reviewed."  Likewise, inmates reported numerous issues, including: (1) the MCC's failure to comply with its own isolation and quarantine policies, including isolated inmates being returned to general housing without negative tests, medical exams, or even the expiration of a 14-day quarantine period; (2) inmates continued to be isolated in punitive housing, *i.e.*, the SHU; and (3) temperature and symptom checks were intermittent and superficial, when conducted at all, even for inmates in isolation or quarantined units.

98.     Evidence of the continued mismanagement of the COVID-19 pandemic remains evident today.  Over the past months, the MCC has benefitted from a barrage of warnings—from scientists, the media, and the government—that infections of COVID-19 would surge as winter began.  Notwithstanding these clear calls to action, the MCC was caught flat-footed and unprepared, yet again.  Despite the recent surge in transmission within the facility—38 inmates and six staff members have tested positive since mid-November—inmates continue to report inexcusable failings at the MCC.  For example, MCC staff still do not consistently wear their PPE even as they move between quarantined and non-quarantined units, symptom and temperature screenings remain sporadic, and common areas—including telephones and computers—are still not uniformly sanitized between uses.

## HABEAS AND CLASS ACTION ALLEGATIONS

99.     Section 2241 authorizes courts to grant habeas corpus relief where, *inter alia*, a person "is in custody in violation of the Constitution … of the United States," 28 U.S.C. § 2241(c)(3), including due to the conditions of confinement.

100.     Actions under Section 2241 may include a "multi-party proceeding similar to the class action authorized by the Rules of Civil Procedure."  *United States ex rel. Sero v. Preiser*, 506

F.2d 1115, 1125 (2d Cir. 1974).  Petitioners accordingly bring this action on behalf of a proposed class of all current and future detainees in custody at the MCC during the course of the COVID-19 pandemic (the "Class").  (Petitioners reserve the right to amend the Class definition or establish sub-classes if further investigation or information reveals the Class should be expanded or otherwise modified.)

101.   <u>Numerosity</u>:   The proposed Class includes approximately 587 people and is therefore so numerous that joinder of all proposed Class members is impracticable.  Further, absent class certification, the proposed Class members would face a series of unreasonable barriers in accessing the relief sought, as they have limited ability to obtain legal representation and pursue litigation, a large portion of the proposed Class has limited educational backgrounds, and a significant percentage of the proposed Class suffers from physical or mental impairments.

102.   <u>Commonality</u>:  Common questions of law and fact exist as to all proposed Class members and predominate over questions that affect only the individual members.  These common questions of fact and law include, but are not limited to: (1) whether Respondent's policies, procedures and practices prior to and during the COVID-19 crisis exposed members of the proposed Class to a substantial risk of serious harm; (2) whether the Respondent knew of and disregarded a substantial risk of serious harm to the safety and health of the proposed Class; (3) whether the Respondent acted with deliberate indifference to members of the proposed Class with respect to their constitutional right to adequate medical care; (4) whether the conditions of confinement described in this Petition amount to violations of the Fifth and Eighth Amendments to the U.S. Constitution; and (5) what relief should be awarded to redress all such violations.

103.   <u>Typicality</u>:  Petitioners' claims are typical of those of the proposed Class as a whole, because each Petitioner is currently in Respondent's custody and Petitioners' claims arise from the

same policies, procedures, conditions, and practices (or lack thereof) that provide the basis for all proposed Class members' claims.

104.   Adequacy:   Petitioners will fairly and adequately protect the interests of the proposed Class.  The interests of the proposed Class representatives are consistent with those of the proposed Class members.  In addition, counsel for Petitioners are experienced in class action and civil rights litigation.  Further, counsel for Petitioners know of no conflicts of interest among the proposed Class members, or between the attorneys and the proposed Class members, that would affect this litigation.

**CAUSES OF ACTION**

**FIRST CLAIM FOR RELIEF**
(FIFTH AMENDMENT DUE PROCESS)

105.   Petitioners incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

106.   The Fifth Amendment to the U.S. Constitution guarantees pretrial detainees the right to be free from conditions of confinement that pose an excessive risk to their health or safety.

107.   Respondent has subjected Petitioners and Class members to conditions of confinement that pose an excessive risk to their health and safety.

108.   Respondent has acted with deliberate indifference to the Fifth Amendment right of Petitioners and Class members to be free from conditions of confinement that pose an excessive risk to their health and safety, by recklessly failing to act with reasonable care to mitigate the risk of COVID-19 to Petitioners and Class members even though Respondent knew or should have known about the risks of COVID-19 to them.

109.   Respondent has subjected Petitioners and Class members to conditions of confinement that increase their risk of contracting COVID-19, even though Respondent knew or

should have known that the conditions at the MCC exposed Petitioners and Class members to a substantial and unreasonable risk of illness and death.

110.    As a result of Respondent's unconstitutional actions and inaction, Petitioners and Class members are suffering, and will (unless remedied) continue to suffer, irreparable injury.

**SECOND CLAIM FOR RELIEF**
(EIGHTH AMENDMENT CRUEL AND UNUSUAL PUNISHMENT)

111.    The Eighth Amendment to the U.S. Constitution protects convicted persons from the infliction of cruel and unusual punishment.

112.    Society does not tolerate the risk of exposure to COVID-19 to which Respondent's policies, procedures, and practices (or lack thereof) have subjected Petitioners and the proposed Class members.  It violates contemporary standards of decency to expose them unwillingly to this risk.

113.    Respondent knows that Petitioners and Class members suffer a substantial and unreasonable risk of serious harm to their health and safety due to the presence of, and spread of, COVID-19 within the MCC.

114.    Respondent has acted with deliberate indifference towards Petitioners and Class members by knowingly subjecting them to conditions of confinement that increase their risk of contracting COVID-19, a disease for which there is no known vaccine or cure.

115.    Respondent's detention of Petitioners and Class members in the above-described conditions of confinement has failed to protect them adequately from the risks of contracting COVID-19.

116.    As a result of Respondent's unconstitutional actions and inaction, Petitioners and Class members are suffering, and will (unless remedied) continue to suffer, irreparable injury.

## PRAYER FOR RELIEF

**WHEREFORE,** Petitioners seek orders:

(i)    granting the Amended Petition;

(ii)    certifying the Class;

(iii)    granting a permanent injunction directing Respondent to take all appropriate actions in order to ensure the health and safety of Petitioners and Class members with respect to COVID-19, including but not limited to:

   a. increased inmate health monitoring and implementation of contact tracing;

   b. medically appropriate quarantine, isolation, and treatment measures for those suffering from, who have tested positive for, who are experiencing one or more symptoms consistent with, who are presumptively positive for, or who have come into contact with an individual determined to have, COVID-19;

   c. improved cleaning of the facility, by professional cleaners on a regular basis, and distribution (free of charge) of basic hygiene necessities to all inmates;

   d. release from MCC confinement, with such conditions as may be appropriate, of Petitioners and Class members (i) who are eligible for release pursuant to the BOP's statutory authority or directives issued by Attorney General Barr; or (ii) for whom release (either temporary or permanent) is otherwise reasonable under the extraordinary circumstances of the COVID-19 pandemic; and

   e. for those inmates who cannot be released under (d) above and who are vulnerable to COVID-19 based on CDC criteria, prompt transfer from the MCC to another BOP facility where appropriate preventive measures may be taken and adequate health care can be provided, until such time as the MCC can improve conditions sufficiently to take such measures and provide such care itself;

(iv)    appointing an independent monitor to oversee Respondent's compliance
with this Court's orders; and

(v)    granting such other and further relief as this Court may deem just and
proper.

Dated: January 13, 2021
      New York, New York

COVINGTON & BURLING LLP

By: _s/Arlo Devlin-Brown_
    Arlo Devlin-Brown

Arlo Devlin-Brown
Andrew A. Ruffino
Alan Vinegrad
Timothy C. Sprague
Ishita Kala
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018
T: (212) 841-1000
E: adevlin-brown@cov.com
    aruffino@cov.com
    avinegrad@cov.com
    tsprague@cov.com
    ikala@cov.com

*Attorneys for Petitioners*